# No. 25-2150

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

SOUNDEXCHANGE, INC.,

*Plaintiff-Appellant*,

v.

SIRIUS XM RADIO, INC.,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court
for the Southern District of New York
No. 1:24-cv-5491 (Hon. Naomi Reice Buchwald)

_____

**BRIEF FOR PLAINTIFF-APPELLANT SOUNDEXCHANGE, INC.**

_____

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KEVIN WYNOSKY
CAMILO GARCIA*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiff-Appellant
SoundExchange, Inc.*

December 10, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), SoundExchange, Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES............................................................................ iv

INTRODUCTION ......................................................................................... 1

JURISDICTION............................................................................................ 5

QUESTION PRESENTED ............................................................................. 5

STATEMENT OF THE CASE......................................................................... 5

    A.    Statutory and Regulatory Background ................................... 5

    B.    Factual and Procedural Background ..................................... 15

    C.    The District Court Decision ................................................. 17

SUMMARY OF ARGUMENT........................................................................ 22

STANDARD OF REVIEW ........................................................................... 25

ARGUMENT .............................................................................................. 25

I.    SoundExchange Can Enforce §114 By Bringing Lawsuits Against Parties Who Fail To Comply With The Obligations It Creates ................... 25

    A.    Section 114 Unambiguously Evinces Congress' Intent That SoundExchange May Enforce Licensing Rights Via Litigation ........................................................................... 27

        1.    The statutory text confirms that SoundExchange may enforce rights by bringing lawsuits........................................... 27

        2.    Statutory context reinforces that conclusion............................ 32

    B.    The District Court's Contrary Conclusion Rests on Reasoning That Cannot Withstand Scrutiny ...................................... 39

II.    SoundExchange Could Sue Statutory Licensees On Behalf Of §114 Rightsholders Even If §114 Did Not Supply A Cause Of Action To Do So ................................................................................... 51

CONCLUSION ....................................................................................................... 54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval*,
    532 U.S. 275 (2001).................................................................. 35, 40, 41

*Beck v. Manhattan Coll.*,
    136 F.4th 19 (2d Cir. 2025)...................................................25

*Burgess v. United States*,
    553 U.S. 124 (2008).................................................................29

*Campos-Chavez v. Garland*,
    602 U.S. 447 (2024).................................................................27

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001).................................................................30

*Deckert v. Indep. Shares Corp.*,
    311 U.S. 282 (1940).................................................................28

*Dodd v. United States*,
    545 U.S. 353 (2005).................................................................44

*Garland v. Cargill*,
    602 U.S. 406 (2024).................................................................36

*Gazzola v. Hochul*,
    88 F.4th 186 (2d Cir. 2023)...................................................53

*Haaland v. Brackeen*,
    599 U.S. 255 (2023).................................................................44

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017)...................................................................44

*Holder v. Hall*,
    512 U.S. 874 (1994).................................................................38

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    697 F.3d 154 (2d Cir. 2012)...................................................45

*Krasner v. Cedar Realty Trust, Inc.*,
    86 F.4th 522 (2d Cir. 2023) ............................................................... 32

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ........................................................................... 22

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ............................................................................. 5

*N.Y. Citizens' Coal. for Child. v. Poole*,
    922 F.3d 69 (2d Cir. 2019) ................................................................ 52

*Oxford Univ. Bank v. Lansuppe Feeder LLC*,
    933 F.3d 99 (2d Cir. 2019) ........................................................ *passim*

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ...................................................................... 29, 43

*SoundExchange, Inc. v. Copyright Royalty Bd.*,
    904 F.3d 41 (D.C. Cir. 2018) .............................................................. 8

*SoundExchange, Inc. v. MUZAK LLC*,
    854 F.3d 713 (D.C. Cir. 2017) .......................................................... 37

*SoundExchange, Inc. v. Muzak, LLC*,
    322 F. Supp. 3d 72 (D.D.C. 2018) .................................................... 12

*SoundExchange, Inc. v. Sirius XM Radio Inc.*,
    65 F. Supp. 3d 150 (D.D.C. 2014) .................................................... 12

*T-Mobile S., LLC v. City of Roswell*,
    574 U.S. 293 (2015) ........................................................................... 29

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979) ........................................................................... 35

*Transamerica Mortgage Advisors v. Lewis*,
    444 U.S. 11 (1979) ............................................................................. 35

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975) .................................................................... 5, 6, 33

v

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960) ..................................................................30

*Wojchowski v. Daines*,
  498 F.3d 99 (2d Cir. 2007) .......................................................30

*WTGD 105.1 FM v. SoundExchange, Inc.*,
  2014 WL 12819789 (W.D. Va. Sept. 12, 2014) ......................12

**Constitutional Provision**

U.S. Const. art. I, §8 cl.8 ............................................................. 6

**Statutes**

17 U.S.C. §101 ..................................................................... 30, 43

17 U.S.C. §104A(c) ....................................................................29

17 U.S.C. §104A(d) ...................................................................29

17 U.S.C. §106(1)-(3) ..................................................................6

17 U.S.C. §106(6) ........................................................................8

17 U.S.C. §114 .............................................................................1

17 U.S.C. §114(d)(1) ....................................................................8

17 U.S.C. §114(d)(2) ............................................................. 8, 21

17 U.S.C. §114(f)(1) .................................................................7, 8

17 U.S.C. §114(g)(1)-(2) ................................................. 21, 34, 47

17 U.S.C. §114(g)(2) ............................................................. 2, 12

17 U.S.C. §114(g)(3) ........................................................... *passim*

17 U.S.C. §115(d)(3) ............................................................ 14, 49

17 U.S.C. §115(d)(6) ............................................................ 14, 48

17 U.S.C. §115(d)(7) ..................................................................14

17 U.S.C. §115(e)(6) ...........................................................................15

17 U.S.C. §501(f)(2) ...........................................................................29

17 U.S.C. §603(b)(1) ...........................................................................29

17 U.S.C. §801(b)(1) .............................................................................6

17 U.S.C. §910 ...................................................................................29

17 U.S.C. §1201(a)(1) ......................................................................... 29

Pub. L. No. 104-39, 109 Stat. 336 (1995) .................................... 8, 32

Pub. L. No. 107-321, 116 Stat. 2780 (2002) .......................... 9, 10, 31

Pub. L. No. 115-264, 132 Stat. 3676 (2018) .............................. 13, 38

**Regulations**

37 C.F.R. §380.6(g) .............................................................................16

37 C.F.R. §382.1 .................................................................................17

37 C.F.R. §382.7 ............................................................................ 9, 17

37 C.F.R. §382.21(a) ...........................................................................16

37 C.F.R. §382.22 ...............................................................................16

37 C.F.R. §384.4(b) .............................................................................11

63 Fed. Reg. 34,289 (June 24, 1998) ............................................ 9, 32

67 Fed. Reg. 45,240 (July 8, 2002) .......................................... 9, 12, 32

82 Fed. Reg. 56,725 (Nov. 30, 2017) ..................................................41

83 Fed. Reg. 65,210 (Dec. 19, 2018) ...................................... 15, 16, 36

**Other Authorities**

Howard B. Abrams & Tyler T. Ochoa, *The Law of Copyright*
(Oct. 2025) .............................................................................................7

Black's Law Dictionary (7th ed. 1999)............................................ 28, 44

*CARP Structure and Process: Hearing Before the Subcomm. on
Courts, the Internet & Intellectual Prop. Of the H. Comm. on the
Judiciary*, 107th Cong. (2002), https://perma.cc/B9WT-CW3M ......................31

CMRRA, *About Us* (2025), https://perma.cc/37EE-C5AR ...................................12

148 Cong. Rec. S11548 (daily ed. Nov. 19, 2002),
*available at* 2002 WL 31600131 .................................................. 10, 45

Merriam-Webster's Collegiate Dictionary (10th ed. 2000) ................................... 28

*Moore's Federal Practice* (3d ed. 2008) .................................................... 53

Jacob Noti-Victor, *Copyright's Law of Dissemination*,
44 Cardozo L. Rev. 1769 (2023).........................................................8

Order, *SoundExchange, Inc. v. Muzak, LLC*, No. 16-7041
(D.C. Cir. Nov. 16, 2016)...............................................................37

Press Release, SoundExchange, *SoundExchange Partners With Music
Story to Improve Creator Metadata and Ensure Accurate Royalty
Payments* (Apr. 18, 2023), https://perma.cc/8T2J-GN7J...................................11

Press Release, SoundExchange, *SoundExchange Surpasses $12
Billion Cumulative Distribution Milestone* (Feb. 24, 2025),
https://perma.cc/6ELG-WP8Y...........................................................52

Press Release, SoundExchange, *SoundExchange Unveils Upgraded
Data Exchange System for Record Labels and Music Publishers*
(Mar. 17, 2021), https://perma.cc/2DFY-7C49.................................................. 12

Random House Dictionary of the English Language (2d ed. 1987).......................... 28

S. Rep. No. 115-339 (2018) .................................................... 13, 38, 49

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) .......................... 28, 35, 36

N. Singer & J. Singer, Sutherland on Statutory Construction
(7th ed. 2007) ................................................................................. 29

SoundExchange, *Annual Report* (2024), https://perma.cc/ZBG2-6JDV ................11

Kaitlyn Tiffany, *A History of Taylor Swift's Odd, Conflicting Stances
on Streaming Services*, Verge (June 9, 2017),
https://perma.cc/PZG5-4SBG ........................................................ 7

U.S. Copyright Off., *Copyright and the Music Marketplace*
(Feb. 2015), https://perma.cc/B2UR-QCUS ............................. 13, 38

Jacob Victor, *Reconceptualizing Compulsory Copyright Licenses*,
72 Stan. L. Rev. 915 (2020) ............................................................7

Webster's New World Dictionary (4th ed. 2003) ......................................28

**INTRODUCTION**

In the 1990s, Congress amended the Copyright Act to strengthen protections for artists and copyright owners while encouraging the growth of digital music services. It extended copyright protections to digital public performances of sound recordings, but also created a statutory license that would allow certain digital service providers to perform all sound recordings ever released. 17 U.S.C. §114. In return, these digital service providers had to agree to make binding royalty payments according to rates set by what is currently known as the Library of Congress' Copyright Royalty Board. It soon became apparent, however, that it was extremely cumbersome for digital service providers to identify and pay every single individual and entity entitled to royalties under §114. To stave off those crippling transaction costs, the parties on both sides of the licensing regime settled on a mutually agreeable solution: empowering a private third party to collect royalty payments due from digital service providers and distribute them to the copyright owners, as well as to the recording artists and other musicians and vocalists who contributed to the tracks.

Congress formalized this arrangement in 2002 by codifying a regime under which an independent "collective" would receive royalty payments, identify all parties entitled to a sum, and distribute them according to a statutory formula. SoundExchange, an independent nonprofit organized under Delaware law, has been designated by the Copyright Royalty Board as that collective ever since. To ensure

that SoundExchange would have the means to accomplish those tasks, Congress gave it the ability to deduct from the royalties it collects any costs it incurs in "the administration" of §114's royalty scheme, the "settlement" of royalty disputes, and the "licensing and enforcement of rights" under the regime, "including" through "negotiations or arbitration proceedings." *Id.* §114(g)(2)-(3). And for decades, SoundExchange—which is funded solely by those deductions—has enforced §114 royalty rights for copyright owners and artists large and small by, among other things, bringing lawsuits in federal court when it cannot amicably resolve royalty payment disputes.

This appeal arises out of one of those efforts. Through a combination of investigative efforts and a financial audit, SoundExchange learned that Sirius XM had been manipulating its accounting practices to avoid paying hundreds of millions of dollars in owed royalties. After Sirius XM refused to remit those unlawfully withheld payments—in direct contravention of the audit's findings and governing regulations—SoundExchange brought suit seeking both restitution for the unpaid royalties and injunctive relief to prevent Sirius XM from continuing to artificially deflate its royalty payments through the methods it uses for allocating revenue among its various services. This time, however, Sirius XM came armed with a novel argument: that despite creating a system of royalty payments and tasking

SoundExchange with "enforc[ing]" that system, Congress gave SoundExchange no authority to bring enforcement actions in court.

In the decision below, the district court became the first court ever to embrace that head-scratching position. The court did not dispute that Congress has clearly tasked SoundExchange with "enforcement of rights" under §114. But it refused to read the term "enforcement" to include bringing lawsuits because Congress did not expressly say that SoundExchange may enforce those rights through "litigation." Indeed, the court insisted that it *could not* give "enforcement" its ordinary meaning because, by saying that the "enforcement of rights" "*includ*[*es*] … participating in negotiations or arbitration proceedings," Congress must have meant *sub silentio* to "deliberately" *exclude* litigation. The court therefore concluded that the sole body expressly tasked with enforcing §114's royalty rights has no power to resort to litigation against those who violate them.

That conclusion is plainly wrong. As even Justice Scalia—no friend of inferred causes of action—recognized, a statute that expressly allows a party to seek reimbursement for costs incurred in taking an action clearly presupposes that the party may take that action. To describe such a statute is to describe 17 U.S.C. §114(g)(3)(C): It expressly authorizes SoundExchange to defray the costs it incurs in "enforcement of rights," a term that even the district court did not deny ordinarily encompasses litigation. And the district court drew exactly the wrong conclusion

3

from Congress' express inclusion of negotiation and arbitration, as SoundExchange is in a position to negotiate favorable outcomes precisely because it can take a statutory licensee to court if attempts to negotiate or arbitrate fail. Taking litigation off the table as a means of enforcing rights makes especially little sense here, as the question is not whether Congress supplemented government enforcement with private lawsuits, but whether the *sole* entity Congress charged with enforcing §114's royalty regime can do so through the ordinary means of bringing lawsuits. In that context, the governing rule is not that courts should be wary of recognizing private rights of action, but that courts should be wary of assuming that Congress created a feckless regime to effectuate a compromise forged by private parties.

The district court largely ignored the reality that its miserly construction of §114 threatens to undo Congress' desired enforcement mechanism, reintroducing the same prohibitive costs that led statutory licensees to seek a central collector and enforcer of the §114 license in the first place, and leaving some intended royalty recipients with *no* obvious way to vindicate their rights in court. The district court instead viewed every question in this case through a presumption against implied causes of action on steroids, searching for magic words that are not required even in cases where that presumption makes sense. Not only is that approach the opposite of textualism, but it led the court to overlook or flatly misread the text of both this statute and others. This Court should reject the district court's misreading and

4

confirm that SoundExchange has the authority to sue §114 licensees who violate the conditions of that statutory license.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. The district court granted Sirius XM's motion for judgment on the pleadings on August 7, 2025, JA142, and the clerk entered judgment on August 8, 2025, JA143. SoundExchange filed a notice of appeal on September 5, 2025. JA144. This Court has jurisdiction under 28 U.S.C. §1291.

## QUESTION PRESENTED

Whether the designated nonprofit collective tasked with the "enforcement of rights" under 17 U.S.C. §114's compulsory licensing regime can sue in federal court when statutory licensees violate those rights.

## STATEMENT OF THE CASE

### A.   Statutory and Regulatory Background

1. It is often said that copyright law "is an exercise in managing … tradeoff[s]." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005). On the one hand, by "secur[ing] a fair return for an 'author's' creative labor," the law "stimulate[s] artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). On the other hand, if the law "confer[red]" a total "monopoly" on the copyright owner "over all uses of his copyrighted work," then it would risk squelching "broad public availability of

literature, music, and the other arts." *Id.* at 155-56. This tradeoff is reflected in Article I of the Constitution, which empowers Congress to "secur[e] for limited Times to Authors … the exclusive Right to their respective Writings" to the extent that doing so "promote[s] … Progress." U.S. Const. art. I, §8 cl.8.

One way Congress has managed this tradeoff is through a series of compulsory licenses in the Copyright Act. For example, the Act generally gives "the owner of [a] copyright … the exclusive rights to do and to authorize" making and distributing copies of the work, or preparing a derivative work. 17 U.S.C. §106(1)-(3). So if an artist wants to make and distribute a cover of a copyrighted song (in copyright parlance, a "mechanical copy"), the artist must ordinarily negotiate a license directly with the copyright owner. But Congress has given artists an easier avenue that avoids the transaction costs associated with individualized licensing: 17 U.S.C. §115 allows an artist to record and distribute a cover without incurring infringement liability, so long as the artist notifies the copyright owner and pays monthly royalty payments at a rate set by the U.S. Copyright Royalty Board, a three-member body appointed by the Librarian of Congress and tasked with "mak[ing] determinations and adjustments of reasonable terms and rates of royalty payments." 17 U.S.C. §801(b)(1).

In addition to setting the rates for §115's mechanical-copy license, the Board sets rates for various other statutory licenses, including, *e.g.*, 17 U.S.C. §116's

6

license for jukebox operators, who can avail themselves of a similar regime that gives them access to an entire universe of music without incurring the transaction costs of a multitude of individual licensing negotiations. *See generally* 1 Howard B. Abrams & Tyler T. Ochoa, *The Law of Copyright* §5.5 (Oct. 2025) (overviewing the Copyright Act's seven different statutory licenses). In effect, these and other statutory licenses give certain entities seeking to use copyrighted music the option of compulsory contracts designed to approximate "the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *E.g.*, 17 U.S.C. §114(f)(1)(B).

2. This case involves 17 U.S.C. §114, which provides a compulsory license for subscription satellite radio providers and noninteractive streaming services.[1] Although "conventional … radio stations" "that broadcast on the AM or FM frequency radio spectrum" can always "play any recorded song without permission of the recording artist or record label that owns the copyright," these digital entities

---

[1] Noninteractive streaming services allow users to listen to a particular genre of music, but not to play a particular recording on demand. Interactive streaming services, by contrast, allow users to play a particular recording on demand. *See* Jacob Victor, *Reconceptualizing Compulsory Copyright Licenses*, 72 Stan. L. Rev. 915, 956 (2020). Interactive streaming services "must negotiate free market licenses" with individual copyright owners, which is what has led some copyright owners to (in)famously pull their songs from interactive streaming services. *Id.* (citing Kaitlyn Tiffany, *A History of Taylor Swift's Odd, Conflicting Stances on Streaming Services*, Verge (June 9, 2017), https://perma.cc/PZG5-4SBG).

cannot do so by default, Jacob Noti-Victor, *Copyright's Law of Dissemination*, 44 Cardozo L. Rev. 1769, 1778-79 (2023); the Copyright Act generally gives copyright owners "the exclusive right[]" "to perform the copyrighted [sound recording] publicly by means of a *digital* audio transmission," 17 U.S.C. §106(6) (emphasis added); *see also id.* §114(d)(1). So these digital entities must either swallow the transaction costs of negotiating licenses with innumerable individual copyright owners or—as is more common—opt into §114's compulsory licensing regime, which allows them to transmit all copyrighted sound recordings without risking infringement liability. *See id.* §114(d)(2). In return, the digital entity must pay royalties according to the "binding" rate schedule set by the Copyright Royalty Board. *Id.* §114(f)(1)(B). Congress directed the Board to periodically update the schedule in accordance with "economic, competitive, and programming information presented by the parties," a years-long process that entails a multi-week administrative hearing involving reams of exhibits and dozens of witnesses. *Id.*; *see SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46-48 (D.C. Cir. 2018).

When Congress first added the §114 license to the Copyright Act in 1995, it initially provided that digital entities would pay royalties directly to individual copyright owners. *See* Pub. L. No. 104-39, §3, 109 Stat. 336, 342-43 (1995). But digital entities disliked that system and pushed for an alternative that would spare them what they considered to be "crippl[ing]" transaction "costs and administrative

8

burdens." 63 Fed. Reg. 34,289, 34,292 (June 24, 1998). To fill that void, the Recording Industry Association of America (RIAA) offered to serve as an intermediary to receive and distribute royalty payments on behalf of all copyright owners, RIAA members and non-members alike. *See id.* The parties further agreed that copyright owners should be able to audit RIAA's distributions, and that RIAA should in turn be able to audit statutory licensees—a system of checks and balances that made its way into the Code of Federal Regulations with the imprimatur of the Librarian of Congress. *See* 67 Fed. Reg. 45,240, 45,271, 45,275 (July 8, 2002) (promulgating what is now 37 C.F.R. §382.7). If the audit reveals that either the statutory licensee or the intermediary has underpaid, then the licensee or intermediary "shall remit the amount of any underpayment determined by the auditor to the Verifying Entity, together with interest at the post-judgment rate specified in 28 U.S.C. [§]1961," which is the rate that applies to money judgments recovered in civil cases in district court. 37 C.F.R. §382.7(g).

In 2002, Congress "codified" that "voluntarily negotiated arrangement[]" by amending §114 to provide for a "nonprofit agent" to receive and distribute royalties according to a statutory formula: 50% to the copyright owner, 45% to the recording artist, and the remaining 5% divided equally between two escrow accounts managed for the benefit of nonfeatured musicians and vocalists, respectively. Pub. L. No. 107-321, §5, 116 Stat. 2780, 2783-85 (2002) (codified as amended at 17 U.S.C.

9

§114(g)(2)).  The 2002 Act further provided that the royalty-receiving agent "may deduct from any of its receipts, prior to the distribution of such receipts … the reasonable costs of such agent incurred … in":

- "the administration of the collection, distribution, and calculation of the royalties";

- "the settlement of disputes relating to the collection and calculation of the royalties"; and

- the "enforcement of rights with respect to … performances subject to licensing under … this section, including those incurred in participating in negotiations or arbitration proceedings."

116 Stat. at 2784 (codified at 17 U.S.C. §114(g)(3)).  As one of the Act's sponsors explained, this provision helps ensure that the royalty-receiving agent can retain "effective legal representation" on behalf of "owners of sound recordings," and that the specified royalty allocation will not be impacted by "the costs of litigation, arbitration, and legal expenses incurred by the designated agents."  148 Cong. Rec. S11548, S11549 (daily ed. Nov. 19, 2002) (statement of Senator Jesse Helms), *available at* 2002 WL 31600131.

Following those 2002 amendments, the royalty-collection operation that began as part of RIAA evolved into an independent §501(c)(6) corporation now known as SoundExchange.  JA60.  Incorporated under Delaware law and overseen

by representatives from all corners of the music industry, SoundExchange now works on behalf of a diverse community comprising hundreds of thousands of stakeholders—everyone from major record labels to small independent labels; Billboard Top 10 stars to background singers. JA5, 61, 88; *see* SoundExchange, *Annual Report* 1 (2024), https://perma.cc/ZBG2-6JDV. Its core function is, without a doubt, collecting and distributing royalties for public performances of copyrighted songs on non-interactive streaming services. JA61, 88. But that function extends far beyond SoundExchange's role as the exclusive royalty-receiving agent under §114, *see* 37 C.F.R. §384.4(b); SoundExchange also administers individually negotiated direct licenses for parties that opt out of the §114 statutory license, and collects and distributes foreign royalties stemming from public performances in other countries too, JA61, 88. Nor is SoundExchange limited to that collection-and-distribution function; SoundExchange also assists stakeholders with everything from political advocacy to data management, including providing tools that help the music industry identify individual sound recordings and that facilitate communications between music publishers and record labels. JA62; *see, e.g.*, Press Release, SoundExchange, *SoundExchange Partners With Music Story to Improve Creator Metadata and Ensure Accurate Royalty Payments* (Apr. 18, 2023), https://perma.cc/8T2J-GN7J; Press Release, SoundExchange, *SoundExchange Unveils Upgraded Data Exchange System for Record Labels and Music Publishers*

11

(Mar. 17, 2021), https://perma.cc/2DFY-7C49. And SoundExchange also has a Canadian subsidiary that administers mechanical licensing rights under Canadian law. *See* CMRRA, *About Us* (2025), https://perma.cc/37EE-C5AR.

Throughout its decades-long tenure as the exclusive §114 royalty-receiving agent, *see* 67 Fed. Reg. at 45,267, SoundExchange has repeatedly used the allowed deduction for rights enforcement just as Congress intended: When it could not resolve disputes about underpayment through negotiation or arbitration, it retained counsel and sued the alleged underpayer in federal court. *See, e.g.*, *SoundExchange, Inc. v. Muzak, LLC*, 322 F. Supp. 3d 72, 75 (D.D.C. 2018); *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150, 153 (D.D.C. 2014); *WTGD 105.1 FM v. SoundExchange, Inc.*, 2014 WL 12819789, at *2 (W.D. Va. Sept. 12, 2014) (SoundExchange "can sue to collect royalties and other fees if a broadcaster does not comply with the terms of its statutory license"), *report and recommendation adopted*, 88 F. Supp. 3d 580 (W.D. Va. 2015); *see also, e.g.*, JA67. SoundExchange, rightsholders,[2] and the U.S. Copyright Office have occasionally lobbied Congress to provide SoundExchange with the additional enforcement power "to terminate a

---

[2] This brief generally uses the term "rightsholder" to refer to parties entitled to receive royalties under the §114 license—a group that includes not just the copyright owner, but also the featured recording artist(s) and any nonfeatured musicians and vocalists—parties who typically do *not* own any copyright in the work. *See* 17 U.S.C. §114(g)(2).

[§114] licensee that fails to account for and pay royalties." U.S. Copyright Off., *Copyright and the Music Marketplace* 181 (Feb. 2015), https://perma.cc/B2UR-QCUS; *see also* JA100. But Congress has so far declined, apparently content with the scope of SoundExchange's existing enforcement powers.

3. SoundExchange's success at "efficiently distribut[ing] … royalties to copyright owners" under §114 did not go unnoticed. S. Rep. No. 115-339 at 19 (2018). In fact, SoundExchange was so successful at administering the §114 license that, 16 years after the 2002 Act, Congress amended §115's mechanical license regime to create a similar arrangement, which it labeled a statutory "collective." Pub. L. No. 115-264, §102(a)(4), 132 Stat. 3676, 3684-3718 (2018) (codified at 17 U.S.C. §115); *accord id.* §302(c), 132 Stat. at 3740 (making "technical and conforming amendments" to §114); *see* S. Rep. No. 115-339 at 19 ("It is hoped that the culture of transparency that SoundExchange has brought to the music industry will be duplicated elsewhere, including in the new mechanical licensing collective established by … this legislation.").

Although SoundExchange was the inspiration behind that new "mechanical licensing collective," there is one big difference between the two: SoundExchange is funded by the deductions from royalty payments authorized by §114(g)(3). *See* JA141. Section 115, by contrast, contains no such deduction for the mechanical licensing collective's costs; the collective instead effectively sets its own budget by

charging licensees (both statutory licensees as well as entities directly licensed by copyright owners) administrative assessments keyed to the amount necessary to "defray" its "total costs." *See* 17 U.S.C. §115(d)(7). Cognizant of the resulting risk of a runaway collective, §115 delimits the mechanical licensing collective's powers and responsibilities with much greater specificity: The mechanical licensing collective "is authorized to perform" only certain enumerated "functions," is subject to very specific governance requirements, is forbidden from "government lobbying activities," and is subject to periodic renewal by the Copyright Office of its status as the collective. *Id.* §115(d)(3)(B)(ii), (C), (D). The mechanical licensing collective must also publish its annual budget online, subject itself to quinquennial audits, and follow specific record-retention policies, *id.* §115(d)(3)(D)(vii) & (ix), (M)—none of which applies to SoundExchange.

Further reflecting the difference in funding streams, Congress gave the mechanical licensing collective the right to sue entities that do not rely on the statutory license (i.e., direct licensees) for failing to pay the standalone administrative assessments. *See id.* §115(d)(6)(C); *see also infra* pp.47-48. That right to sue direct licensees over administrative assessments is separate and in addition to the mechanical licensing collective's general role in "[c]ollect[ing] and distribut[ing] royalties from digital music providers for" statutory licensees, *id.* §115(d)(3)(C)(i)(II)—a function that Congress expressly contemplated would

14

involve "enforcement of rights" and distinct "legal" expenses, *e.g.*, *id.* §115(e)(6)(A)(ii) & (v).

## B.     Factual and Procedural Background

1. Sirius XM is a well-known provider of a satellite digital audio radio service. JA1. It provides that service on a subscription basis to more than 34 million Americans, collecting $9 billion in annual revenue in return. JA1-2, 25. In recent years, Sirius XM has expanded its business to include an online streaming service. It offers this streaming service "at no extra charge" to its satellite subscribers, and for a small fee to non-satellite subscribers who want the streaming service as a standalone product. JA2, 13, 15-16.

Sirius XM takes advantage of the §114 compulsory licensing regime, and it is no stranger to being sued by SoundExchange for underpayment of royalties: It previously paid SoundExchange $150 million to settle two underpayment cases in the U.S. District Court for the District of Columbia. JA58. And Sirius XM has openly acknowledged the prospect of such litigation since at least 2018, when it petitioned the Copyright Royalty Board for "a two-year statute of limitations for disputed audit findings after which the Licensee's calculations would be deemed binding and final, unless [SoundExchange] initiated a legal action before the running of that proposed limitations period." 83 Fed. Reg. 65,210, 65,263 (Dec. 19, 2018).

15

The Board declined, "see[ing] no reason to establish a statute of limitation … where the Act does not provide for one." *Id.*

2. This case involves allegations that Sirius XM avoided hundreds of millions of dollars in royalty payments through creative accounting. Current Copyright Royalty Board regulations key the royalty payment for satellite radio providers to a portion of their gross revenue attributable to satellite radio, excluding revenue derived from other products. *See* 37 C.F.R. §§382.21(a), 382.22. SoundExchange alleges that Sirius XM, which offers satellite radio service bundled with its online streaming service, artificially depressed its satellite-specific revenue by attributing an unjustifiable amount of the bundled revenue to its online streaming product. JA3, 7-19. On top of that, an independent auditor hired by SoundExchange found that Sirius XM had also underpaid its 2018 royalties by millions more. JA20-21.

Copyright Royalty Board regulations are unequivocal: "If the auditor determines the payor or distributor underpaid royalties, the payor or distributor shall remit the amount of any underpayment … together with interest." 37 C.F.R. §380.6(g). But Sirius XM thumbed its nose at the audit results and this "shall remit" mandate, agreeing to pay just 3% of the underpayment calculated by the auditor. JA1, 21. So SoundExchange brought this lawsuit in the Eastern District of Virginia, seeking both restitution of the unpaid royalties (with late fees and interest) and an

16

injunction requiring Sirius XM to use a reasonable method of allocating revenue between its bundled satellite and streaming services going forward. JA23-24.

Having failed to persuade the Copyright Royalty Board to impose a statute of limitations, *see supra* p.15, Sirius XM took a different tack. First, it unsuccessfully moved to dismiss the case on jurisdictional grounds, but succeeded in getting the case transferred to the Southern District of New York. JA152. Then it filed a bevy of counterclaims alleging (among other things) that the audit is invalid because the auditor failed to meet the standard of independence required by Copyright Royalty Board regulations. JA51-53 (citing 37 C.F.R. §§382.1, 382.7). After a few months, Sirius XM changed tack yet again, dropping those counterclaims and moving for judgment on the pleadings on the theory that SoundExchange lacks a cause of action to sue statutory licensees for underpayment. JA155-56.

### C.    The District Court Decision

The district court granted Sirius XM's motion for judgment on the pleadings and closed the case. JA142. The court began not by looking at what the text of §114 *does* say, but by focusing on what it does *not* say. In the court's view, because §114 does not explicitly state *in hac verba* that SoundExchange may bring lawsuits in the course of discharging its undisputed duty to enforce rights under §114, that must be "presumed to be an 'intentional' decision by the legislature to withhold such authority." JA119. Apparently believing that Congress (in 2018) gave the

17

*mechanical licensing* collective "express '[l]egal enforcement' authority to" bring the kind of lawsuit SoundExchange brought here, the court found the "presumption" that Congress (in 2002) "deliberately omitted" litigation from SoundExchange's enforcement powers "even stronger." JA119-20. *But see supra* p.14 (explaining that §115(d)(6)(C) provides an express right to sue direct licensees for failing to pay their standalone administrative assessments, not for failing to make statutory royalty payments). For those reasons, the court concluded that "the text of the Copyright Act clearly lacks an express conferral of a right of action upon SoundExchange." JA121.

From there, the district court turned to "whether" a "statutory right of action … can nevertheless be implied." JA121. The court analyzed that question through the lens of this Court's decision in *Oxford University Bank*, which asked "(1) whether the provision[] allegedly violated contains rights-creating language focused on the individuals protected; (2) whether Congress provided an alternate means of enforcing the relevant provisions; and (3) whether Congress expressly provided a cause of action elsewhere in the statute." JA123 (quoting *Oxford Univ. Bank v. Lansuppe Feeder LLC*, 933 F.3d 99, 104 (2d Cir. 2019)).

On the first question, the district court acknowledged that Congress expressly contemplated that SoundExchange may enforce the royalty rights that §114 creates, as it authorized SoundExchange to deduct costs incurred in "enforcement of

18

rights … including those incurred in participating in negotiations or arbitration proceedings." *See* JA124-25 (emphasis omitted) (quoting 17 U.S.C. §114(g)(3)). But the court deemed that insufficient evidence that Congress expected SoundExchange to enforce those rights through a lawsuit because "[e]nforcement is not synonymous with litigation" and can include "other[]" tools as well. JA125. And the court was unwilling to assume that "enforcement" includes "litigation" "without further clarification from Congress as to what 'enforcement' might mean in this context." JA125-26. Invoking the "maxim *expressio unius est exclusio alterius*," the court then posited that Congress' reference to "'negotiations' and 'arbitration[]'" as included enforcement costs "*excludes* other similar yet unmentioned terms, i.e., litigation," JA126 (emphasis added)—while never grappling with the problems of using that maxim in the context of a provision that introduces a non-exhaustive list of examples with the word "including."

More puzzling still, the district court next invoked cases dealing with parties who have entered into contractual agreements to arbitrate their disputes as support for the sweeping proposition that "the express mention of arbitration is often interpreted as precluding litigation." JA126. Finally, the court invoked the elephants-in-mouseholes canon to deem it "unlikely that Congress, had it wanted to confer litigation authority upon the collective, would have done so by" authorizing SoundExchange to recover its "enforcement" costs. JA127. The court therefore

19

found "compelling evidence that Congress deliberately considered the scope of SoundExchange's enforcement power and intentionally opted not to include litigation authority as an arrow in its quiver." JA127.

Turning to the second *Oxford University Bank* inquiry—i.e., whether Congress provided alternative enforcement means—the district court did not suggest that §114 gives anyone *other than* SoundExchange the power to enforce royalty rights via litigation. It instead doubled down on the (purportedly) "highly significant" point "that Section 114's reference to costs incurred in the collective's 'enforcement of rights' enumerates costs 'incurred in participating in negotiations or arbitration proceedings' but not costs incurred in litigation." JA128 (emphasis omitted). (Once again, the court made no mention of Congress' use of the word "including.") The court then posited that SoundExchange does not need litigation as an enforcement tool because its ability to "negotiat[e] voluntary licenses," "monitor[] digital music providers to ensure compliance with statutory licensing requirements," "investigat[e]" compliance via audits, and "send[] notices to copyright holders whose works are entitled to royalty payments" gives it all the "enforcement hammer" it needs. JA128-29 (footnote omitted).

Finally, turning to whether Congress "expressly provided a cause of action" elsewhere in the Copyright Act, *Oxford Univ. Bank*, 933 F.3d at 104, the district court puzzlingly returned to §115, which it once again (mistakenly) seemed to think

20

expressly authorizes the mechanical licensing collective to bring the kind of action for underpayment SoundExchange brought here (albeit only to enforce rights under §115, not §114). *See* JA130-31. *But see supra* p.14. The court also dropped a footnote suggesting that Congress' failure to amend §114 to expressly grant SoundExchange a power it had already long been exercising when Congress added §115 in 2018 somehow evinces Congress' *disapproval* of that long-settled status quo. *See* JA131 n.10.

Looking even further afield, the district court claimed that its reading of §114 is supported by 17 U.S.C. §501(b), which authorizes a copyright owner "to institute an action for any infringement of that particular right." *See* JA132. Overlooking the fact that §114 creates a limited statutory *licensing* regime, not a remedy for infringement, *see, e.g.*, 17 U.S.C. §114(d)(2), as well as the fact that not everyone entitled to royalties under that licensing regime is a copyright owner, *see id.* §114(g)(1)-(2), the court deemed it significant that "Congress easily could have, but did not, designate SoundExchange as one of the entities permitted under Section 501 to initiate legal action" for infringement. JA132.

To its credit, the district court acknowledged SoundExchange's long history of suing statutory licensees who violate their royalty-payment obligations. JA134-36. But it dismissed that history because it had rarely crossed anyone's mind—defendant and court alike—to question SoundExchange's power to do so. JA134-

21

38. The court also made the befuddling suggestion that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), somehow supports finding that SoundExchange cannot bring litigation to enforce §114 royalty rights because SoundExchange "occup[ies] a liminal space wherein it is an independent non-profit but also a statutory creation," and "the main takeaway from *Loper*" is "that only a clear delegation of authority must be found in a statute before a court can find that such authority exists as a matter of law." JA134 n.11.

For all those reasons, the district court "conclude[d] that Section 114 fails to confer on SoundExchange—either expressly or impliedly—the authority to commence a legal action." JA142.

## SUMMARY OF ARGUMENT

The question in this case is whether Congress authorized the private entity statutorily entrusted with administering and enforcing §114 royalty rights to enforce those rights by suing parties who violate them and then refuse to remit the payments that are due. The answer is yes. Indeed, a contrary ruling would cripple the regime Congress carefully constructed and risk making it impossible to enforce the royalty rights Congress created.

Nobody disputes that Congress intended for SoundExchange to enforce the §114 royalty regime; that much is plain from Congress' decision to authorize the designated collective to deduct the costs it incurs in the "enforcement of rights" from

22

the royalty payments it collects before distributing them to royalty recipients. The only question is whether SoundExchange's power to enforce those rights includes the power to enforce them through litigation. It plainly does. "Enforcement" is a term that ordinarily—indeed, naturally—includes litigation; Congress conveyed that understanding by using the term to encompass litigation in provisions all throughout the Copyright Act. And Congress made clear its intention that "enforcement" be read especially expansively in §114, as it expressly stated that it "includ[es]" "negotiations" and "arbitration proceedings"—alternatives to litigation that would not result in much enforcement if they were not backed by the power to bring a lawsuit if SoundExchange cannot secure voluntary compliance.

Statutory context powerfully reinforces what the text makes plain. Section 114 is not a statute that the federal government is charged with enforcing in the main, backed by the threat of imposing penalties on those who violate its terms. Section 114 creates rights between two sets of private parties, giving one set a license to use copyrighted works in a particular way, and the other set a right to collect royalties for that use. No federal actor is charged with enforcing those rights; Congress instead gave that task to the collective designated by the Copyright Royalty Board— i.e., SoundExchange. So the question here is not, as it is in most implied-cause-of-action cases, whether Congress intended to silently supplement its principal means of enforcement with private lawsuits seeking private remedies. The question is

23

instead whether Congress supplied *any* means of enforcing §114 royalty rights through litigation at all. In that context, implied-cause-of-action concerns are decidedly misplaced—indeed, *dis*placed by the rule that a right ordinarily assumes the ability to secure a remedy for its violation. And nothing in §114 gives the slightest indication that Congress intended this to be the rare regime in which it created statutory rights but no meaningful mechanism to enforce them.

In rejecting that commonsense conclusion, the district court committed the same mistake this Court corrected in *Oxford University Bank*. It became so fixated on the fact that §114 does not explicitly say "SoundExchange may bring lawsuits" that it "overlooked" the best "evidence of Congressional intent": "the text of [the statute] itself." 933 F.3d at 105. Worse still, the court overlooked the reality that its decision undoes much of what Congress was trying to accomplish when it designated a single collective to administer and enforce §114. The whole reason the industry voluntarily decided to centralize administration and enforcement of §114's licensing regime is because doing so eliminates the crippling transaction costs that both licensees and rightsholders face when fending for themselves. Congress understood that when it embraced the collective approach in 2002, and it understood that even better by 2018, when it used SoundExchange's success story as a model for creating a similar collective enforcement regime in §115. Yet if SoundExchange cannot bring lawsuits to enforce the rights it is charged with enforcing, then the parties are largely

24

back where they started, with a collective that can opine on who owes what but do little to make them pay it. That leaves individual copyright owners in the unenviable position of having to resort to infringement suits that are at best inefficient, if not prohibitively expensive. Worse yet, it could leave others with rights under §114— recording artists, vocalists, and musicians who do not own the copyright but are nonetheless entitled to royalties—with *no* path to enforce their rights in court at all.

In short, by depriving SoundExchange of the power to sue, the district court's decision not only makes a hash of Congress' compulsory licensing and collective enforcement regime, but threatens to leave §114 royalty recipients with no meaningful remedy for violations of their royalty rights. Nothing in the statute begins to compel that untenable result; to the contrary, text, context, and common sense foreclose it. This Court should reverse.

## STANDARD OF REVIEW

The Court reviews orders granting motions for judgment on the pleadings de novo. *See Beck v. Manhattan Coll.*, 136 F.4th 19, 22 (2d Cir. 2025).

## ARGUMENT

**I.    SoundExchange Can Enforce §114 By Bringing Lawsuits Against Parties Who Fail To Comply With The Obligations It Creates.**

The question in this case is whether Congress authorized SoundExchange to bring lawsuits to enforce §114 royalty obligations. The district court conducted its entire analysis of that question through a fundamentally misguided legal lens. In

25

that court's view, because Congress did not state *in hac verba* that "SoundExchange has a cause of action to bring a lawsuit against any licensee who fails to pay royalties," SoundExchange bore a "heavy burden" of overcoming a purportedly "strong presumption" that it cannot. JA121. That is not the right way to approach the question even in an ordinary implied-right-of-action case. But it certainly is not the right way to approach it in this case, as the question here is not whether Congress supplemented a government enforcement regime with private lawsuits seeking private remedies. SoundExchange, as the designated collective, is the *only* entity that Congress expressly empowered to enforce §114's royalty system. So if SoundExchange cannot bring lawsuits to do so, then it is not clear who can.

A "strong presumption" against a cause of action makes little sense in that context. If anything, the presumption should run in the opposite direction, as Congress does not ordinarily deprive those charged with enforcing rights of the power to do so in court. And there is no reason to think Congress intended to do so here; to the contrary, both statutory text and statutory context confirm that Congress fully expected the entity that it charged with enforcing §114 royalty rights to be able to bring lawsuits against those who violate them.

**A.** **Section 114 Unambiguously Evinces Congress' Intent That SoundExchange May Enforce Licensing Rights Via Litigation.**

**1.** **The statutory text confirms that SoundExchange may enforce rights by bringing lawsuits.**

The place to begin is, "[a]s always," with the text. *Campos-Chavez v. Garland*, 602 U.S. 447, 457 (2024). And here, the inquiry can largely end there as well, as the "statutory text, even though not explicit in declaring the right to a cause of action, unambiguously communicates Congress's intention," *Oxford Univ. Bank*, 933 F.3d at 108, that SoundExchange can bring lawsuits to enforce §114 royalty obligations.

Section 114(g)(3)(C) authorizes SoundExchange to deduct its costs "incurred" in "the licensing and enforcement of rights." The statute thus expressly contemplates that SoundExchange will be engaged in the "enforcement of rights" under §114. After all, it is an indisputable principle of law and logic that a statute authorizing the reimbursement of specified expenses presupposes the ability to incur them. So "[t]he text of" a statute that expressly "presuppos[es] the availability of a private right of action" "unambiguously evince[s] Congressional intent to authorize" one. *Oxford Univ. Bank*, 933 F.3d at 105. Indeed, even Justice Scalia—no fan of implied rights of actions—acknowledged that a statute that provides, "In any private suit for violation of this statute, the victorious plaintiff will be entitled to attorney's fees," would plainly empower aggrieved parties to sue over the underlying statutory

27

violation. Antonin Scalia & Bryan A. Garner, *Reading Law* 316 (2012). With a statute like that, it is not a matter of trying to divine Congress' implicit intent; the entitlement to attorney's fees leaves no doubt that Congress intended to permit the lawsuit in which they can be recovered.

The only question, then, is whether "enforcement" encompasses bringing lawsuits against §114 licensees who violate the conditions of their statutory license. The answer to that question is straightforward, as Supreme Court precedent confirms: "The power to enforce implies the power to make effective," and in particular, "[t]he power to enforce" a statutory "duty … implies the power to utilize any of the procedures or actions normally available." *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 287-88 (1940). That longstanding rule accords with the plain meaning of "enforcement"—to compel compliance with a law—which easily encompasses affirmative litigation. *See, e.g.*, *Enforce*, Black's Law Dictionary (7th ed. 1999) ("To give force or effect to (a law, etc.); to compel obedience to; … to compel a person to pay damages for not complying with (a contract)."); Webster's New World Dictionary 216 (4th ed. 2003) ("[T]o compel observance of (a law, etc.)"); Merriam-Webster's Collegiate Dictionary 382 (10th ed. 2000) ("[C]ompel[;] … to carry out effectively"); Random House Dictionary of the English Language 644 (2d ed. 1987) ("[T]o put or keep in force; compel obedience to; … to support (a demand, claim, etc.), by force."). The Copyright Act itself reflects that

28

understanding, as several of its provisions use the term "enforcement" to encompass litigation. *See, e.g.*, 17 U.S.C. §§104A(c), (d) (discussing "[e]nforcement of" rights via an infringement action), 501(f)(2) (discussing "enforce[ment]" of rights via "civil action"), 603(b)(1) ("enforcement" includes obtaining "a court order enjoining" violations), 910 (discussing "[e]nforcement of exclusive rights" via "a civil action"), 1201(a)(1)(E) (discussing "any action to enforce any provision"). And "a word used across 'the same act' should be given the same meaning." *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 306 n.5 (2015).

Far from suggesting that Congress intended some narrower understanding here, the text of §114 confirms that Congress intended the term "enforcement" to be read expansively, as Congress authorized SoundExchange to recoup all costs incurred via "enforcement of rights[,] … *including* those incurred in participating in negotiations or arbitration proceedings."  17 U.S.C. §114(g)(3) (emphasis added). "Including" is "usually a term of enlargement, and not of limitation." *Samantar v. Yousuf*, 560 U.S. 305, 317 n.10 (2010) (quoting 2A N. Singer & J. Singer, Sutherland on Statutory Construction §47.7 (7th ed. 2007)); *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[A] term whose statutory definition declares what it 'includes' is … susceptible to extension of meaning"). In fact, the Copyright Act expressly instructs that the term "including" is meant to be "illustrative and not limitative" all

29

throughout its many provisions. 17 U.S.C. §101. And that is just how it is used in §114, as "including" plainly introduces a non-exhaustive list of examples.

Litigation fits comfortably within a list that "includ[es]" "negotiations or arbitration proceedings," as those actions are ordinarily "substitute[s] for litigation." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960); *see, e.g.*, *Wojchowski v. Daines*, 498 F.3d 99, 108 n.8 (2d Cir. 2007) ("general words are construed to embrace … objects similar in nature to those" described by "specific words" (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001))). Indeed, negotiations and arbitration proceedings are not just substitutes for litigation; they presuppose the ability to litigate the claim the parties are trying to resolve. Arbitration is something parties can choose in lieu of litigation, and negotiation is a path they pursue to try to avoid litigation. It therefore makes sense that Congress would want to clarify that "enforcement" is broad enough to include those alternative dispute resolution measures as well.

It makes no sense, by contrast, to think that Congress would have wanted to empower SoundExchange to engage in negotiations and arbitration proceedings, but not to have the ability to resort to litigation if those efforts come up short. After all, negotiation is a useful means of trying to enforce rights only when it is backed by the ability to go to court and seek a judgment compelling compliance if negotiations break down. And it is difficult to get a counterparty to agree to use more streamlined

30

arbitration proceedings—or comply with the orders they produce—if the would-be plaintiff lacks the power to force that counterparty into litigation. The enforcement powers that Congress expressly contemplated SoundExchange could exercise would therefore be toothless if they were not backed by the power to enforce rights in court if those alternative dispute resolution paths come up short.[3]

The provisions surrounding §114(g)(3)(C) reinforce the conclusion that it encompasses litigation. Costs incurred in "the licensing and enforcement of rights" are not the only costs SoundExchange can recover under §114(g). In addition to authorizing SoundExchange to deduct costs arising from the "administration of the collection, distribution, and calculation" of the royalties owed under §114, the statute authorizes SoundExchange to deduct costs associated with the "settlement of disputes relating to the collection and calculation" of those royalties. *See* 17 U.S.C. §114(g)(3)(A)-(B). Once again, it would make little sense for Congress to expect

---

[3] The history of arbitration in the statutory-licensing context underscores the breadth of the term "enforcement." Before the Copyright Royalty Board was created in 2004, royalty rates were set through ad hoc Copyright Arbitration Royalty Panels convened by the Librarian of Congress. *See generally CARP Structure and Process: Hearing Before the Subcomm. on Courts, the Internet & Intellectual Prop. Of the H. Comm. on the Judiciary*, 107th Cong. (2002) (statement of Marybeth Peters, Register of Copyrights), https://perma.cc/B9WT-CW3M (discussing the Copyright Royalty Tribunal Reform Act of 1993). That arbitration regime remained in place when Congress revised §114 to embrace the collective model in 2002, *see* Pub. L. No. 107-321, §5, 116 Stat. at 2784, so Congress likely included the term "arbitration proceedings" with those rate-setting proceedings in mind.

31

SoundExchange to settle disputes over what royalties are due if SoundExchange did not have the power to litigate the underpayment claims it is trying to settle. The statutory text thus compels the conclusion that Congress intended SoundExchange to enforce rights by resorting to litigation when necessary.

### 2. Statutory context reinforces that conclusion.

The conclusion that SoundExchange can enforce rights in court is powerfully reinforced by the surrounding statutory context. *See Krasner v. Cedar Realty Trust, Inc.*, 86 F.4th 522, 529 (2d Cir. 2023) (stressing the need to "look to statutory context"). Before Congress amended the Copyright Act to task a single party with administering and enforcing §114's statutory licensing regime, digital entities had to pay each and every copyright owner seriatim, and copyright owners in turn had to divide and distribute that payment among the other parties entitled to receive royalties. *See* Pub. L. No. 104-39, §3, 109 Stat. at 340-43. Digital entities themselves recognized that that system was untenable because it required them to "identify, locate and pay" thousands of copyright owners individually. 67 Fed. Reg. at 45,266. Not only is doing so exceedingly difficult, but it imposes "crippl[ing]" transaction costs on both sides. 63 Fed. Reg. at 34,292. To relieve that burden, RIAA (and later SoundExchange) stepped in to collect and distribute royalties on behalf of everyone entitled to payment, effectively acting as those individual parties'

32

agent for statutory licensees. Congress, noticing the success of that system, codified it in 2002, with digital entities' support. *See supra* pp.8-9.

To deprive SoundExchange of the power to enforce royalty rights in court would impose all those same transaction costs and feasibility problems—on the very parties whose rights the statute is supposed to protect, no less. Rather than rely on one non-profit to enforce their royalty rights, every single artist and record company would have to find and bring suit against any service provider who played any of its sound recordings without paying the royalties due. And instead of having to deal with the collective alone, digital entities would have to individually litigate the deluge of lawsuits that the district court's (and Sirius XM's) reading would spawn.

That is no way to run a royalty system. The *raison d'être* of copyright law is to "promot[e] broad public availability of literature, music, and the other arts"—and the *raison d'être* of statutory licenses in particular is to guarantee that rightsholders can "secure a fair return for" their "creative labor." *Aiken*, 422 U.S. at 156. A system that saddles rightsholders with substantial transaction costs and forces them to take a higher-than-necessary haircut, while simultaneously making it easier for those profiting off their work to evade paying royalties, runs afoul of that "basic purpose." *Id.* And in an increasingly digital world, the cumulative effect of making it easier for Sirius XM and other major digital entities to duck the terms of their statutory licenses will be to frustrate musicians and vocalists tired of watching the fruits of

33

their labors evaporate—and ultimately drive them out of the industry. That is why both licensees *and rightsholders* strongly supported charging one body with administering §114 and enforcing licensees' obligations. But if SoundExchange does not have the power to get courts to compel statutory licensees to comply with their §114 obligations, then rightsholders got the exceedingly short end of the stick in that deal: They have a collective who can tell statutory licensees what royalties it thinks are owed, but they must fend for themselves if a licensee refuses to pay them. By contrast, the digital entities would receive the windfall of access to every sound recording ever released, with royalty payments backed only by the honor system.

In practice, that would turn those statutory royalty obligations into empty promises for many of those entitled to royalties under §114. Not only would forcing copyright owners to bring a flood of infringement litigation be exceedingly costly and cumbersome—among other things, copyright owners would need to resort to civil discovery in order to audit statutory licensees—it is not even clear that other royalty recipients would have any path to bring their own lawsuits. After all, not everyone entitled to royalty payments under §114 is a copyright owner; the statute lays out a royalty scheme that includes both "copyright owners" as well as "featured" "artists," "nonfeatured musicians," and "nonfeatured vocalists." 17 U.S.C. §114(g)(1)-(2). It is not obvious how those who do not own copyrights would bring litigation to enforce their royalty rights if they cannot rely on SoundExchange to do

34

so. Unlike copyright owners, they do not have the option of an infringement action, and they would have an even harder time demonstrating that §114 gives *them* a cause of action when it does not expressly contemplate *any* enforcement role for them. So for some royalty recipients, if SoundExchange cannot bring lawsuits to enforce their §114 rights, then it is unclear whether anyone can.

Depriving these royalty recipients of any way to enforce their royalty rights in court would run directly counter to the background principles against which §114 operates. To be sure, "[a] statute's mere prohibition of a certain act does not" automatically "imply creation of a private right of action for its violation," especially when the statute otherwise puts enforcement "discretion" in "the hands of public officials." Scalia & Garner, *supra*, at 313, 316. But the law is quite different when a statute confers "rights" on an "identifie[d] … class of persons" and gives no one else the ability to secure a remedy for their violation. *Oxford Univ. Bank*, 933 F.3d at 105; *see also, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001); *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 18-19 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979). In that context, the question is whether Congress wanted *anyone* to be able to sue to secure a remedy for a violation of the private rights it created—and it should take quite a bit to conclude that the answer is no. After all, "Congress presumably does not enact useless laws."

35

*Garland v. Cargill*, 602 U.S. 406, 427 (2024); *see also* Scalia & Garner, *supra*, at 316 (directing courts to "look for the fair import of the statute").

Nothing in §114 gives even the slightest indication that Congress intended to create rights with no judicial remedy when it codified SoundExchange's role as the body charged with "enforcement" of those rights back in 2002. And Congress' actions since then reinforce the conclusion that it both appreciates and approves of SoundExchange's view that it can enforce rights via litigation when necessary. This is hardly the first lawsuit SoundExchange has brought against a recalcitrant licensee. SoundExchange has been bringing lawsuits to enforce royalty obligations for more than a decade. *See supra* p.12. What is more, Sirius XM itself has been a sufficiently frequent defendant in those actions that it asked the Copyright Royalty Board back in 2018 to curb that power by imposing a two-year statute of limitations for SoundExchange to initiate "legal action" based on "disputed audit findings." 83 Fed. Reg. at 65,263. The Board declined, and in doing so notably made no suggestion that a statute of limitations is unnecessary because SoundExchange cannot bring legal actions in the first place—an argument that apparently did not occur to Sirius XM at the time either.

Indeed, before this litigation came along, the only body that had ever even thought to question SoundExchange's ability to sue is the D.C. Circuit, which back in 2016 sought supplemental briefing on a variety of issues, including "the source of

36

[SoundExchange's] cause of action." Order, *SoundExchange, Inc. v. Muzak, LLC*, No. 16-7041 (D.C. Cir. Nov. 16, 2016). But even that court was focused not on whether SoundExchange can bring litigation *at all*, but whether it must first adjudicate disputes before the Copyright Royalty Board and then challenge the Board's decision in a court of appeals, instead of initiating a lawsuit in district court. *See SoundExchange, Inc. v. MUZAK LLC*, 854 F.3d 713, 718 (D.C. Cir. 2017). After reviewing supplemental briefing, the court was "persuaded" that SoundExchange did not need to pursue that path, and that both the district court and the D.C. Circuit had "jurisdiction" over SoundExchange's lawsuit. *Id.*[4] Rejecting the commonsense status quo that SoundExchange may initiate lawsuits to enforce rights under §114 thus not only would put this Circuit alone on an island, but would open up a split with the D.C. Circuit.

In addition to the sanction of judicial precedent, that longstanding status quo has been tacitly blessed by Congress. Far from stepping in to alter SoundExchange's duties and powers under §114, Congress used §114 as a model when it added a similar enforcement-by-collective regime to §115 in 2018, after both the Senate

---

[4] The district court seemed to think that the D.C. Circuit "did not directly address any of the questions it had posed to the parties," JA137, but the D.C. Circuit in fact squarely answered the cause-of-action question it had raised by concluding that the district court did have jurisdiction over SoundExchange's lawsuit, *see MUZAK*, 854 F.3d at 717-18.

Judiciary Committee and the Copyright Office praised SoundExchange's work. *See, e.g.*, S. Rep. No. 115-339 at 19; *cf.* U.S. Copyright Off., *Copyright and the Music Marketplace* 6-7. At no point during that legislative process did anyone suggest that SoundExchange had been straying outside its lane by bringing lawsuits to enforce rights when necessary. And the only changes Congress made to §114 when it added a similar enforcement-by-collective regime to §115 were "technical and conforming amendments" that left SoundExchange's role in the "enforcement of rights" untouched. *See* Pub. L. No. 115-264, §302(c), 132 Stat. at 3740. When "there ha[s] been a longstanding … interpretation of a statute" and "Congress re-enact[s]" the statute in substantially similar form, courts typically "conclude that Congress … ratified" that understanding. *Holder v. Hall*, 512 U.S. 874, 961 (1994). That aptly describes Congress' 2018 amendments, which made no effort to withdraw from SoundExchange the litigation power it had by then been exercising for years.

*   *   *

In short, both statutory text and surrounding context confirm that Congress expected SoundExchange to bring lawsuits to recover unpaid royalties, which §114 made explicit by allowing SoundExchange to defray the costs it incurs in enforcing those royalty rights. Congress chose to preserve all ordinary "enforcement" tools, and the alternative dispute resolution tools it went out of its way to make sure were "includ[ed]" in that toolbox presume the existence of the most natural enforcement

38

tool—litigation. And for good reason, as §114 royalty rights would be worth very little if the body charged with enforcing them could not secure a coercive order to do so. Simply put, statutory text and context make Congress' intent plain: Of course the entity expected to enforce §114's payment obligations may do so through the ordinary means of suing those who violate them.

## B. The District Court's Contrary Conclusion Rests on Reasoning That Cannot Withstand Scrutiny.

The district court's decision rejecting that conclusion is flawed from top to bottom. In addition to giving short shrift to what §114 says, the district court latched onto other parts of the Copyright Act that it then proceeded to mangle just as badly as it mangled §114. And by failing to grasp the basic purpose of a compulsory licensing regime, the district court not only resurrected the same crippling transaction costs that led Congress to embrace the centralized administrator and enforcer regime in the first place, but may have left many §114 rightsholders with no remedy at all.

1. At the outset, the district court was fundamentally off-base in proceeding as if virtually every question it asked had to be answered with a heavy thumb on the scale against permitting SoundExchange to bring suit. The impact of that pervasive mistake is perhaps most evident in the court's interpretation (if one can call it that) of the term "enforcement." In the court's view, because Congress did not expressly say that "enforcement" includes "litigation," "it would be inappropriate for this

39

Court to attempt to define the boundaries of the collective's enforcement authority" *at all*—save to suggest that it is somehow confined to "negotiations" and "arbitration proceedings." JA125-26.

That kind of radically aggressive presumption against finding that Congress provided a cause of action is misplaced in any context. To be sure, courts "[h]ave sworn off the habit of venturing *beyond* Congress's intent," and asking whether a private cause of action would be "desirable … as a policy matter." *Alexander*, 532 U.S. at 287-88 (emphasis added). But that hardly means that courts must throw the ordinary rules out the window when it comes to assessing what Congress' intent was. As both the Supreme Court and this Court have made clear, "[i]n determining whether Congress has created a private right of action, 'the interpretive inquiry begins,'" as it does in any case, "with the text and structure of the statute," informed by all the traditional tools of statutory interpretation. *Oxford Univ. Bank*, 933 F.3d at 104 (quoting *Alexander*, 532 U.S. at 288 n.7). There is not some magic-words test under which nothing short of the express language that is *never* present in an implied-cause-of-action case will do.

The district court's contrary approach is especially misguided when it comes to §114. In the typical case asking whether Congress supplied a private cause of action, the question is whether Congress intended to supplement the government's enforcement powers by empowering private parties to bring lawsuits seeking their

own remedies for violations of federal law. That is why courts typically frame the question as whether Congress supplied a "private" cause of action. And it is why the question in such cases is not just—or often even principally—whether Congress authorized a private party to bring a lawsuit. It is "whether [a statute] displays an intent to create not just a private right *but also a private remedy*." *Alexander*, 532 U.S. at 286 (emphasis added). That is because courts are loath to assume that Congress intended to authorize private parties to obtain their own remedies for violations of federal law unless Congress makes that intent clear.

None of those background principles comes into play here, as §114 is not a statute that Congress tasked the government with enforcing. Section 114 expressly delegates the "enforcement of rights" to SoundExchange, not to any government agency. That makes sense, as §114 does not create obligations vis-à-vis the federal government and lay out penalties for those who violate its terms. It creates rights and obligations between private parties. Digital entities are granted a statutory license to play copyrighted recordings without first obtaining the copyright owner's permission, provided that they accept and comply with the statutory obligation to pay royalties according to the rate schedule set by the Copyright Royalty Board. While the Copyright Royalty Board sets those rates, §114 empowers neither it nor any other federal actor to enforce the statutory obligation to pay them. *See* 82 Fed. Reg. 56,725, 56,727 (Nov. 30, 2017) (Board jurisdiction "does not extend to [the]

41

application" of §114). That task is instead left to SoundExchange, the entity designated by the statute to enforce §114.

Because SoundExchange is the sole entity charged with enforcing the payment of §114 royalties, the question here is not whether Congress supplemented its *principal* means of enforcing §114 with a private cause of action with private remedies. It is whether Congress provided *any* means to enforce §114, and secure the private royalty rights it grants, though litigation at all. Put differently, the consequence of refusing to recognize a right to sue here is not that enforcement will be left to the government, but that Congress' express delegation of enforcement responsibility—and ultimately the rights Congress created—will be negated. This is thus the very last statutory regime in which courts should approach the cause-of-action inquiry with an exceedingly heavy thumb on the scale against finding that Congress provided one.

2. Making matters worse, the district court was so fixated on the "strong presumption against *creating* private rights of action" it mistakenly thought it had to apply, JA121 (emphasis added), that it "overlooked clear evidence of Congressional intent to *provide* a right of action: the text of [the statute] itself," *Oxford Univ. Bank*, 933 F.3d at 105 (emphasis added). Much of the court's textual analysis rested on the fact that §114(g)(3)(C) expressly authorizes SoundExchange to deduct costs incurred in "negotiations and arbitration proceedings." (Mis)applying "[t]he maxim

42

*expressio unius est exclusio alterius*," the court insisted—repeatedly—that Congress' express reference to "'negotiations' and 'arbitration[]' excludes other similar yet unmentioned terms, i.e., litigation." JA126. But the court missed the glaring problem with that argument: Those terms are preceded by the word "including." *See* 17 U.S.C. §114(g)(3)(C). As explained, "including" is "usually a term of enlargement, and not of limitation." *Samantar*, 560 U.S. at 317 n.10. That is doubly true here, as the Copyright Act expressly instructs that the term "including" is meant to be "illustrative and not limitative." 17 U.S.C. §101. The district court thus got the import of those illustrative examples exactly backward—an error that pervaded its analysis. *See* JA128.

In reality, no tool of construction supports the district court's seeming view that Congress silently deprived §114's sole enforcer of the most natural means of enforcing it just because Congress did not include litigation on that short, illustrative list. If that were what Congress wanted to accomplish, there are any number of ways it could have countered the ordinary rule that the power to enforce obligations includes the power to hale those who violate them into court. It could have used the words "limited to" instead of "including." It could have said that the collective may recover "only" enforcement costs "incurred by participating in negotiations or arbitration proceedings," or some other subset of "enforcement" actions. It could have simply said that the collective may not bring litigation. Instead, Congress opted

43

for both an expansive term ordinarily connected to litigation ("enforcement") and an express right to recover from licensees all enforcement costs "including" even those *not* incurred via the most traditional means of enforcement. Congress "says … what it means and means … what it says." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (quoting *Dodd v. United States*, 545 U.S. 353, 357 (2005)). And here, it said that it expected the collective to incur "enforcement" costs, full stop.

By using a term of expansion to artificially constrict the statutory text, the district court effectively sapped the term "enforcement" of any meaning. It is one thing to posit that "[e]nforcement is not synonymous with litigation." JA125. It is quite another to read "enforcement" as devoid of *any* power "to compel obedience." *See Enforce*, Black's Law Dictionary, *supra*. Yet that is precisely what the district court did. Under its (and Sirius XM's) reading of §114, SoundExchange would have the ability to identify unlawful conduct and try to persuade lawbreakers to negotiate, arbitrate, or settle disputes. But none of those powers would be backed by the one that makes them effective: the ability to bring a lawsuit seeking a compulsory order if the recalcitrant licensee refuses to abide by its statutory obligations. That is not enforcement. An investigation and cease-and-desist letter, much like an advisory opinion, may encourage a party to comply with its legal obligations, but it cannot "compel obedience." *Cf. Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (judgment

44

cannot compel compliance by non-parties regardless of how "persuasive or even awe-inspiring" the opinion attached to it is).

It would be beyond strange to think that Congress authorized SoundExchange to defray costs incurred in "enforc[ing]" "rights" under §114, yet confined SoundExchange to auditing service providers and trying to persuade them to comply. That is a far cry from the "effective legal representation" Congress wanted SoundExchange to provide for copyright owners and artists to ensure they received adequate compensation for their work. 148 Cong. Rec. at S11549, *available at* 2002 WL 31600131. Instead of being the industry's "collective" representative and fulfilling its role as "enforce[r]" of §114's compulsory license, SoundExchange would be reduced to the role of hallway monitor. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 163 (2d Cir. 2012) (statutory terms should not be defined in a way that "would destroy one of the major purposes of" the statute).

Indeed, it is even worse than that. Depriving SoundExchange of its (g)(3)(C) litigation authority would drain its budget, as it is entirely funded by the deductions it takes from the royalties paid by entities like Sirius XM. If statutory licensees know that they can withhold millions in royalties (as happened here) and face little or no consequences, there is no telling how far they will go. That race to the bottom could threaten to wipe out SoundExchange's ability to administer the statutory licensing scheme at all.

45

3. To the extent the district court thought the answer to that concern was to shift enforcement to someone other than SoundExchange, that reflects a failure to grasp what §114's compulsory licensing scheme is designed to accomplish.

At the outset, the district court seemed to misunderstand the nature of the inquiry into whether Congress has "expressly provided a cause of action" elsewhere. *Oxford Univ. Bank*, 933 F.3d at 104. The court began that discussion by examining the enforcement mechanisms available to the mechanical licensing collective under §115. But no one has ever suggested that §115 empowers the mechanical licensing collective to enforce *§114*. The parties have pointed to §115 only to inform the inquiry into *how to interpret* §114. The court thus appeared to conflate the question of whether Congress has elsewhere spoken with greater clarity when providing a cause of action with the question of whether Congress elsewhere provided someone else with a cause of action *to enforce the provision at hand* (although even as to the former question, the court got it wrong, *see infra* pp.48-49).

When the district court finally turned to the question that mattered, it failed to appreciate how §114 works. According to the district court, Congress did not need to provide a cause of action to enforce §114 because §501(b) of the Copyright Act authorizes copyright owners to "institute an action for any infringement of" their rights. JA132. That is doubly wrong.

46

For one thing, not everyone with royalty rights under §114 is a copyright owner. As explained, the statute also simplifies negotiations between rightsowners and others involved in a sound recording by creating a uniform royalty regime that covers both featured and non-featured artists without regard to any copyrights they may own. *See* 17 U.S.C. §114(g)(1)-(2). The district court did not even appreciate that problem, let alone identify any solution to it. Of course, the most obvious solution would be to infer from the creation of §114 royalty rights that those who hold them have the ability to enforce them in court. But there is no principled reason to infer a cause of action for §114 rightsholders (i.e., parties that the statute does *not* charge with "enforcement"), while refusing to do the same for SoundExchange (the sole entity Congress *did* charge with "enforcement").

Even for copyright owners, moreover, forcing §114 disputes into §501 infringement actions not only would reintroduce the same inefficiencies that the collective approach was designed to resolve, but would force a square peg into a round hole: The question in such a suit would not be whether the defendant was entitled to digitally perform the sound recordings, but whether it paid what is due under the §114 regime that it opted into. So while infringement actions are certainly available in this context, it makes little sense to think that is how Congress wanted parties to have to resolve §114 disputes even apart from the intractable transactions costs of doing so.

47

4. Finally, the district court was equally confused in its assessment of the import of neighboring §115 and its provisions governing the mechanical licensing collective. The court seemed to think that §115(d)(6)(C) provides the mechanical licensing collective with express authority to "commence an action in an appropriate district court of the United States for damages and injunctive relief" for royalty underpayment. JA120 (emphasis omitted). From that premise, it posited that Congress must have "deliberately omitted" from §114 an enforcement power that it expressly conveyed in §115. JA119. But that is not what §115(d)(6)(C) does.

What that provision actually does is authorize the mechanical licensing collective to sue certain music services that are *not* relying on the §115 license for failure to pay the administrative assessments that are used to fund that collective's activities. *See* 17 U.S.C. §115(d)(6)(C)(i) (authorizing suit for "fail[ure] to comply with subparagraph (A)," which requires payment of and assistance in calculating that "administrative assessment"). Section 114 does not have a parallel to that provision for an obvious reason: SoundExchange is not funded by an administrative assessment collected from either licensees or non-licensees; it is instead authorized to "deduct" the "costs" it "incur[s]" from the royalty payments licensees make before it distributes them to §114 royalty recipients. *See id.* §114(g)(3). So §115(d)(6)(C) simply has nothing to say one way or the other about *either* collective's power to enforce the rights of the royalty recipients.

48

As to the question that matters here—whether a collective may sue licensees who fail to pay the royalties they owe—what §115 has to say on that undercuts the district court's reading of §114. The most relevant provision of §115 is subsection (d)(3)(C)(i), which lays out the "Authorities and functions" of the mechanical licensing collective. Among those is the power to "[e]ngage in legal and other efforts to enforce rights and obligations under this subsection." *Id.* §115(d)(3)(C)(i)(VIII). Congress thus made plain there (as it did in many other provisions of the Copyright Act, *see supra* pp.28-29) that it considers "legal … efforts" not just *a*, but *the*, core way to "enforce rights and obligations" under a statutory licensing regime. That makes it awfully hard to see the 2018 amendments as doing anything other than reinforcing Congress' understanding that SoundExchange's undisputed power to "enforc[e] … rights" includes the ability to sue statutory licensees for failure to pay royalties—particularly since Congress largely patterned the mechanical licensing collective off of the SoundExchange model. *See* S. Rep. No. 115-339 at 19-20. After all, Congress knew full well of SoundExchange's established history of suing §114 licensees for underpayment by the time it gave the same power to the mechanical licensing collective. *See supra* pp.12-13, 37-38.

The district court tried to draw a very different conclusion from the 2018 amendments, positing that Congress' failure to *add* "litigation" to §114's illustrative list of "enforcement" powers implies that Congress meant to withhold it. JA131

49

n.10. There are multiple problems with that argument, the first being that it rests on the same misconception that §115(d)(6)(C)(i) bestows upon the mechanical licensing collective the power to bring suits to enforce royalty payment obligations. *But see supra* pp. 14, 48. But the court's confusion ran deeper still. According to the court, Congress' failure to expressly add a power SoundExchange had been exercising for years was "especially significant" because Congress "declined to adopt" a proposal to grant SoundExchange the *additional* power "to terminate a license that fails to account for and pay for royalties." JA131 n.10. That makes no sense. The decision not to add a *new* power says nothing about whether a *different* power already exists. If anything, the fact that Congress had specific reason to be focused on the scope of SoundExchange's enforcement powers yet chose not to alter them reinforces the conclusion that Congress ratified the status quo of using those powers to bring lawsuits.

At bottom, the district court missed the forest for the trees. The court was so fixated on the fact that Congress did not explicitly say that SoundExchange can bring "litigation" that it proceeded to warp every piece of evidence of Congress' intent to fit its "strong presumption" that it must have been a "deliberat[e] omi[ssion]." JA119, 121. In reality, the reason Congress did not expressly spell out that "enforcement" includes "litigation" is probably because that is so obvious that the thought never crossed anyone's mind. At the very least, there is nothing to

recommend the district court's conclusion that Congress used the word "including" to broaden the meaning of "enforcement" in certain respects while simultaneously harboring a silent intention to exclude the most obvious "enforcement" method—which also happens to be the one enforcement method on which the other specified methods depend.

## II. SoundExchange Could Sue Statutory Licensees On Behalf Of §114 Rightsholders Even If §114 Did Not Supply A Cause Of Action To Do So.

Even if §114 did not provide SoundExchange with a cause of action, that still would not mean that it could not bring lawsuits on behalf of §114 rightsholders. One of the most curious features of the district court's opinion is its passing suggestion—barely explained, and in a footnote—that *other* private organizations representing §114 rightsholders may "bring lawsuits to enforce the rights of" those they represent under ordinary agency-law principles, but that SoundExchange for some reason cannot. JA114 n.3. The court's apparent reason for so thinking is that those non-profits are "private organizations," while SoundExchange is a "statutory creation[]." JA114 n.3. That reasoning is wrong in both premise and conclusion.

First, SoundExchange's existence does not depend on any federal statute. Quite the opposite: SoundExchange is a private §501(c)(6) that came into existence independent of §114, and that continues to exists wholly independent of its designation as the §114 "collective." To be sure, Congress expressly sanctioned the role that §114 licensees and rightsholders decided to assign SoundExchange (and its

51

predecessor RIAA) when Congress embraced the collective model in §114. But if Congress eliminated the collective's role from §114 tomorrow, SoundExchange not only would continue to exist, but would continue to carry out core functions that have nothing to do with §114, such as administering direct licenses, collecting and distributing foreign royalties, and "serving as the critical backbone to today's digital music industry." JA61, 88.

For that very reason, textbook principles of federal jurisdiction confirm that SoundExchange is just as entitled to sue on behalf of the parties it represents as any other non-profit agent would be. The relevant questions for purposes of bringing such litigation are whether SoundExchange has a "close[] relationship" with §114 rightsholders, and whether those rightsholders face "barrier[s] to [their] ability to assert [their] own interests." *N.Y. Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019). The answer to both is plainly yes. SoundExchange not only enjoys a close relationship with the individuals and entities entitled to royalties under §114, but has been designated as their "collective" agent since 2002, and has successfully collected and distributed over $12 billion in royalties over that period. *See* Press Release, SoundExchange, *SoundExchange Surpasses $12 Billion Cumulative Distribution Milestone* (Feb. 24, 2025), https://perma.cc/6ELG-WP8Y. And while governing precedent requires little more than a "practical disincentive to sue" on the part of the individuals on whose behalf suit is brought, *Poole*, 922 F.3d at 75 (quoting

52

15 *Moore's Federal Practice* §101.51[3][c][iii] (3d ed. 2008)), §114 rightsholders here would face—at minimum—significant practical and economic barriers to individually filing suit; some §114 rightsholders may entirely lack any mechanism (to say nothing of means) to do so. *See supra* pp.34-35, 47.

This Court has "ha[d] no trouble" finding "standing to bring such a derivative claim" in materially analogous situations. *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023). So in the unlikely event this Court were to conclude that §114 itself does not empower SoundExchange to bring lawsuits, it should likewise "have no trouble concluding that [SoundExchange has] standing to bring … a derivative claim" on behalf of §114 rightsholders wholly apart from the powers that §114 grants it. *Id.*

## CONCLUSION

The Court should reverse and remand for further proceedings.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KEVIN WYNOSKY
CAMILO GARCIA*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellant*

December 10, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 12,512 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

December 10, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ACMS system on December 10, 2025, and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement