# 25-2150-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———◆———

SOUNDEXCHANGE, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

SIRIUS XM RADIO INC.,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* AMERICAN ASSOCIATION OF INDEPENDENT MUSIC IN SUPPORT OF APPELLANT

MATTHEW J. KEELEY
KEELEY LAW AND POLICY PLLC
*Attorneys for Amicus Curiae*
Two Massachusetts Avenue NE,
 #1022
Washington, DC 20002
(202) 949-4222

CP COUNSEL PRESS    (800) 4-APPEAL • (388403)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the American Association of Independent Music, often referred to as A2IM, certifies that it is a tax-exempt 501(c)(6) non-profit that does not have a parent corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................... iii

STATEMENT OF AMICUS ...........................................................1

INTRODUCTION .........................................................................2

STATEMENT OF THE CASE ......................................................5

    A.    SoundExchange Has Always Been Understood to Be Able to Sue in Federal Court................................................................5

    B.    A2IM Raises Concerns That A Kavanaugh Opinion Impacts § 114 ......................................................................................8

    C.    More Recent Congressional Activities Confirm SoundExchange's Authority to Seek Enforcement in Federal Court ....................................................................................12

    D.    The Music Modernization Act Does Not Point to a Need for Congress to Enact Additional Legislation for SoundExchange..........17

CONCLUSION..................................................................................20

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*In re AccuRadio, Inc.*,
    Bankr. N.D. Ill. 25-07366 (2024) ................................................................12

*Oxford Univ. Bank v. Lansuppe Feeder, LLC,*
    933 F.3d 99 (2d Cir. 2019) .........................................................................19

*Recording Industry Association v. Librarian of Congress,*
    No. 09-1075 (D.C. Cir. 2010) ...........................................................8, 9, 10

*SoundExchange Inc. v. AccuRadio, LLC*,
    Case: 1:24-cv-06125, N.D. Ill. (2024) .......................................................12

*SoundExchange, Inc. v. Sirius XM Radio Inc.*,
    65 F. Supp. 3d 150 (D.D.C. 2014) ..............................................................16

*White-Smith Music Pub. Co. v. Apollo Co.*,
    209 U.S. 1 (1908) ..........................................................................................5

*WTGD 105.1 FM v. SoundExchange, Inc.*,
    2014 WL 12819789 (W.D. Va. Sept. 12, 2014), *report and
    recommendation adopted*, 88 F. Supp. 3d 580 (W.D. Va. 2015) .................16

**Statutes & Other Authorities:**

17 U.S.C. § 106(6) .............................................................................................2

17 U.S.C. § 114 ....................................................................................... *passim*

17 U.S.C. § 114(e)(2)(A) ...................................................................................2

17 U.S.C. § 114(g)(3) .........................................................................................2

17 U.S.C. § 115 ...................................................... 5, 6, 7, 8, 9, 12, 18

17 U.S.C. § 115(c) ............................................................................................11

17 U.S.C. § 115(c)(3)(J) .....................................................................................9

17 U.S.C. § 115(c)(6) ......................................................................................8, 9

17 U.S.C. § 115(d) ..............................................................................................9

iii

17 U.S.C. § 115(d)(4)(E)(ii) ........................................................................9

148 Cong. Rec. S11548 ...........................................................................2-3

148 Cong. Rec. S11549 ..............................................................................3

H.R. Rep. No. 115-651 (2018) ............................................................ 13, 18

A2IM, *A2IM Star Certification* (2025) ......................................................4

*Copyright and the Music Marketplace, A Report of the Register of Copyrights* (2015) ............................................................................16, 17

*Discussion Draft of the Section 115 Reform Act (SIRA) of 2006, Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property,* 109 Cong. 58 (2006) ..........................................................7

*Music Licensing Study: Notice and Request for Public Comment,* 79 Fed. Reg. 14739 (Mar. 17, 2014) .................................................. 13, 14

*Music Licensing Under Title 17 (Part I and II) Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property,* 113 Cong. 105 (2014) ...........................................................................15

Pub. L. No. 60-349, 35 Stat. 1075 (1909) ..................................................5

Pub. L. No. 94-553, 90 Stat. 2541 (1976) ..................................................5

Pub. L. No. 104-39, § 102, 109 Stat. 336 (1995) .......................................2

Pub. L. No. 107-321, 116 Stat. 2780 (2002) ..............................................2

Pub. L. No. 115-264, 132 Stat. 3676 (2018) ............................................17

RIAA, *RIAA Album Award* (2025) ............................................................3

*Section 115 Reform Act of 2006*, H.R. 5553, 109th Cong., proposed § 115(e)(9)(D) (2006) ..........................................................................8

U.S. Copyright Office, *Music Licensing Public Roundtable*, June 23, 2014 .........14

U.S. Copyright Office, *Overview* (2025) ...................................................5

U.S. Copyright Office, *Public Roundtables on Music Licensing* ...........................14

## STATEMENT OF AMICUS

The American Association of Independent Music, or A2IM, is the voice of the independent music community. A2IM relies upon SoundExchange to collect and distribute royalties that are due to its members under Section 114 of the Copyright Act in addition to enforcing their rights if these royalties are not paid.

Counsel for A2IM authored this brief in whole. No other party or a party's counsel contributed money that was intended to fund preparing or submitting the brief, and no other person — other than the amicus curiae, its members, or its counsel — contributed money that was intended to fund preparing or submitting the brief.

Written consent to file this amicus has been provided by counsel of record for each party.

1

**INTRODUCTION**

Congress expanded the scope of copyright protections in 1995 with the enactment of the Digital Performance Right in Sound Recordings Act that added a sixth exclusive right now codified at 17 U.S.C. § 106(6) – "in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission". Pub. L. No. 104-39, § 102, 109 Stat. 336 (1995). Simultaneous with the creation of this new right, Congress in Section 3 of the same legislation allowed copyright owners in 17 U.S.C. § 114 (e)(2)(A) to " … designate common agents to act on their behalf to grant licenses and receive and remit royalty payments." *Ibid*, § 3.

In 2002, Congress further amended § 114 to provide for a nonprofit agent to use a statutory formula to distribute royalties among copyright owners, recording artists, nonfeatured musicians, and nonfeatured vocalists. Pub. L. No. 107-321, 116 Stat. 2780 (2002). This formula was to be used after deductions for "the settlements of disputes relating to the collection and calculation of royalties" § 114(g)(3). One of the sponsors of the legislation noted that allowing the collective to deduct from receipts the administrative costs of enforcing its rights would ensure that the collective would be able to have "effective legal representation" and that the division of royalties would not be affected by "the costs of litigation, arbitration, and legal expenses incurred by the designated agents." 148 Cong. Rec.

2

S11548, 11549 (daily ed. Nov. 19, 2002) (statement by Senator Jesse Helms of North Carolina).

This amicus, the American Association of Independent Music, or A2IM, and its members, relies upon the nonprofit designated agent SoundExchange for enforcement of their § 114 copyright royalties due them. Founded in 2005 from predecessor organizations dating back to 1972, A2IM currently represents independent labels and independent artists who are not signed to either a "major" or independent label. A2IM's independent label members are small businesses who compete for sales with the "major labels" that often dwarf their individual resources. A2IM's independent artist members spend months on the road, touring in smaller venues of hundreds to thousands of seats in a difficult attempt to build a middle-class career that is increasingly hard to achieve.

As a point of comparison to the larger Recording Industry Association of America (RIAA) members, or the "major labels" as they are often referred to, RIAA's well-known Gold and Platinum awards for record sales recognizes album sales starting at 500,000 copies, while the comparable Stars award from A2IM to its members for their record sales starts at only 50,000 album sales. Respective qualifying criteria at RIAA, *RIAA Album Award* (2025), https://www.riaa.com/wp-content/uploads/2023/09/ALBUM-AWARD-RIAA-AND-GRF-CERTIFICATION-

AUDIT-REQUIREMENTS52.pdf, and A2IM, *A2IM Star Certification* (2025), https://certifications.a2im.org.

This size difference does not mean that A2IM members only represent less popular works or have different concerns on enforcement. In some cases, artists in the early stages of their careers sign with an independent label represented by A2IM before moving to a "major label" when their initial independent label contract expires. For example, Taylor Swift began her career with an independent label known as Big Machine Records in 2004 before moving to a "major label" in 2018.

Like most companies in a small trade association, the strength of A2IM is derived from its ability to direct the combined membership dues of its members towards priority projects. However with A2IM's annual revenue of only $2 million, there is a limit to what A2IM can afford to do on its own as an enforcement arm for its individual members. It is a vital necessity for A2IM that it partner with other copyright owners to jointly undertake enforcement efforts through SoundExchange. Absent A2IM's partnership with SoundExchange, A2IM Members, regardless if they are a copyright owner or not, have no practical means of copyright enforcement for § 114 licenses taken by Sirius XM Radio or any other licensee.

## STATEMENT OF THE CASE

**A.      SoundExchange Has Always Been Understood to Be Able to Sue in Federal Court**

Although the 1995 creation of the digital performance right dates back three decades, other music copyrights date back much further. The origin of the § 115 compulsory license for musical compositions dates back to 1908 when the Supreme Court ruled that piano rolls were not eligible for copyright protection. *White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1 (1908). The following year, Congress overturned that ruling in the 1909 Copyright Act, but simultaneously created a compulsory license for the newly created right. Pub. L. No. 60-349, 35 Stat. 1075 (1909). A major update to U.S. copyright law including § 115 occurred with the enactment of the 1976 Copyright Act that was the fourth major copyright revision in America. Pub. L. No. 94-553, 90 Stat. 2541 (1976). After the 1976 Act was signed into law, there was little attention paid to updating § 115 prior to 1995 when the digital performance right was created.

The mission page of the U.S. Copyright Office notes that "The Register of Copyrights is the principal advisor to Congress on national and international copyright matters, testifying upon request and providing ongoing leadership and impartial expertise on copyright law and policy." U.S. Copyright Office, *Overview* (2025), https://www.copyright.gov/about. In 2004 after calls to update § 115 for the digital age, then Register of Copyrights Marybeth Peters testified before the

5

Subcommittee on Courts, Intellectual Property, and the Internet of the U.S. House Judiciary Committee. *Section 115 of the Copyright Act: In Need of an Update? Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property,* 92 Cong. 480 (2004). The Register presented Members with her views on how best to reform § 115. Among her suggestions for reform were two in particular. Under the first suggestion, "Designation of a single entity, like the Copyright Office, upon which to serve notices and make royalty payments", there is no question that a federal agency responsible for collecting revenue of any sort, copyright royalty based or otherwise, could seek redress in an appropriate federal court if a required payment was not made. *Ibid, p. 15*.

Thus, it is informative that the head of the agency responsible for advising Congress on copyright law and policy included another option for Congress to consider that would emulate the § 114 collective in the § 115 context – "Establishment of a collective to receive and disburse royalties under the Section 115 license. Again, Section 114 may provide a useful model. Royalties under the Section 114 statutory license, which are owed to copyright owners of sound recordings rather than of musical works, are paid to SoundExchange, an agent appointed through the CARP process to receive the royalties and then to disburse them to the copyright owners." *Ibid*. [The CARP was a precursor to the current Copyright Royalty Board.]

6

The Register did <u>not</u> say establish a new collective and <u>also</u> give them the new authority to sue in federal court. She did not need to. She simply pointed to the existing collective, SoundExchange, and its existing rights to enforce its rights in federal court.

In response to the Register's call for music licensing reform in the § 115 context, then Register Peters stated in her follow-up 2006 testimony to the Subcommittee, "As the Subcommittee has heard at a number of hearings, the existing section 115 does not comport with the realities of the digital environment in which music creators, distributors and users now operate. The draft Section 115 Reform Act of 2006 ("SIRA") represents a significant advancement towards modernizing the Copyright Act to facilitate digital audio transmissions of music while balancing the interests of songwriters, music publishers, and online music services, as well as the consuming public." *Discussion Draft of the Section 115 Reform Act (SIRA) of 2006, Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property,* 109 Cong. 58 (2006). Among the provisions included in the proposed and incredibly detailed Section 115 Reform Act was explicit authority for Designated Agents to "(ii) engage in such additional activities in the interest of music publishers and songwriters as the designated agent considers appropriate, including industry negotiations, ratesetting proceedings, litigation, and legislative

efforts." *Section 115 Reform Act of 2006*, H.R. 5553, 109[th] Cong., proposed §

115(e)(9)(D) (2006).

Although the Section 115 Reform Act did not advance out of Committee in

2006, a modified version of § 115 reform legislation was eventually signed into

law as the Music Modernization Act of 2018.

**B.      A2IM Raises Concerns That A Kavanaugh Opinion Impacts § 114**

As the use of compulsory licenses grew with the expansion of digital music

services in the early 2000s, questions not considered by Congress began arising.

For example, in the pre-Music Modernization Act version of § 115, the Recording

Industry Association of America disputed whether the Copyright Royalty Board

had the authority to create a late fee for late payments of a compulsory license that

could be backed up with federal court enforcement, in lieu of the statutory right to

terminate the compulsory license in § 115(c)(6). *Recording Industry Association v.*

*Librarian of Congress*, No. 09-1075 (D.C. Cir. 2010).

In a 2010 decision written by then District of Columbia Circuit Judge

Kavanaugh, joined by Judges Garland and Randolph, the Court held that:

> "The Copyright Act authorizes copyright owners to terminate § 115 licenses
> for nonpayment. 17 U.S.C. § 115(c)(6). RIAA argues that the presence of
> that provision renders a late fee unnecessary. But the Copyright Act itself
> refutes this either-or argument. The statute both grants the copyright owners
> a termination right and authorizes the Board to impose a late fee. Moreover,
> by the terms of the statute, that late fee "in no way shall ... prevent the
> copyright holder from asserting other rights or remedies provided" by the

8

Copyright Act. Id. § 803(c)(7). The congressional scheme clearly contemplates both a termination right and a late fee." *Ibid at 11.* [1]

Judge Kavanaugh then added,

> "The congressional framework makes good sense because the incentive to make timely payments in order to avoid § 115 license termination is rather weak, if any such incentive exists at all. Under the terms of the statute, a copyright owner must give a licensee 30 days to cure any nonpayment before terminating the license. Id. § 115(c)(6). As the Government persuasively points out, the termination provision 'cannot possibly serve as an incentive to make timely royalty payments, because the licensee can avoid any consequences of withholding payment by simply waiting until the copyright owner initiates termination and then making the payment before the 30–day notice period has expired.' quoting from the Government's Brief at 40." *Ibid*.

As Judge Kavanaugh found, it was important for copyright owners and their agents

to be able to seek either late fees or a termination right for recalcitrant licensees to

---

[1] U.S. music copyright law can be incredibly confusing, even more so when similar phrasing is interchangeably used to describe two totally different issues. U.S. copyright law in Title 17 recognizes "termination rights" in §§ 203, 304(c), and 304(d) which refer to the ability of certain music creators to terminate their grant of a transfer or license of their copyright in a work following specific statutory requirements imposed upon the creator under procedures specified in these three Sections. The title of § 304(d) uses the specific phrase "termination rights" while the other two sections use "termination of the grant". For more details on this "termination right", see https://www.copyright.gov/recordation/termination.html.

U.S. music copyright law also recognizes in § 115(c)(3)(J) and § 115(d)(4)(E)(ii), for non-digital and digital uses respectively, a licensor's "termination right", sometimes referred to as a "right to terminate", of the user of a compulsory license under limited circumstances. The latter "termination right" in § 115(d) was added by the Music Modernization Act of 2018. The Kavanaugh opinion in *Recording Industry Association v. Librarian of Congress* refers to this same issue using the phrase "termination right". This is also the issue that was raised by this amicus in its May 23, 2014 filing with the Copyright Office highlighted at JA100.

avoid allowing licensees being able to string along the copyright owner and its agent *ad nauseum* with no effective remedy by paying some, but not all, of the royalties due. A late fee is just that, a fee that is typically calculated as a portion of the original amount due. In contrast, usage of copyrighted music after the termination of a license brings the real possibility of significantly higher statutory damages for infringement.

In the absence of a comparable explicit termination provision in § 114, A2IM grew increasingly concerned that the absence would make it difficult to terminate recalcitrant licensees. On May 23, 2014, A2IM filed detailed written comments with the U.S. Copyright Office in response to their broad inquiry on music issues seeking, among other things, the following revisions to copyright law, "Increased laws and enforcement at the source related to Internet Service Providers, search engines, payment processors, etc. to protect copyright owners. This should include granting explicit enforcement rights to SoundExchange, including specific remedies up to and including termination of a license for services that repeatedly fail to act in compliance with license terms." JA100, *emphasis added*.

To restate the understanding in the copyright community at that time - following the *Recording Industry Association* decision, a copyright owner or its agent could go to federal court to enforce late fees or seek termination of the

license under § 115(c) for gross abuse of the license, but it remained unclear whether termination was available under § 114. A2IM wanted a resolution of this issue and explicitly stated this in its May 23, 2014 comments to the Copyright Office.

The very same § 114 termination issue arose only a few years later in an August 2013 case involving the same two parties in this case. *SoundExchange, Inc. v. Sirius XM Radio*, 1:13-cv-01290-RJL, D.D.C., 2013. SoundExchange alleged in its complaint that "Starting from at least January 1, 2007, and until December 31, 2012 … , Sirius XM systematically underpaid SoundExchange for the statutory license." *Ibid*, complaint, page 2. The court never had an opportunity to answer the termination question as it applied to §114 since this and another case involving the parties were eventually settled out of court in 2018 with a payment of $150 million by Sirius XM. Sirius XM, Form 8-K (June 7, 2018), https://www.sec.gov/Archives/edgar/data/1560385/000156038518000021/lmca-20180607x8k.htm.

Finally, A2IM brings to this Court's attention that the lack of an explicit termination right in § 114 continues to deny copyright owners the ability, under the penalty of a copyright infringement complaint, to terminate non-compliant licensees who drag out payments for years, and therefore deny copyright owners and artists the royalties that are due them, potentially forever. For example,

11

beginning in 2016, AccuRadio, Inc. began underpaying its § 114 license fees to SoundExchange, entered into a payment plan in 2020, and then stopped payments in 2023, leading to a July 2024 filing by SoundExchange in the District Court for the Northern District of Illinois Eastern Division to force this recalcitrant § 114 licensee to pay the required royalty fees. *SoundExchange Inc. v. AccuRadio, LLC*, Case: 1:24-cv-06125, N.D. Ill. (2024). Sadly, A2IM's 2014 call to the Copyright Office for the need to add an explicit termination right to § 114 was prescient when AccuRadio filed for bankruptcy in May 2025, leaving SoundExchange and its members as unsecured creditors for $9 million of copyright royalties. *In re AccuRadio, Inc*. Bankr. N.D. Ill. 25-07366 (2024). The end result was that thanks to the lack of a § 114 termination right, the licensee was able to string along SoundExchange for years while artists never got paid.

## C. More Recent Congressional Activities Confirm SoundExchange's Authority to Seek Enforcement in Federal Court

Although the Section 115 Reform Act of 2006 did not advance, both the Copyright Office and the respective Judiciary Committees continued to study music licensing issues in the years that followed, most notably by bringing together interested parties in the music space in an ongoing effort to determine the policy issues that needed to be addressed by Congress.

The House Judiciary Committee under then Chairman Bob Goodlatte of Virginia began a series of 20 hearings with 100 witnesses in 2014 to

12

comprehensively review American copyright laws. H.R. Rep No. 115-651, at 2 (2018). Although not every one of these hearings focused on music policy, each hearing did focus on key issues in U.S. copyright law. Among the 20 hearings were several that focused on whole or in part on music policy.

Simultaneously, the U.S. Copyright Office began its aforementioned in-depth and comprehensive study of all music licensing issues in 2014 with a 24-question Notice of Inquiry. *Music Licensing Study: Notice and Request for Public Comment*, 79 Fed. Reg. 14739 (Mar. 17, 2014). Four questions related to § 114 were identified as relevant by the Copyright Office, none of which had to do with SoundExchange's ability to enforce § 114 royalties through the federal court system which by that time was well established,

> "8. Please assess the current need for and effectiveness of the Section 112 and Section 114 statutory licensing process. 9. Please assess the effectiveness of the royalty ratesetting process and standards applicable to the various types of services subject to statutory licensing under Section 114. 10. Do any recent developments suggest that the music marketplace might benefit by extending federal copyright protection to pre-1972 sound recordings? Are there reasons to continue to withhold such protection? Should pre-1972 sound recordings be included within the Section 112 and 114 statutory licenses? 11. Is the distinction between interactive and noninteractive services adequately defined for purposes of eligibility for the Section 114 license?" *Ibid*, p. 14742.

To the extent that interested parties felt that there were important 114 issues not being included in the discussion with these four topics, the Copyright Office included a generic placeholder question to cover anything of interest or concern to

study participants, "24. Please identify any pertinent issues not referenced above that the Copyright Office should consider in conducting its study." *Ibid.*

As part of their inquiry, the Copyright Office held three public roundtables in Nashville, New York City, and Los Angeles to hear from interested parties. U.S. Copyright Office, *Public Roundtables on Music Licensing*, https://www.copyright.gov/policy/musiclicensingstudy/transcripts/. At the June 23, 2014 roundtable in New York City, representatives of SoundExchange and Sirius XM Radio provided comments to the Copyright Office in which neither representative raised access to federal courts as a cause for concern even though SoundExchange had been serving an enforcement role since its founding in 2003. U.S. Copyright Office, *Music Licensing Public Roundtable*, June 23, 2014, at https://www.copyright.gov/policy/musiclicensingstudy/transcripts/mls-nyc-transcript06232014.pdf.

To reiterate, Sirius XM Radio never raised any concerns about SoundExchange having sued them in federal court in 2014, nor did the federal agency responsible for advising Congress on U.S. copyright law as it conducted a comprehensive review of American music licensing. The primary discussion point raised at the in-person roundtable by Sirius XM Radio's representative was its preference for the § 801(b) rate setting standard, in contrast to the willing buyer, willing seller rate setting standard, to be used by the Copyright Royalty Board in

14

rate determinations. This § 801(b) standard was later eliminated by the Music Modernization Act.

In case the Sirius XM Radio representative had simply forgotten days earlier to raise concerns over SoundExchange's past use of the federal courts at the Copyright Office roundtable in New York City on June 23, 2014, Sirius XM Radio once again had the opportunity to raise their concerns directly to Members of Congress only two days later on June 25, 2014 when the Chief Financial Officer of Sirius XM Radio, David Frear, testified at the second half of an expansive 16-witness House Judiciary Committee hearing on music issues. Other witnesses included the then General Counsel, now president and CEO, of SoundExchange, Michael Huppe, along with Darius Van Arman testifying on behalf of this amicus, A2IM. *Music Licensing Under Title 17 (Part I and II) Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property,* 113 Cong. 105 (2014).

At no point during Sirius XM Radio's oral or written testimony to Congress only two days after its remarks before the Copyright Office roundtable in New York City did it raise any concerns about § 114 related use of federal courts by SoundExchange, nor were any raised by the other 15 Congressional witnesses who appeared at either Part I or II of the music hearings. *Ibid*. Nor was the issue raised by any Member of the Judiciary Committee. Simply put, music licensors and

licensees, as well as the U.S. Copyright Office, recognized that from its creation in 2003, SoundExchange's enforcement authority that was backstopped by its ability to utilize the federal court system was what Congress had authorized.

It is worth noting that SoundExchange's enforcement efforts in federal courts were underway at this time so this was not a hypothetical issue. *See, e.g.*, *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150, 153 (D.D.C. 2014) and *WTGD 105.1 FM v. SoundExchange, Inc.*, 2014 WL 12819789, at *2 (W.D. Va. Sept. 12, 2014) (SoundExchange "can sue to collect royalties and other fees if a broadcaster does not comply with the terms of its statutory license"), *report and recommendation adopted*, 88 F. Supp. 3d 580 (W.D. Va. 2015).

As a result of its lengthy analysis and review based upon numerous public comments and roundtable witnesses, the U.S. Copyright Office released its comprehensive study, *Copyright and the Music Marketplace*, in February 2015 noting "This report is the result of that effort. In addition to identifying the shortcomings of the current methods of licensing music in the United States, it offers an in-depth analysis of the law and industry practices, as well as a series of balanced recommendations to improve the music marketplace." *Copyright and the Music Marketplace, A Report of the Register of Copyrights,* (2015), https://www.copyright.gov/policy/musiclicensingstudy. In their comprehensive report, the Copyright Office recognized that

16

"[s]ince SoundExchange became an independent entity in 2003, it has distributed over $2 billion to artists and labels. The collective engages in outreach to identify and locate artists and labels who may be due royalties from the funds that is has collected. Nonetheless, significant amounts of unclaimed funds have accumulated over time. ... Under the applicable regulations, SoundExchange retains all undistributed royalties for not less than three years, and thereafter may release them to offset its administrative costs and/or to engage in ratesetting and enforcement activities." *Ibid*, p. 48. *Internal footnotes omitted.*

As part of its comprehensive analysis, the Copyright Office did not suggest any need for legislation to enable SoundExchange to access federal courts since its "enforcement activities" already included that.

**D.     The Music Modernization Act Does Not Point to a Need for Congress to Enact Additional Legislation for SoundExchange**

The robust record on music policy issues developed by Congress and the Copyright Office in the mid-2010s was then used to develop the Music Modernization Act that was signed into law in October 2018. Pub. L. No. 115-264, 132 Stat. 3676 (2018). As the report accompanying the House version of the Music Modernization Act noted,

"The Committee undertook a lengthy 20 hearing, 100 witness review of all of our nation's copyright laws over a five-year period. Two of these copyright review hearings in June 2014 were focused specifically on music copyrights and the Committee received testimony from a total of 16 witnesses at these two hearings. … In February 2015, the Committee received a detailed study of the music licensing system from the Register of Copyrights titled "Copyright and the Music Marketplace," which identified a number of issues requiring Congressional attention. Following the release of this report, the Committee undertook a series of nationwide listening sessions on copyright law, travelling first to Nashville, TN on September 22, 2015, to hear from an additional twenty parties focused on music issues and

17

to undertake several music related visits in the Nashville area. On January 26, 2018, the Committee further held a field hearing in New York City entitled "Music Policy Issues: A Perspective from Those Who Make It" during GRAMMYs weekend. The Committee also traveled to California in November 2015 to hear from technology and copyright industries on these and other copyright issues.

"As a result of this extensive review of music copyright, on April 10, 2018, Chairman Bob Goodlatte and Ranking Member Jerrold Nadler introduced H.R. 5447, the Music Modernization Act …" H.R. Rep. No. 115-651, at 2 (2018).

The district court makes several references to the enactment of the Orrin G. Hatch - Bob Goodlatte Music Modernization Act as a basis to question why Congress should have enacted in the Music Modernization Act or elsewhere statutory language that the court believed was necessary to enable SoundExchange to sue in federal court when statutory licensees fail to meet the requirements of § 114. JA131-2.

However, this question presupposes that Congress felt that it needed to enact such explicit authorizing language and chose not to do so. The robust record leading up to the Music Modernization Act demonstrates that the opposite is true – Congress already felt that SoundExchange had the authority to sue in federal court when § 114 licensees failed to meet the requirements of the statute and that there were many other issues that needed their attention including the reform of § 115 in the Music Modernization Act, and the Copyright Office agreed. Furthermore, there were no hints of any other perspectives on this point from the Defendant-Appellee whose Chief Financial Officer testified before Congress on music licensing issues

18

days after another Sirius XM Radio counsel spoke at the Copyright Office's comprehensive review of music licensing issues in the lead up to the enactment of the Music Modernization Act. The District Court also ignored years of SoundExchange's unchallenged efforts in Federal Courts.

Finally, as the Plaintiff-Appellant highlights in their opening brief, SoundExchange's ability to sue in federal court when § 114 licensees fail to meet the requirements of the statute begins with the text of the statute. § 114(g)(3)(C) makes specific reference to the ability of the licensing collective authorized by Congress, in this case SoundExchange, to deduct costs "incurred" in "the licensing and enforcement of rights." It is unclear why further inquiry is needed when the "statutory text, even though not explicit in declaring the right to a cause of action, unambiguously communicates Congress's intention," *Oxford Univ. Bank v. Lansuppe Feeder, LLC,* 933 F.3d 99 (2d Cir. 2019) at 108. This "enforcement of rights" language in § 114 would be *reductio ad absurdum* for an entity designated by a federal agency under a Congressionally authorized provision to have the Congressional authority to enforce its rights without the ability to have federal courts back up such authority if one or more parties chose to ignore their enforcement efforts by simply saying that there is little meaningful that the entity can do in response.

19

In non-copyright contexts, the lack of a right to sue eviscerates the underlying right. Imagine if a private property owner's right to exclude, which is considered among the most fundamental rights of private property, could not be enforced in court making the right to exclude a mere "written on paper alone" right. In the § 114 context here, the "enforcement" right given to SoundExchange from Congress means nothing if it cannot be backed up in a court of law.

## CONCLUSION

For these reasons, the Court should reverse and remand for further proceedings.

Respectfully submitted,

s/<u>Matthew Joe Keeley</u>
Matthew Joe Keeley
*Counsel of Record*
KEELEY LAW AND POLICY, PLLC
(202) 210-6020
joe@keeleylaw.org
*Counsel for Amicus*
December 17, 2025

20

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This amicus brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 4,543 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

December 17, 2025

s/ Matthew Joe Keeley

21

## CERTIFICATE OF SERVICE

I hereby certify that an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ACMS system on December 17, 2025, and thereby served upon all counsel appearing in this case.

s/Matthew Joe Keeley

22