# 25-2150

# United States Court of Appeals
# for the Second Circuit

SOUNDEXCHANGE, INC.,

*Appellant,*

v.

SIRIUS XM RADIO INC.,

*Appellee.*

On Appeal from the United States District Court
for the Southern District of New York,
Case No. 24-cv-5491, Hon. Naomi Reice Buchwald

**BRIEF OF *AMICUS CURIAE* RECORDING INDUSTRY
ASSOCIATION OF AMERICA IN SUPPORT OF APPELLANT**

ELAINE J. GOLDENBERG
DANIEL J. KANE
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500E
Washington, DC 20001
Telephone: (202) 220-1114
elaine.goldenberg@mto.com
daniel.kane@mto.com

*Counsel for* Amicus Curiae

December 17, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus* states that it is a nonprofit organization that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF CONTENTS ....................................................................ii

TABLE OF AUTHORITIES................................................................iii

INTEREST OF *AMICUS CURIAE*......................................................1

INTRODUCTION ............................................................................3

ARGUMENT...................................................................................4

I.    The Text, Structure, and History of the Copyright Act All Demonstrate That SoundExchange Has a Cause of Action to Remedy Underpayment ...................................................................4

II.    Construing Section 114 to Deny SoundExchange a Cause of Action for Underpayment Would Create Absurd Results .............14

III.    The District Court's Ruling, if Affirmed, Would Gravely Harm the Music Industry and the Public ....................................27

CONCLUSION ...............................................................................31

CERTIFICATE OF COMPLIANCE ......................................................32

CERTIFICATE OF SERVICE..............................................................33

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)........................................................4, 5

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011).........................................................12

*Burgess v. United States*,
553 U.S. 124 (2008)...........................................................8

*King v. Burwell*,
576 U.S. 473 (2015).........................................................26

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016).........................................................29

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
933 F.3d 99 (2d Cir. 2019) ......................................4, 5, 9, 13

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989).........................................................26

*Pugin v. Garland*,
599 U.S. 600 (2023).........................................................27

*Robers v. United States*,
572 U.S. 639 (2014).........................................................26

*Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*,
101 F.4th 176 (2d Cir. 2024).............................................26

*United States v. Venturella*,
391 F.3d 120 (2d Cir. 2004) ..............................................26

*USV Pharm. Corp. v. Weinberger*,
412 U.S. 655 (1973).........................................................27

iii

## Constitutions

U.S. Const. art. 1, § 8, cl. 8..................................................................29

## Federal Statutes

17 U.S.C.
    § 101..........................................................................................8
    § 114................................................................................... passim
    § 114(d) ......................................................................................5
    § 114(f) .....................................................................................17
    § 114(f)(1)(B)..............................................................................6
    § 114(f)(3)(B)..............................................................................5
    § 114(f)(3)(B)(i) .........................................................................18
    § 114(g)(2) .............................................................................6, 17
    § 114(g)(2)(A) ...........................................................................16
    § 114(g)(2)(B) .......................................................................16, 28
    § 114(g)(2)(D) .......................................................................16, 28
    § 114(g)(3) ...........................................................6, 7, 19, 29
    § 114(g)(3)(B) .............................................................................9
    § 114(g)(3)(C) ....................................................................8, 9, 17
    § 115.................................................................11, 12, 13, 21, 22
    § 115(d)(6)(C)............................................................................13
    § 411(a) .....................................................................................18
    § 501(b) .....................................................................................16
    § 505..........................................................................................23

Orrin G. Hatch–Bob Goodlatte Music Modernization Act,
    Pub. L. No. 115-264 § 102(a)(4), 132 Stat. 3676 (2018)................ 12, 21

Small Webcaster Settlement Act of 2002,
    Pub. L. No. 107-321 § 5, 116 Stat. 2780 (2002) ...................................11

## Federal Regulations

37 C.F.R. § 370.4(c)................................................................................19

37 C.F.R. § 380.4(d)(1)............................................................................6

37 C.F.R. § 380.6(a) ...............................................................................20

37 C.F.R. § 382.3(a) ...............................................................19

37 C.F.R. § 382.4(a) ...............................................................19

37 C.F.R. § 382.5(a)(1) ...........................................................20

37 C.F.R. § 382.5(d)(1) .............................................................6

37 C.F.R. § 382.7(a) ...............................................................21

37 C.F.R. § 382.21(a) ..............................................................20

**Congressional Materials**

148 Cong. Rec. H7047 (daily ed. Oct. 7, 2002) ........................25

H.R. Rep. No. 104-274 (1995).................................................16

H.R. Rep. No. 115-651 (2018).................................................13

S. Rep. No. 101-305 (1990) .....................................................21

S. Rep. No. 104-128 (1995) .....................................................10

S. Rep. No. 115-339 (2018) ...............................................25, 26

**Other Authorities**

Travis M. Andrews, *In the Spotify Era, Many Musicians
   Struggle To Make A Living*, Wash. Post (Feb. 4, 2023)......................28

Shyamkrishna Balganesh, *Copyright Infringement Markets*,
   113 Colum. L. Rev. 2277 (2013) .......................................21

*Black's Law Dictionary* (12th ed. 2024)...................................7

Robert Cooter *et al.*, *Bargaining in the Shadow of the Law:
   A Testable Model of Strategic Behavior*, 11 J. Legal Stud.
   225 (1982) .......................................................................9

*Determination of Reasonable Rates and Terms for the Digital
   Performance of Sound Recordings and Ephemeral
   Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002) ...............10, 11, 25

*Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 82 Fed. Reg. 56,725 (Nov. 30, 2017) .....................................15

*Determination of Royalty Rates (SDARS III)*, 83 Fed. Reg. 65,210 (Dec. 19, 2018)...............................................................15, 30

*Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007)...............20

2 Nimmer on Copyright § 7.16 (2025) ...................................................18

2 Nimmer on Copyright § 8.22 (2025) ...................................................11

2 Nimmer on Copyright § 8.35 (2025) ...................................................13

RIAA, *2024 Year-End Music Industry Revenue Report Revenue Report* (2024), *available at* https://www.riaa.com/reports/2024-year-end-music-industry-revenue-report-riaa/ ..........................................................28

Dana A. Scherer, Cong. Rsch. Serv., R43984, *Money for Something: Music Licensing in the 21st Century* (2018)...................20

Sirius XM Radio Inc.'s Reply Memorandum of Law in Further Response to Order Withdrawing Ruling and Soliciting Briefing on Unresolved Issues, *In re Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, No. 2006-1 (U.S. Copyright Royalty Bd. May 15, 2017).....................15

Ben Sisario, *Rise of SoundExchange Shows the Growth of Digital Radio Royalties*, N.Y. Times (Aug. 4, 2015) ..........................28

SoundExchange, *What We Do*, https://www.soundexchange.com/what-we-do/#products-and-services (last visited Dec. 15, 2025)............................................27

Joseph Story, III *Commentaries on the Constitution of the United States* (1833)............................................................................29

vi

U.S. Copyright Off., *Copyright and the Music Marketplace*
    (Feb. 2015) .............................................................................. 13, 22

Amy X. Wang, *The $1 Billion Waiting for Artists Who Know
    Where to Look*, Rolling Stone (Mar. 27, 2019) ................................... 19

*Webster's Third New International Dictionary* (2002) ............................... 7

## INTEREST OF *AMICUS CURIAE*[1]

The Recording Industry Association of America ("RIAA") is a 501(c)(6) nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it. The RIAA's several hundred members—ranging from small artist-owned labels to global music businesses—make up this country's most vibrant and innovative music community. RIAA members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the United States, and own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. In support of its members, the RIAA works to protect the intellectual property rights of artists and music labels.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* confirms that no party or counsel for any party authored this brief in whole or in part, and that no person other than *amicus* or its counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

1

The RIAA and its members have a significant interest in the proper resolution of this case. The district court adopted an unprecedented interpretation of 17 U.S.C. § 114 that could lead to the systematic underpayment of statutory royalties owed to copyright owners and recording artists. That interpretation would inflict grave harm on RIAA's members, who receive significant proceeds under Section 114.

## INTRODUCTION

Section 114 of the Copyright Act requires Sirius XM Radio Inc. ("Sirius") to pay certain defined royalties to copyright owners and recording artists in exchange for the right to transmit sound recordings. Rather than require Sirius to negotiate individual licenses with a multitude of copyright owners, Congress allowed Sirius to benefit from a blanket compulsory license and pay only one party—SoundExchange, Inc. ("SoundExchange"). And rather than require Sirius to distribute payments to hundreds of thousands of individual rightsholders, Congress placed that administrative burden on SoundExchange. Congress thus designed a scheme that would dramatically reduce transaction costs by allowing a collective to act on behalf of copyright owners and performers.

Now, long after Congress built that scheme of collective administration and payment, Sirius argues—and the district court agreed—that Congress chose to deny SoundExchange a cause of action to collect any underpayments of royalties by statutory service providers like Sirius. That is a remarkable holding. The text, structure, and history of the statute all strongly support the conclusion that SoundExchange has a cause of action to remedy underpayment. Indeed, the statute *expressly*

3

*refers* to SoundExchange's power to enforce the royalty rights of the copyright owners and performers it represents. And the district court's theory, if affirmed, would have absurd on-the-ground consequences, effectively allowing Sirius to evade royalty payments that Congress has clearly required Sirius to make even as Sirius continues to perform— unlawfully—any of millions of sound recordings. That result would, in turn, destabilize a vast segment of the music industry. This Court should reverse the judgment of the district court and reject Sirius's effort to enjoy the great benefits of the statutory scheme without bearing its concomitant burdens.

## ARGUMENT

**I.  The Text, Structure, and History of the Copyright Act All Demonstrate That SoundExchange Has a Cause of Action to Remedy Underpayment**

Congress gave SoundExchange a cause of action to recover unpaid royalties owed under Section 114. The interpretive task is familiar: reviewing statutory text, structure, and history to assess whether Congress intended to give SoundExchange a remedy to cure violations of that section. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 104, 107 (2d Cir. 2019); *see Alexander v. Sandoval*, 532 U.S. 275, 286

4

(2001) ("Statutory intent . . . is determinative."). Congress plainly did intend to do so here. In concluding otherwise, the district court incorrectly assumed that only the most express statutory statement about a right to sue would suffice to give SoundExchange a cause of action—an assumption that runs contrary to this Court's precedent, *see Oxford Univ. Bank*, 933 F.3d at 105, and is particularly unwarranted where, as here, the statutory scheme does not authorize government enforcement. *See* Brief for Plaintiff-Appellant SoundExchange, Inc. ("SoundExchange Br.") 23-24, 40-42; *Sandoval*, 532 U.S. at 290.

A. 1. The text and structure of the relevant provisions make clear that Congress intended to give SoundExchange a cause of action to remedy underpayment of royalties owed under Section 114.

In Section 114, Congress created a compulsory license for noninteractive satellite radio service providers (*e.g.*, Sirius) and webcasters (*e.g.*, Pandora) that digitally transmit copyrighted sound recordings. 17 U.S.C. § 114(d). That license allows Sirius to transmit any sound recording owned by any copyright owner without risk of infringement. *See id.* § 114(f)(3)(B).

5

At the same time, Section 114 mandates the payment of royalties to copyright owners and recording artists—who often do not own copyrights—for the transmission of sound recordings under Section 114, based on rates set by the Copyright Royalty Board ("CRB"). *See* 17 U.S.C. § 114(f)(1)(B), (g)(2). To facilitate the collection of royalties from statutory service providers like Sirius and the corresponding distribution of royalties to copyright owners and artists, the statute authorizes the CRB to designate a nonprofit "collective" responsible for "collection, distribution, and calculation of [statutory] royalties." *Id.* § 114(g)(3). The CRB has designated Appellant SoundExchange to carry out that responsibility. *See, e.g.*, 37 C.F.R. §§ 380.4(d)(1), 382.5(d)(1). The statute thus creates a scheme of collective statutory licensing, rate setting, royalty collection, and royalty distribution.

Fittingly, then, the statute also expressly contemplates collective enforcement for underpayment of statutory royalties. Under Section 114, SoundExchange may deduct from its distributions to copyright owners and artists the costs it incurs not only in calculating, collecting, and distributing royalties but also in "the settlement of disputes relating to the collection and calculation of the royalties" and "the licensing and

6

enforcement of rights with respect to" the transmission of sound recordings subject to Section 114. 17 U.S.C. § 114(g)(3). Congress thus anticipated a collective that would have the right to "collect" royalties through "enforcement" of the statutory scheme by remedying underpayments, *id.*—which is exactly what SoundExchange seeks to do in this case.

2. The district court erred in concluding otherwise. First, although the court acknowledged that the statute contemplates that SoundExchange will "enforce[]" royalty rights, the court understood that term to refer to activities other than lawsuits, such as "negotiating," "monitoring," "investigating," and "sending notices." JA128-129. But those activities are at most *precursors* to enforcement; they do not *constitute* "enforcement" because they do not "compel[] compliance with" the statutory license. *Black's Law Dictionary* (12th ed. 2024) (defining "enforcement"); *see Webster's Third New International Dictionary* 751 (2002) (defining "enforcement" as "the compelling of the fulfillment (as of a law or order)"). By using the term "enforcement of rights" and allowing SoundExchange to recoup its own enforcement costs, Congress plainly intended SoundExchange's authority to extend to actual enforcement

7

rather than simply to activities that, at most, allow SoundExchange to encourage statutory compliance by learning of or communicating about underpayment. *See* 17 U.S.C. § 114(g)(3)(C).

Second, the district court misread Section 114's reference to "negotiations or arbitration proceedings" to suggest that Congress meant to exclude litigation from SoundExchange's enforcement powers. JA126-127. That gets things exactly backwards. The statute refers to enforcement costs "*including* those incurred in participating in negotiations or arbitration proceedings." 17 U.S.C. § 114(g)(C)(3) (emphasis added). And the term "including" is one "of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (citation modified); *see* 17 U.S.C. § 101 (defining "including" for purposes of Title 17 as "illustrative and not limitative"). If negotiation and arbitration were the *only* acceptable ways that SoundExchange could engage in enforcement, then Congress would never have used the term "including" to describe them. In other words, because Congress identified negotiation and arbitration as *examples* of enforcement powers, it could not have intended to exclude alternatives. It also strains credulity that Congress would have authorized SoundExchange to "negotiat[e]" without

8

the leverage of meaningful enforcement power. Negotiation ordinarily occurs "in the shadow of the law," such that the parties either "settle[] out of court" or, in the event of a "bargaining breakdown," proceed to litigation. Robert Cooter *et al.*, *Bargaining in the Shadow of the Law: A Testable Model of Strategic Behavior*, 11 J. Legal Stud. 225, 225 (1982). If SoundExchange cannot take noncompliant statutory service providers to court, those providers have little incentive to negotiate (or comply with their legal obligations).

Finally, the district court thought that Congress would not have "hid[den]" litigation authority "in a provision governing accounting protocols." JA127. But Congress need not have stated SoundExchange's authority *anywhere*. Even where a statute does not "expressly state" that a party has a right of action, the statute may "presuppose[]" one. *Oxford Univ. Bank*, 933 F.3d at 105. Here, however, Congress not only presupposed SoundExchange's power to litigate, but also provided for it expressly. The statute allows SoundExchange to deduct costs from "enforcement" and from "the settlement of disputes relating to the collection" of royalties. 17 U.S.C. § 114(g)(3)(B)-(C). As explained, *see* pp. 6-9, *supra*, it is hard to see how Congress could have contemplated

SoundExchange "enforc[ing]" licensing rights and "settl[ing]" royalty-collection disputes if SoundExchange had no authority to litigate claims based on the failure to pay royalties.

B. 1. The history of Section 114 and its surrounding provisions likewise supports the conclusion that SoundExchange has the right to bring a lawsuit in furtherance of its "enforcement" responsibilities. In 1995, when creating the statutory license in Section 114, Congress recognized that, given the vast number of copyright owners, collective negotiations over the associated statutory royalties would be "important to help effectuate" the license, S. Rep. No. 104-128, at 28 (1995), thereby "eliminat[ing] the usual transaction costs associated with negotiating separate licenses with each of the copyright owners," *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240, 45,245 (July 8, 2002). But it soon became clear that difficulties would arise even once rates were set: "[a]s a practical matter," services like Sirius could not realistically "identify, locate and pay each individual [c]opyright [o]wner whose works it performed." 67 Fed. Reg. at 45,266. The Copyright Office therefore appointed SoundExchange "to receive and distribute all

10

royalties," thereby "maximiz[ing] administrative efficiencies" for copyright owners, performers, and service providers alike. 67 Fed. Reg. at 45,266-67.

Shortly thereafter, in 2002, Congress revised Section 114 to codify that approach, specifying the procedures under which a collective would distribute royalties and, in particular, deduct from its receipts costs incurred in "enforc[ing]" royalty rights under the statutory scheme. Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(a)(3), (b), (c), 116 Stat. 2780, 2784 (2002). Congress thus recognized SoundExchange's enforcement power precisely when it recognized SoundExchange's critical role in reducing the transaction costs that Section 114 would otherwise create. *See* 2 Nimmer on Copyright § 8.22[D][2] & n.350 (2025).

2. The district court all but ignored that history and instead invoked a *different* provision that governs *different* rights held by *different* participants in the music ecosystem: 17 U.S.C. § 115, which provides an express cause of action in certain limited circumstances for the collective responsible for administering licenses for nondramatic musical works. JA119-120, 130-131. That provision does not support the

11

court's conclusion—indeed, it indicates that the court's holding is incorrect.

First, Section 115 does nothing to establish that SoundExchange lacks the right to bring suit. Section 115 addresses a distinct scheme to collect "administrative assessment[s]" from entities that do not operate under a compulsory license. 17 U.S.C. § 115(d)(6)(C); *see* SoundExchange Br. 13-15, 48-50 (explaining that Section 115 authorizes suits to accommodate the distinctive funding scheme in that statute). And it was enacted in 2018, *see* Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 102(a)(4), 132 Stat. 3676, 3706 (2018), more than a decade after Congress put in place the amendments to Section 114 that are relevant to this case. Section 115 cannot possibly define Congress's *earlier* intent in making a separate enactment on a distinct subject. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("post-enactment legislative history by definition could have had no effect on the [original] congressional vote" (citation modified)).

Second, if anything, Section 115 cuts in *favor* of reading Section 114 to provide a right of action, as Congress recognized in Section 115 that litigation is the standard "enforcement" mechanism. 17 U.S.C.

12

§ 115(d)(6)(C); *see id.* § 115(d)(3)(C)(i)(VIII), (d)(3)(G)(ii), (e)(6)(A)(v). Legislative history confirms the point, as the committee report accompanying the 2018 bill amending Section 115 explained that SoundExchange had by that time "gained widespread industry support with its efforts to efficiently distribute webcasting royalties to copyright owners and artists." H.R. Rep. No. 115-651, at 16 (2018); *see* U.S. Copyright Off., *Copyright and the Music Marketplace* 6-7 (Feb. 2015) ("One of the few things that seems to be working reasonably well in our licensing system is the statutory license regime under sections 112 and 114."). Congress therefore sought to "duplicate[]" SoundExchange's efficiency in administration—as well as the "culture of transparency" it had fostered—through "the new mechanical licensing collective." H.R. Rep. No. 115-651, at 16; *accord* 2 Nimmer on Copyright § 8.35[C] (2025). Accordingly, Congress understood Section 115 to be premised on SoundExchange's settled authority to enforce the payment of statutory royalties in court. *See Oxford Univ. Bank*, 933 F.3d at 106-07 (Congress may intend to create an implied cause of action even where it expressly provides for a cause of action elsewhere in a statute).

13

## II. Construing Section 114 to Deny SoundExchange a Cause of Action for Underpayment Would Create Absurd Results

The district court's holding severely undermines the purposes of Section 114.  Congress enacted and later amended Section 114 to create a functional statutory license and royalty collection and distribution system.  Sure enough, in practice, the appropriate payment of royalties under Section 114 occurs *because of* enforcement by SoundExchange.  If Section 114 does not authorize SoundExchange to enforce royalty rights by bringing suits to remedy underpayment, as it has long done, *see* SoundExchange Br. 12, the statute would not only impose vast transaction costs whenever payment disputes arise but also encourage statutory service providers like Sirius to shirk their royalty obligations.  That is so because, under the district court's interpretation of Section 114, there is no viable means of enforcement either by the government or by those who are not owners of a right under a copyright, and many copyright owners would face substantial practical obstacles to enforcement.

A.  1. *No viable government enforcement.*  The district court did not suggest that the CRB or the Copyright Office could enforce the right to collect statutory royalties—and both entities have expressly stated that

14

they lack any ability to do so. *See Determination of Royalty Rates (SDARS III)*, 83 Fed. Reg. 65,210, 65,263 (Dec. 19, 2018); *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 82 Fed. Reg. 56,725, 56,727 (Nov. 30, 2017). Notably, Sirius itself has explained that the CRB lacks any such authority. *See* Sirius XM Radio Inc.'s Reply Memorandum of Law in Further Response to Order Withdrawing Ruling and Soliciting Briefing on Unresolved Issues at 2, *In re Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, No. 2006-1 (U.S. Copyright Royalty Bd. May 15, 2017). Accordingly, the enforcement mechanism that almost always forms a backstop in cases in which courts conclude that Congress has denied a private right of action to enforce a statute is simply not present here. *See* SoundExchange Br. 23-24, 40-42.

2. *No viable enforcement by those who are not owners of a right under a copyright.* Absent enforcement by SoundExchange through court actions like this lawsuit, there would be no viable way for recording artists who are entitled to royalties under Section 114 but who are not

15

owners (or beneficial owners) of a right under a copyright to enforce their entitlement to be paid the full amount of royalties that they are owed.

The district court briefly suggested that "[c]opyright owners" who possess the copyrights in recordings that Sirius digitally performs can "sue in an individual capacity to enforce their copyright." JA129 n.9. But many of those entitled to statutory royalties are not copyright owners. Indeed, only *half* of the royalties provided for in Section 114 go to copyright owners as such. *See* 17 U.S.C. §§ 501(b), 114(g)(2)(A). The other half go to featured artists and nonfeatured musicians and vocalists, *id.* § 114(g)(2)(B)-(D), who usually are not copyright owners themselves, *see* H.R. Rep. No. 104-274, at 23-24 (1995).

The district court did not suggest that those artists, musicians, and vocalists would have any recourse if Sirius decided to significantly underpay the royalties that were owed—and none is readily apparent. An underpaid artist who does not own a right under a copyright (whether beneficial or legal) *cannot* bring a copyright infringement suit to remedy such an underpayment, *see* 17 U.S.C. § 501(b)—even assuming that the artist had the resources to sue and that such a suit was otherwise a feasible way to address the misconduct. *See* pp. 17-23, *infra*. Moreover,

16

under the district court's interpretation, Section 114 itself offers no relief to such an artist. The district court's ruling presumes that Section 114 contains no private right of action *at all*, which means that an artist would be just as disabled from suing under that provision as SoundExchange itself would be. And, in any event, whatever rights individual artists may have, Section 114 expressly contemplates enforcement *by SoundExchange*. *See* 17 U.S.C. § 114(g)(3)(C).

Leaving artists who are entitled to royalties and own no right under a copyright without any recourse if those royalties are never paid cannot be what Congress intended in awarding those individuals a substantial portion of the royalties for digital performances or in establishing complex rate-setting proceedings before the CRB. *See* 17 U.S.C. § 114(f), (g)(2). What Congress plainly did intend was meaningful enforcement, on their behalf, by SoundExchange. *See* pp. 6-11, *supra*.

3. *Obstacles to enforcement by copyright owners.* The district court's suggestion that copyright owners can protect their own interests by suing is likewise problematic as a practical matter. Whether the proposed solution is copyright infringement suits or—as Sirius has suggested—some other, unspecified statutory cause of action that such

owners could use to try to obtain unpaid royalty amounts, the district court's ruling is simply unworkable.

a. *Copyright infringement suits.*  There would be a host of complex and challenging issues associated with a regime in which copyright infringement actions were treated as the only avenue for addressing a failure to comply with the royalty payment obligations in Section 114. Such a regime would therefore undermine the predictability and effective functioning of a statutory licensing scheme that has been integral to the proliferation of online radio services.

First, copyright infringement suits are generally available only where a copyright owner has registered the work at issue. *See* 17 U.S.C. § 411(a).  But registration is not a condition of owning a copyright, *see* 2 Nimmer on Copyright § 7.16[A][1] (2025), and Section 114 requires royalty payments even on unregistered works, *see* 17 U.S.C. § 114(f)(3)(B)(i).  Thus, copyright infringement suits are no substitute for SoundExchange enforcement for unregistered works.

Second, many copyright owners would be unaware that they had been underpaid royalties at all and therefore would have no reason to know that they could or should bring an infringement suit.

18

SoundExchange devotes considerable resources to identifying those who are entitled to royalties, in part because individuals and entities who have that entitlement often do not realize that they may receive a distinct revenue stream under the statutory license. *See* Amy X. Wang, *The $1 Billion Waiting for Artists Who Know Where to Look*, Rolling Stone (Mar. 27, 2019), https://www.rollingstone.com/pro/features/soundexchange-michael-huppe-sxsw-810131/. But SoundExchange is funded by deductions from the royalties it collects. *See* 17 U.S.C. § 114(g)(3). If the threat of SoundExchange enforcement of royalty payments were removed, then Sirius would have greater incentive to significantly underpay royalties, which in turn would deprive SoundExchange of the funds it uses to undertake the complex task of identifying those who should receive royalties.

Individual copyright owners—particularly individuals or small entities—are very ill suited to undertake that task themselves. By regulation, statutory service providers like Sirius report usage information not to individual copyright owners but to SoundExchange. *See* 37 C.F.R. §§ 370.4(c), 382.3(a), 382.4(a). Copyright owners therefore

19

may not realize without SoundExchange's assistance that services are using their recordings.

Moreover, absent help from SoundExchange, copyright owners could not readily determine the *amount* that they are owed. As a satellite digital radio service, Sirius pays royalties as a percentage of its revenue. *See* 37 C.F.R. § 382.21(a). That model is notorious for creating "measurement difficulties" and "difficult questions for purposes of auditing and enforcement," including because the way that Sirius's payment obligation is measured is not directly tied to the right being licensed. *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084, 24,089 (May 1, 2007), *aff'd in relevant part*, *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 760 (D.C. Cir. 2009) (per curiam); *see also* Dana A. Scherer, Cong. Rsch. Serv., R43984, *Money for Something: Music Licensing in the 21st Century* 19-20 & n.130 (2018). Rather, a copyright owner's share of royalties depends on how much Sirius uses other copyright owners' works. But again, only SoundExchange receives that information. *See* 37 C.F.R. § 382.5(a)(1). As a result, copyright owners and artists—who at least arguably have no right to audit Sirius, *see* 37 C.F.R. §§ 380.6(a),

382.7(a)—lack meaningful visibility into Sirius's usage and accounting. And without the power to bring suit (and the attendant bargaining power in settlement negotiations), SoundExchange itself would have reduced incentives to conduct audits. Thus, if the district court's interpretation of Section 114 were correct, Sirius could underpay royalties and the appropriate rightsholders might simply never know about it.

Third, many copyright owners would lack the resources to conduct any such audits or to bring their own suits. Many rightsholders are small companies or private individuals who typically cannot afford individualized audits or litigation, particularly where they potentially stand to win only minimal amounts as a result. *See* Shyamkrishna Balganesh, *Copyright Infringement Markets*, 113 Colum. L. Rev. 2277, 2285 (2013) (discussing high costs of litigating copyright suits); S. Rep. No. 101-305, at 10, 12 (1990) (noting deterrent effect of cost of litigation on smaller entities, including an instance in which "[a] company that licenses performance rights for musical compositions withdrew an infringement suit . . . because it was too expensive to contest"). Indeed, before Congress amended Section 115 to allow a collective to audit and sue service providers, *see* Music Modernization Act § 102(a)(4), artists

21

often chose not to litigate underpayment of royalties under Section 115 because of the high costs of audits and litigation. *See* U.S. Copyright Off., *Copyright and the Music Marketplace* 108 & n.563 (Feb. 2015). And in this context, copyright owners would know that Sirius, as a defendant worth billions of dollars, would have all the resources necessary to draw out litigation.

Fourth, those problems with individualized litigation could not necessarily be overcome by some groups of copyright owners banding together in some way. To be sure, plaintiffs might seek to consolidate suits or pursue class actions. But even so, any such consolidated or class actions would likely involve only a subset of those entitled to royalties. There is no realistic prospect that all copyright owners could somehow coordinate with each other. And multi-plaintiff litigation would result in a poor facsimile of the scheme Congress designed in Section 114 by shifting to copyright owners and courts the costs of coordination, administration, and enforcement now borne by SoundExchange.

Finally, all of those issues would result in tremendous unpredictability for copyright owners hoping to ascertain whether they were underpaid (or never paid) royalties in the first place and, if so, to

22

recover an appropriate remedy. That type of uncertainty makes it difficult or impossible for copyright owners—who may depend on those royalties—to adequately undertake business planning and make informed business decisions.

b. *Other, unspecified cause of action*. To the extent that Sirius suggests, as it did in the district court, that copyright owners could assert some cause of action other than copyright infringement to claim that they were underpaid digital-performance royalties that they are owed under Section 114, there are numerous potential obstacles to any such suit.

As an initial matter, Sirius never identified the statutory cause of action that it thought those copyright owners could invoke to pursue such underpayment claims. But if Section 114 does not create a private cause of action for *anyone* to bring suit to collect underpaid royalties, including copyright owners, it is unclear where in the U.S. Code such a cause of action might exist.

In addition, even if there were a statutory cause of action for copyright owners other than an action for copyright infringement—which presumably would not permit plaintiffs to recover attorneys' fees, as they might under the Copyright Act, *see* 17 U.S.C. § 505—virtually all of the

23

same problems described above with respect to copyright infringement suits would arise. As explained, *see* pp. 18-23, *supra*, individual copyright owners would be uncertain if they had been underpaid (or unpaid) in the first instance; many would lack the resources to sue; devices for consolidating suits would be far from perfect and significantly worse than the system that exists now; and copyright owners would face considerable uncertainty, which would itself harm copyright owners' businesses and operations.

*    *    *

Given all those challenges, casting aside the existing scheme for enforcing royalties under Section 114 would have one all-but-certain result: providing Sirius and other statutory licensees with substantially greater opportunities to shirk their statutorily mandated royalty obligations. Even if some individual copyright owners could bring infringement actions as a remedy, statutory service providers like Sirius would have little incentive to pay royalties given practical obstacles to enforcement, including the prohibitive expense of litigation. And those providers would have no meaningful incentive, beyond the fear of future legislation, to pay royalties either to copyright owners who have not

24

registered their works or to the huge body of artists who are entitled to royalties under Section 114 but do not own rights under a copyright.

Congress did not intend that result. In enacting and amending Section 114, Congress struck a careful balance. On one hand, Congress provided a great benefit to services like Sirius, dramatically reducing their transaction costs by creating a blanket compulsory license with enormous breadth and allowing those services to pay royalties to just one collective. *See* S. Rep. No. 115-339, at 4 (2018) ("Song-by-song licensing negotiations increase the transaction costs to the extent that only a limited amount of music would be worth engaging in such licensing discussions."); 67 Fed. Reg. at 45,266 ("[I]t would be impractical for a [service like Sirius] to identify, locate and pay each individual [c]opyright [o]wner whose works it performed."). On the other hand, Congress gave copyright owners and musicians a right to royalties without imposing on them the burden of negotiating licenses or chasing down payment. *See* 148 Cong. Rec. H7047 (daily ed. Oct. 7, 2002) (statement of Rep. Conyers) (explaining that Section 114 "ensures the musicians, vocalists, and artists receive their royalties from digital music directly from the collection agent" rather than services or record labels); *see id.* (statement

25

of Rep. Berman) (similar).  That was intended as a win-win trade, even if Sirius "benefit[s] most from the reduction in transaction costs."  S. Rep. No. 115-339, at 6.

But the district court has unwound the bargain, giving Sirius all the benefits of minimal transaction costs in obtaining a massively valuable blanket license without the burdens of meaningful enforcement of Sirius's statutory obligations.  That is not the scheme Congress designed, and this Court should not impose it.

B.   The district court waved those arguments away as "policy" considerations that the court believed it could not take into account. JA133-134.  That was mistaken.  As this Court has long recognized, statutes should be interpreted to avoid "absurd results."  *United States v. Venturella*, 391 F.3d 120, 126-27 (2d Cir. 2004).  And because statutes are designed to "cure specific ills," *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989), courts—including this one—routinely consider whether the consequences of a particular interpretation would undermine the statute's purpose, *see, e.g.*, *King v. Burwell*, 576 U.S. 473, 488 & n.1 (2015); *Robers v. United States*, 572 U.S. 639, 644 (2014); *Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*, 101 F.4th 176, 183

(2d Cir. 2024). This Court will not attribute "a self-defeating purpose to the Congress." *USV Pharm. Corp. v. Weinberger*, 412 U.S. 655, 665 (1973); *accord, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023). Yet that is precisely what the district court did below.

## III. The District Court's Ruling, if Affirmed, Would Gravely Harm the Music Industry and the Public

Allowing Sirius to evade royalties would come at tremendous cost to the music industry. To start, SoundExchange itself is funded by deductions from royalty payments. If Sirius and other statutory service providers like it were given latitude to avoid those payments, SoundExchange could not perform the vital services that it provides to the industry, which include not only collecting and distributing royalty payments but also assisting artists, labels, producers, and publishers through a wide range of technological solutions, education, and advocacy. *See* SoundExchange, *What We Do*, https://www.soundexchange.com/what-we-do/#products-and-services (last visited Dec. 15, 2025).

The royalties recovered and administered by SoundExchange are also vital to the music industry more generally. In 2024, for example, SoundExchange distributions accounted for more than nine percent of total U.S. record music revenue on a wholesale basis—roughly $1 billion.

*See* RIAA, *2024 Year-End Music Industry Revenue Report Revenue Report* 1, 3 (2024), *available at* https://www.riaa.com/reports/2024-year-end-music-industry-revenue-report-riaa/; *see also* Ben Sisario, *Rise of SoundExchange Shows the Growth of Digital Radio Royalties*, N.Y. Times (Aug. 4, 2015), https://www.nytimes.com/2015/08/05/business/media/rise-of-soundexchange-shows-the-growth-of-digital-radio-royalties.html.

As noted, that money flows not only to copyright owners but also directly to performers who do not own copyrights. *See* 17 U.S.C. § 114(g)(2)(B)-(D); *see* p. 16, *supra*. If the district court's ruling were affirmed, those performers would stand to lose a very meaningful part of their livelihoods. *See* Travis M. Andrews, *In the Spotify Era, Many Musicians Struggle To Make A Living*, Wash. Post (Feb. 4, 2023), https://www.washingtonpost.com/arts-entertainment/2023/02/04/spotify-grammys-songwriters-payment-musicians/.

As to both copyright owners and performers, interrupting the flow of royalties for digital performance rights would have harmful consequences not only now but also in the future. A lack of adequate payment would undermine the incentive to engage in artistic creation in

28

the first place, threatening the very existence of creative content and the "useful Arts" that the Constitution directs Congress to promote. U.S. Const. art. 1, § 8, cl. 8. Reducing industry revenue by significant amounts thus would harm not only those who would otherwise engage in that creation but also the general public that seeks to enjoy the fruits of creators' labor. *See generally Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (to accomplish the fundamental copyright-law objective of "enriching the general public through access to creative works," it is critical to "encourag[e] and reward[]" those "creations") (citation modified); Joseph Story, III *Commentaries on the Constitution of the United States* 49 (1833) ("depredation and piracy" mean there is "little inducement to prepare elaborate works for the public").[2]

All the harm that would arise from loss of the revenue obtained through SoundExchange-enforced royalties would be compounded by the fact that copyright owners and performers have reasonably relied for

---

[2] In addition, limited enforcement under Section 114 would incentivize services that currently fall outside the scope of the statutory license to adjust their products to fall within the statutory license as a way of avoiding royalty payments, potentially decreasing the availability of interactive services and reducing consumer choice.

decades on receiving that money. For more than twenty years, SoundExchange and statutory service providers have operated on the understanding that Section 114 gives SoundExchange the right to "enforce[]" the statutory royalty scheme. 17 U.S.C. § 114(g)(3). Courts have routinely allowed SoundExchange to exercise that right, *see* SoundExchange Br. 12, 36-37 & n.4, and neither Sirius nor any other service has seriously challenged its exercise. To the contrary, Sirius has previously *acknowledged* that SoundExchange has the right to sue for enforcement. *See* 83 Fed. Reg. at 65,263 (noting that Sirius proposed a statute of limitations for disputed audit findings that would apply unless SoundExchange "initiated a legal action").

The district court failed to recognize that, absent enforcement by SoundExchange, statutory service providers will have almost no incentive to discharge their statutory payment duties, and the wider music industry will pay the price. Indeed, as if to prove that point, Sirius in this very case resisted compliance with SoundExchange's efforts to compel compliance through an audit—one of the devices that the district court insisted that SoundExchange can use to "address the unauthorized use of sound recordings or the nonpayment of royalties." JA129; *see*

30

JA20-21. Given statutory text that clearly contemplates a cause of action for SoundExchange, statutory history that confirms the centrality of SoundExchange's enforcement rights, and the absurd results that would follow from accepting Sirius's novel arguments, this Court should reverse the deeply harmful decision below.

## CONCLUSION

This Court should reverse and remand for further proceedings.

DATED: December 17, 2025  MUNGER, TOLLES & OLSON LLP

_By: /s/ Elaine J. Goldenberg_
ELAINE J. GOLDENBERG
DANIEL J. KANE
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500E
Washington, DC 20001
Telephone: (202) 220-1114
elaine.goldenberg@mto.com
daniel.kane@mto.com

_Counsel for_ Amicus Curiae

## CERTIFICATE OF COMPLIANCE

1.     This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c).  The body of the petition contains 5,598 words, excluding the portions exempted by rule.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in New Century Schoolbook 14-point font.


DATED:  December 17, 2025          By:   /s/ *Elaine J. Goldenberg*
                                              Elaine J. Goldenberg

32

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2025, I caused the foregoing to be electronically served on all counsel of record via electronic mail through the Court's ACMS system. I have also submitted six paper copies to the Court via overnight delivery.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

DATED: December 17, 2025     By: _/s/ *Elaine J. Goldenberg*_

                                            Elaine J. Goldenberg

33