# No. 25-2150

**United States Court of Appeals
for the Second Circuit**

SOUNDEXCHANGE, INC.

*Plaintiff—Appellant,*

*v.*

SIRIUS XM RADIO INC.

*Defendants—Appellees.*

On Appeal from the United States District Court
for the Southern District of New York
Case No: 1:24-cv-5491 (Hon. Naomi Reice Buchwald)

**BRIEF OF *AMICI CURIAE* SCREEN ACTORS GUILD–AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, THE AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, THE AFM & SAG-AFTRA INTELLECTUAL PROPERTY RIGHTS DISTRIBUTION FUND, MUSIC ARTISTS COALITION, AND ARTIST RIGHTS ALLIANCE IN SUPPORT OF PLAINTIFF-APPELLANT**

Danielle S. Van Lier
5632 Van Nuys Blvd, #2155
Sherman Oaks, CA 91401
Tel: (424) 265-5564
Danielle@VanLierLaw.com

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *Amici Curiae* provide the following disclosures of corporate identity:

Screen Actors Guild-American Federation of Television and Radio Artists, The American Federation of Musicians of the United States and Canada, Artist Rights Alliance, Music Artists Coalition, and the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund are all non-profit corporations; they do not offer stock; and they have no parent corporations.

## TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ i

Table of Contents ................................................................................. ii

Table of Authorities............................................................................. iv

Interest of Amici Curiae .........................................................................1

Summary of Argument............................................................................5

Argument..............................................................................................7

   I.    This Dispute is Not Just Between Two Large Companies—Its Outcome Will Impact Hundreds of Thousands of Performing Artists and Their Beneficiaries ......................................................................................7

      A.    Most Musicians Are Not Wealthy Celebrities; They Are Working Professionals Who Often Rely on Multiple Income Sources...........................8

      B.    SiriusXM Is a Multi-Billion-Dollar Enterprise with the Resources to Comply with the Statutory Royalty Framework It Benefits From..................11

   II.    Congress Deliberately Designed a Centralized, Mandatory Licensing System with Specific Protections for Performers That Depends on Collective Enforcement.....................................................................................14

      A.    The Evolution of Section 114's Royalties Illustrate Congress' Intent to Centralize Enforcement. ........................................................................14

      B.    Congress Purposefully Created a Statutory Compensation Right to Protect Performers ...............................................................................17

      C.    SoundExchange's Enforcement Authority Is Essential to the Statutory Scheme...............................................................................................19

      D.    Section 114 Royalties Are an Important Source of Income for Performers.............................................................................................20

   III.    The District Court's Reading of Section 114 Divorces it from its Purpose and Leaves Performers Without a Practical Means of Enforcement..................21

      A.    The District Court Treated the Absence of an Express Right of Action as Dispositive, Contrary to the Language and Operation of Section 114...........22

1. Section 114 Creates Rights and Obligations That Cannot Function Without Enforcement........................................................................................23

2. The Court Mistook "No Express Right" for "No Enforceable Right"25

3. The *Expressio Unius* Canon Does Not Foreclose Judicial Enforcement 26

4. The District Court's Interpretation Renders Key Statutory Provisions Superfluous    28

B. The District Court's Holding Leaves Performers Without a Means of Enforcement........................................................................................29

1. Individual Performers Lack the Ability to Identify or Prove Violations of Section 114    30

2. Individual Litigation is Economically Prohibitive...........................31

IV. Conclusion .....................................................................................34

Certificate of Compliance ...............................................................................1

Certificate of Service .......................................................................................2

# TABLE OF AUTHORITIES

**Cases**

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ..............................................27

*Burns v. United States,* 501 U.S. 129 (1991) ...........................................................28

*Duncan v. Walker*, 533 U.S. 167 (2001) ..................................................................28

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111(D.C. Cir. 2015) ......................................................................................................................14

*N.L.R.B. v. S.W. Gen., Inc.*, 580 U.S. 288 (2017)....................................................27

SoundExchange, Inc., v. Sirius XM Radio Inc., 796 F. Supp. 3d 1 (S.D.N.Y. 2025) ......................................................................................................................16

*U.S. v. Vonn*, 535 U.S. 55 (2002) ...........................................................................26

**Statutes**

17 U.S.C. § 112(e)....................................................................................................27

17 U.S.C. § 114(d) ...................................................................................................14

17 U.S.C. § 114(f)........................................................................................... passim

17 U.S.C. § 114(g) ............................................................................................. 14, 17

17 U.S.C. § 114(g)(2)..................................................................................................3

17 U.S.C. § 114(g)(3)................................................................................. 25, 26, 28

Pub. L. No. 104-39, 109 Stat. 336 (1995)................................................... 14, 15, 18

Pub. L. No. 107-321, 116 Stat. 2780, 2783-84 (2002) .................................... 16, 17

Pub. L. No. 115-264, 132 Stat. 3676, 3740 (2018)......................................... 17, 18

**Other Authorities**

17 U.S.C. § 114(d)(2)................................................................................................23

Brief for Plaintiff-Appellant, *Soundexchange, Inc. v. Sirius XM Radio Inc.*, No. 25-2150 (2d Cir. Dec. 10, 2025) ........................................................................16

H.R. Rep. No. 104-274 ....................................................................................... 15, 18

Kevin J. Hickey and Dana A. Scherer, *On the Radio: Public Performance Rights in Sound Recordings*, Cong. Rsch. Serv. at 4 (Mar. 31, 2025), https://www.congress.gov/crs-product/R47642.....................................................23

Musician Salary, Comparably, (updated Oct 29, 2025), https://www.comparably.com/salaries/salaries-for-musician .............................10

Press Release, Sirius XM Holdings Inc., *SiriusXM Reports Third Quarter 2025 Operating and Financial Results* (Oct. 30, 2025), SiriusXM Investor Relations, https://investor.siriusxm.com/financial-information/financial-results ......... 12, 13

Recording Artist Salary, Comparably, (updated Nov 13, 2023), https://www.comparably.com/salaries/salaries-for-recording-artist ...................10

Sirius XM Holdings Inc., *Quarterly Report (Form 10-Q)* (for the quarterly period ended Sept. 30, 2025) ............................................................................... 12, 13

U.S. Bureau of Lab. Stat., Occupational Outlook Handbook: Musicians and Singers, U.S. Dep't of Lab., https://www.bls.gov/ooh/entertainment-and-sports/musicians-and-singers.htm.........................................................................10

**Regulations**

37 C.F.R. § 380.6 ........................................................................................................30

37 C.F.R. § 382.7 ........................................................................................................30

37 C.F.R. §382.11–382.21 ..................................................................................... 30, 32

37 C.F.R. §382.6 ..................................................................................................... 30, 32

## INTEREST OF AMICI CURIAE[1]

The *Amici Curiae* are organizations that represent many of the musicians and recording artists who receive royalties collected and distributed by SoundExchange, Inc. ("SoundExchange") pursuant to Section 114 of the U.S. Copyright Act (17 U.S.C. § 114). While each amicus has a unique perspective, they share a common goal of protecting and empowering the artists they represent and serve.

Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") is the world's largest labor union representing working media artists. SAG-AFTRA represents more than 160,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists, influencers and other media professionals. The professionals represented by SAG-AFTRA are the faces and voices that entertain and inform America and the world. SAG-AFTRA exists to secure the strongest possible protections for media artists in the 21st century and beyond.

---

[1] No party or its counsel had any role in authoring this brief. No person or entity, other than amicus curiae and their counsel, contributed money that was intended to fund preparing or submitting this brief.

The American Federation of Musicians of the United States and Canada ("AFM") is the largest organization in the world representing the interests of professional musicians, including the interests of featured artists and session musicians. AFM represents over 80,000 musicians who perform in orchestras, backup bands, festivals, clubs and theaters and make music for films, television, commercials and sound recordings.

SAG-AFTRA and AFM (collectively, the "Unions") are the preeminent labor unions representing performing artists.

Artist Rights Alliance ("ARA") is an artist-run, non-profit. ARA aims to empower musicians to advocate for their own interests and ensure that artists can participate in the process when decisions are made on policies that impact their lives and their livelihood. ARA's Artists' Bill of Rights outlines fundamental principles for a healthy creative economy, chief among them being the musician's right to control their work. ARA believes that a sound and just copyright system requires, above all, respect for creators and their art.

Music Artists Coalition ("MAC") exists to champion the rights, compensation, and well-being of the people who create music. Both music industry executives and music creators created MAC to ensure that musicians have a seat at the table, driving the strategy and conversation about the legal issues that shape their lives and livelihoods. MAC's membership includes recording artists,

2

songwriters, and music creators whose work has shaped musical history and drives the music business today. Members of MAC include chart-topping songwriters, Grammy-winning artists, Rock and Roll Hall of Fame inductees, as well as music creators at all points of career development. MAC advocates on behalf of its constituents for appropriate compensation and for better terms regarding creative control of their works.

The AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is the independent administrator appointed jointly by copyright owners and AFM and SAG-AFTRA, respectively, pursuant to 17 U.S.C. §114(g)(2) to receive and distribute royalties to non-featured musicians and vocalists. The Fund distributes royalties to both union and non-union musicians and vocalists for their performance on songs played on satellite radio, non-interactive streaming services, webcasts, other digital formats, and international neighboring rights. The Fund has distributed more that $750 million since it was founded in 1998.

As the entity tasked with administering nonfeatured artist royalties, the Fund has a very direct interest in this litigation. Its ability to fulfill its own statutory obligations are dependent on SoundExchange's ability to collect receipts from licensees and, therefore, its enforcement capabilities. If SoundExchange is

3

precluded from enforcing the payment obligations under Section 114, it could have a significant impact on the Fund's operations.

The outcome of this case will affect the livelihood of countless artists and beneficiaries who derive a significant portion of their income from statutory royalties. Most are not the headliners who might immediately come to mind when one thinks of the music industry; they are middle-class, working artists for whom the royalties might be the difference between being able to pay their bills or not in a given month. Some royalty recipients are elderly beneficiaries with little other income.

As representatives of these artists, the unions and organizations have unique insight into the impact this case may have on their members and the broader music industry.

*Amici* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

This appeal concerns the integrity of the statutory licensing system Congress created in Section 114 of the Copyright Act. That system reflects a deliberate legislative choice to replace individual licensing and enforcement with a centralized framework designed to function at industry scale. The district court's interpretation disrupts that framework by denying the designated collective the ability to enforce compliance with mandatory royalty obligations, while suggesting individual enforcement mechanisms that cannot operate in practice.

Section 114 establishes a statutory license that permits digital audio services to publicly perform sound recordings without negotiating individual licenses, provided they comply with statutory conditions and pay royalties. To make that regime administrable, Congress required that royalties be collected, accounted for, and distributed through a single designated nonprofit collective.

Congress further ensured that performers would benefit from the licensing regime. The law requires that a guaranteed, non-waivable share of those royalties, be paid to performers by the designated collective. This statutory scheme reflected Congress' reasoned judgment that individual performers lack the bargaining power and access necessary to protect their interests through private markets.

The district court treated the absence of an express "right to sue" provision as dispositive, effectively concluding that the collective may identify systemic

5

underpayment but could not compel compliance. That reading divorces the statute from its purpose, structure, and operation. Section 114 presupposes enforcement by creating a right to payment coupled with mandatory payment obligations, centralizing reporting and auditing, and expressly authorizing the collective to incur costs for the "licensing and enforcement of rights." Interpreting the statute to allow violations to be identified but not remedied renders key provisions superfluous and transforms a mandatory payment regime into one dependent on voluntary compliance.

Nor does the court's reliance on individual enforcement withstand scrutiny. Performers entitled to Section 114 royalties generally lack access to the usage and revenue data necessary to detect underpayment, possess no audit rights, and cannot realistically litigate service-wide accounting disputes. Individual litigation is further rendered impracticable by the modest size of most performers' royalty payments which would be dwarfed by the cost of litigation.

The practical consequence of the district court's interpretation is a statutory right without a meaningful remedy. It allows licensees to retain the benefits of compulsory access to sound recordings without full payment of the royalties that Congress required be distributed to copyright owners and performers for the use of their works. Congress did not design a centralized statutory licensing regime that

6

depends on thousands of individual artists pursuing cost-prohibitive litigation to secure the compensation the statute guarantees them.

Because the district court's interpretation undermines the structure, purpose, and administrability of Section 114, the judgment should be reversed.

## **ARGUMENT**

**I. This Dispute is Not Just Between Two Large Companies—Its Outcome Will Impact Hundreds of Thousands of Performing Artists and Their Beneficiaries**

At first glance, this case appears to be a dispute between two companies over a substantial sum of money. In reality, it concerns the systemic underpayment of statutory royalties owed to individual working performers whose interests are represented by a nonprofit entity statutorily designated to collect and distribute those royalties. The district court's decision, based on a flawed analysis of the statute, will reverberate well beyond the parties to impact hundreds of thousands of working musicians and singers and their beneficiaries who rely on the underpaid royalties at issue.

This dispute arises against the backdrop of significant structural changes in the music industry, including the shift from over-the-air broadcasting to digital audio transmissions and streaming. The transition from physical to digital distribution has altered the economics of recorded music, including the manner in

which artists are compensated for the use of their sound recordings. Although aggregate industry revenues have increased in the digital era, many performers—particularly non-featured, session, and mid-level artists—remain dependent on statutory royalty streams as a meaningful source of income.

Those economic pressures have been compounded by the rapid deployment of artificial intelligence ("AI") technologies capable of generating content that closely resembles human performances. As companies increasingly turn to AI systems trained on existing sound recordings (typically without consent or compensation), rather than hiring human performers, the role of statutory royalties becomes more, not less, significant. In today's environment, Section 114's framework is not ancillary to the industry's functioning; it is a central mechanism through which Congress sought to ensure that working performers (and, where applicable, their heirs) share in the value generated by the use of their recorded performances.

### A. Most Musicians Are Not Wealthy Celebrities; They Are Working Professionals Who Often Rely on Multiple Income Sources

When the public thinks of "recording artists," they often envision globally recognized celebrities like Taylor Swift, Beyoncé, or Drake. The district court's reasoning appears to rest on a similar faulty assumption: that individual artists generally possess the resources and practical ability to pursue litigation when statutory royalties are underpaid.

That assumption does not reflect the economic reality faced by most performers. The overwhelming majority of artists who receive the royalties collected and distributed by SoundExchange are not high-earning celebrities but working professionals. Session musicians and background vocalists, in particular, typically earn modest incomes and often fall at or below the lower end of the middle-class income spectrum.[2]

Available labor data confirms this reality. The U.S. Bureau of Labor Statistics estimates that the median hourly wage for musicians and singers in 2024 was $42.45, with only the top ten percent earning more than $105.44 per hour. U.S. Bureau of Lab. Stat., *Occupational Outlook Handbook: Musicians and Singers*, U.S. Dep't of Lab., https://www.bls.gov/ooh/entertainment-and-sports/musicians-

---

[2] According to research by Pew Research Center, "middle class" or "middle income" households are those with an income falling in a range from two-thirds to double the U.S. median household income, adjusted for household size. Rakesh Kochhar, *The State of the American Middle Class*, Pew Research Ctr. (May 31, 2024), https://www.pewresearch.org/race-and-ethnicity/2024/05/31/the-state-of-the-american-middle-class/. The median middle-class income for a family of three in 2022 was $106,100. Id. According to another analysis, 2024 U.S. Census Bureau data indicated that the median U.S. household income was $83,730 with middle-class households earning between $55,262 to $167,460. *Are You Actually Middle Class? The Answer Might Surprise You*, Investopedia (Oct. 30, 2025), https://www.investopedia.com/are-you-actually-middle-class-the-answer-might-surprise-you-11770664. These numbers do not reflect geographic location, with many locations having much higher costs of living. *Id.*

and-singers.htm (last visited Dec. 8, 2025). Even if extrapolated to full-time work, these figures approximate national median earnings.[3] But most musicians and singers do not work at their chosen profession full time. Many experience irregular employment, extended periods between engagements, and significant income volatility. U.S. Bureau of Lab. Stat., *Musicians and Singers*.

As a result, musicians and singers frequently supplement their income through other work, such as teaching, unrelated gig work, or employment in other fields, while continuing to seek work in their profession. *Id.* For these performers, statutory royalties are not ancillary or discretionary; they function as a modest but recurring source of income that contributes to financial stability. These modest but recurring payments help cover ordinary living expenses—such as rent, childcare, health insurance, or transportation—particularly during periods when performance

---

[3] The website Comparably, which provides workplace insights and benchmarking, estimates the average income for a recording artist is $62,953, with a range of $27,203 to $297,004. *Recording Artist Salary*, Comparably, (updated Nov 13, 2023), https://www.comparably.com/salaries/salaries-for-recording-artist. Comparably estimates musicians average $77,925, within a range of $39,292 to $337,134. *Musician Salary*, Comparably, (updated Oct 29, 2025), https://www.comparably.com/salaries/salaries-for-musician. It is worth noting that each page contains a disclaimer that the data is "estimated and depends on the generous anonymous contributions of individuals." *Id*.

work is unavailable. The same is true for the heirs of deceased performers who receive Section 114 royalties, many of whom depend on those payments.

These economic realities underscore the administrability concerns that underlie the statute. Individual litigation is not a realistic option for most performers. Effective royalty collection therefore depends on centralized administration that permits uniform reporting, auditing, and distribution without requiring individual artists or their estates to undertake enforcement efforts that would be economically infeasible.

The concerns are only amplified by broader technological change. Advances in AI now allow music to be generated, imitated, and distributed at unprecedented scale, intensifying competition for listener attention and further weakening the connection between human creative labor and compensation. For countless artists in today's industry, the reliable and predictable functioning of Section 114's collective royalty mechanisms is not merely convenient; it is essential to maintaining a viable means of earning a living.

### B. SiriusXM Is a Multi-Billion-Dollar Enterprise with the Resources to Comply with the Statutory Royalty Framework It Benefits From

The prior section describes the economic reality facing most musicians and singers, for whom statutory royalties represent a modest but essential source of income. In contrast, the court must also consider the position of the party responsible for paying and reporting those royalties. SiriusXM's scale, revenues,

and institutional capacity are directly relevant to the administrability of the statutory framework Congress enacted.

Defendant-Appellee SiriusXM's public financial disclosures underscore the economic context and the significant disparity between the parties. For the quarter ending September 30, 2025, SiriusXM reported total revenue of approximately $2.16 billion, including $1.6 billion from its core SiriusXM subscription service. Press Release, Sirius XM Holdings Inc., *SiriusXM Reports Third Quarter 2025 Operating and Financial Results* (Oct. 30, 2025), SiriusXM Investor Relations, https://investor.siriusxm.com/financial-information/financial-results; *see also* Sirius XM Holdings Inc., *Quarterly Report (Form 10-Q)* (for the quarterly period ended Sept. 30, 2025), filed with the U.S. Sec. & Exch. Comm'n, SEC EDGAR, https://www.sec.gov. Subscription fees from nearly 33 million subscribers, the consumers of sound recordings through its platform, were SiriusXM's primary source of revenue. *SiriusXM Q3 2025 Form 10-Q* at 12.

Against those revenues, SiriusXM reported quarterly operating expenses of $1.67 billion with $721 million categorized as "revenue share and royalties."[4] *Id.* at 2. That figure encompasses not only payments to performers and copyright

---

[4] The amount attributable specifically to its SiriusXM service was $384 million. *SiriusXM Q3 2025 Form 10-Q* at 43.

owners under statutory and contractual royalty regimes, but also revenue-sharing arrangements with automakers, content providers, and advertisers. *Id.* at 45. As a result, only a limited portion of that expense reflects compensation to the individual musicians and singers whose sound recordings drive SiriusXM's core product.

At the same time, SiriusXM reported gross profit approaching $1 billion for the quarter, reflecting a profit margin of approximately 59 percent. *SiriusXM Q3 2025 Earnings Press Release.* Over the nine-month period ending September 30, 2025, the company also paid $274 million in dividends to shareholders. *SiriusXM Q3 2025 Form 10-Q* at 10. The amounts in dispute in this case thus represent a small fraction of SiriusXM's revenues and profits, but a meaningful source of income for the performers entitled to statutory royalties.

These figures highlight why Congress placed the responsibility for accurate royalty payment and reporting on single collective organization, rather than on individual performers. SiriusXM has the scale, resources, and institutional capacity to comply with the statutory framework. Individual musicians—many of whom receive modest, recurring royalty payments—do not. Interpreting the statute in a manner that diminishes collective enforcement shifts risk and cost away from the party best positioned to bear it and onto the very performers the statute was designed to protect.

II. **Congress Deliberately Designed a Centralized, Mandatory Licensing System with Specific Protections for Performers That Depends on Collective Enforcement**

Congress enacted Section 114 to create a workable statutory license for the digital public performances of sound recordings. The statute reflects a deliberate balance: digital services availing themselves of the license receive certainty and nationwide access to sound recordings, while performers and sound recording copyright owners receive guaranteed compensation without the need for individual negotiation. *See* 17 U.S.C. § 114(d), (f), (g); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 114 (D.C. Cir. 2015).

To make that balance administrable at industry scale, Congress required that statutory royalties be collected, accounted for, and distributed through a single designated nonprofit collective. 17 U.S.C. § 114(g)(2). Centralization is not merely an administrative convenience; it is essential to managing uniform reporting, auditing, and payment obligations across thousands of copyright owners and millions of performances. The statutory license cannot function as intended if the entity responsible for administering it lacks the ability to enforce compliance when systemic underpayments are identified.

A. **The Evolution of Section 114's Royalties Illustrate Congress' Intent to Centralize Enforcement.**

When Congress enacted the Digital Performance Right in Sound Recordings Act of 1995 ("DPRSRA"), Pub. L. No. 104-39, 109 Stat. 336 (1995), it recognized

14

that emerging digital transmission technologies posed a direct threat to existing revenue streams upon which recording artists and their labels relied. *See* H.R. Rep. No. 104-274, 12-14. Congress expressly acknowledged that "copyright law is inadequate to address all of the issues raised by these new technologies…" and, that legislative action was necessary to "protect the livelihoods of the recording artists, songwriters, record companies, music publishers and others who depend upon revenues derived from traditional record sales." *Id.* at 13.

To address these developments, Congress created a new exclusive right to publicly perform sound recordings "by means of a digital audio transmission." Pub. L. No. 104-39 §2, 109 Stat. 336. The exclusive right was limited and tempered by a series of statutory limitations designed to balance the competing interests of performers, copyright owners, and digital services. *See* H.R. Rep. No. 104-274, 14. Among those limitations was the creation of a compulsory licensing regime that guaranteed qualifying transmitters access to sound recordings, provided they complied with statutory requirements, including the payment of royalties. Pub. L. No. 104-39 §2, 109 Stat. 336 (1995). *See also*, H.R. Rep. No. 104-274, 20-21 (1995).

From the outset, Section 114 was designed to operate at national scale and to address the practical impossibility of individualized negotiations between countless copyright owners and digital audio services. As originally enacted, however, the

15

statute imposed significant administrative burdens and inefficiencies, as SoundExchange describes in its opening brief. Brief for Plaintiff-Appellant at 8-10, *Soundexchange, Inc. v. Sirius XM Radio Inc.*, No. 25-2150 (2d Cir. Dec. 10, 2025).

In response, Congress amended Section 114 in 2002 to codify industry agreements that had emerged in practice and to further streamline administration of the statutory license. *See* Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(a), (c) 116 Stat. 2780, 2783-84 (2002). Those amendments recognized that stakeholders had "voluntarily negotiated arrangements under which payments shall be made directly to featured recording artists," arrangements that had already been implemented through regulations issued by the Librarian of Congress. [5] Pub. L. No. 107-321, § 5(a), 116 Stat. 2780, 2783-84.

Critically, Congress amended Section 114(g)(2) to require that royalties be distributed by "an agent designated to distribute receipts from the licensing of transmissions." *Id.* at §5(c).[6] Congress also added express language authorizing the

---

[5] In its opinion, the district court referred to SoundExchange as being "established" by statute or "a statutory creation." *SoundExchange, Inc., v. Sirius XM Radio Inc.*, 796 F. Supp. 3d 1, 5-9 (S.D.N.Y. 2025). It is clear from this legislative history that the court misinterpreted both the language of Section 114(g) and SoundExchange's very existence. This error permeates the opinion, potentially impacting the court's analysis.

[6] A "technical and conforming amendment" in the Orrin G. Hatch-Bob Goodlatte Music Modernization Act reidentified the agent as "a nonprofit

designated agent to deduct its "reasonable costs" incurred in, among other responsibilities, "the licensing and *enforcement* of rights" under Section 114. *Id.* (emphasis added). That enforcement authority is central to the statutory design.

The decision below treats Section 114, and SoundExchange's role in it, as if it were a routine administrative framework rather than a comprehensive statutory system reflecting a careful legislative balance. In reality, Section 114 consists of three interdependent components: automatic licensing; mandatory royalty payments; and centralized collection, distribution, and *enforcement*. *See* 17 U.S.C. § 114(d), (f), (g) (emphasis added). Congress adopted this structure because individual licensing and enforcement are infeasible at industry scale. Centralization of collection, distribution, and enforcement is not incidental to the statutory license, it is the mechanism that allows the system to function.

### B. Congress Purposefully Created a Statutory Compensation Right to Protect Performers

Congress deliberately crafted Section 114's statutory licensing regime to address the unique challenges posed by digital transmission technologies and to ensure that performers—separate and apart from copyright owners—receive compensation for certain public performances of sound recordings. *See* H.R. Rep.

---

collective designated by the Copyright Royalty Judges." Pub. L. No. 115-264, §302(c), 132 Stat. 3676, 3740 (2018).

No. 104-274, 23-24 ("The Committee intends the language of section 114(g) to ensure that a fair share of the digital sound recording performance royalties goes to performers"). The district court's analysis ignores this central feature of the statute.

Section 114 does not treat performers as incidental or ancillary beneficiaries of the statutory license. It affirmatively identifies them as intended recipients of a right to compensation. It requires that receipts are divided evenly, one half to the copyright owner and one half to the performers. H.R. Rep. No. 104-274, at 24; Pub. L. No. 104-39, §3, 109 Stat. 336. Congress adopted this allocation to reflect the contributions of the performers whose creative labor is embodied in sound recordings, including those who do not receive featured billing.

As codified, Section 114 requires that royalties be divided among specific classes of performers, including nonfeatured musicians and vocalists. *See* 17 U.S.C. § 114(g)(2)(B). Royalties are to be allocated as follows: 45 percent to featured artists; 2.5 percent to nonfeatured vocalists (through a designated administrator); and 2.5 percent to nonfeatured musicians (through a designated administrator). *Id.* These statutory entitlements cannot be contracted away. [7] With

---

[7] In 2018, Congress added a provision allowing royalty recipients to direct a portion of their royalties to "a producer, mixer, or sound engineer who was part of the creative process that created a sound recording." Pub. L. No. 115-264, §302(a), 132 Stat. 3676, 3739-40.

the exception of later amendments assigning distribution responsibility to a designated collective (*i.e.* SoundExchange), and making conforming amendments, the allocation framework has remained materially unchanged since its enactment in 1995.

Congress thus made a deliberate judgment that, in the digital public-performance context, performers whose contributions are typically uncompensated in private markets—such as session musicians, background vocalists, and ensemble players—must share in the value generated by the use of their recorded performances.

### C. SoundExchange's Enforcement Authority Is Essential to the Statutory Scheme

Congress did not design Section 114 as a system that relies on individual performers to monitor compliance or vindicate their rights through litigation. It created a centralized statutory licensing regime administered by a collective entity precisely because individualized enforcement would be impractical for most performers.

SoundExchange's role as the designated collective is therefore not incidental. It implements the statutory design by centralizing collection, accounting, auditing, and enforcement so that individual artists and copyright owners need not pursue separate negotiations or claims to receive the

19

compensation Congress guaranteed. SoundExchange's authority to enforce compliance with Section 114 is a necessary component of that structure.

If enforcement responsibility is effectively shifted onto individual performers, the statutory protections Congress enacted become largely illusory. For working musicians with limited financial resources, the absence of collective enforcement would result in underpayment without any realistic means of recovery. Such a result would undermine the very protections Congress designed Section 114 to provide.

### D. Section 114 Royalties Are an Important Source of Income for Performers

For many performers, particularly nonfeatured musicians and vocalists, statutory royalties under Section 114 are not merely supplemental. They represent a meaningful and recurring form of compensation in an industry where most revenue streams are volatile, highly intermediated, or dependent on bargaining power that many performers lack.

Even as aggregate recorded-music revenues have increased in the streaming era, those gains have not translated into sustainable earnings for most working musicians, especially those who do not receive songwriting income or featured-artist royalties. In this environment, Section 114 royalties function as one of the few mechanisms through which performers can receive compensation without

20

negotiating individual licenses, pursuing private enforcement actions, or relying on market leverage they do not possess.

Nonfeatured performers, in particular, rarely have contractual audit rights, negotiating leverage, or direct royalty accounting relationships with digital services. Section 114 accounts for these market realities by guaranteeing a defined share of the performance royalty pool directly to nonfeatured musicians and vocalists, irrespective of private contractual arrangements or label distributions. *See* 17 U.S.C. § 114(g)(2).

In sum, Section 114 reflects Congress's considered judgment that performers require statutory protection and compensation when their recorded performances are digitally transmitted at scale. The statute's text, structure, and legislative history demonstrate that Congress intended not merely to impose a royalty obligation on digital services, but to ensure enforceable, non-waivable compensation for all contributing performers.

## III. The District Court's Reading of Section 114 Divorces it from its Purpose and Leaves Performers Without a Practical Means of Enforcement

The district court adopted a rigid reading of Section 114 that isolates individual statutory provisions from the structure and operation of the statutory license as a whole. In doing so, it detached the statute from the economic and administrative framework Congress deliberately created and effectively eliminated any meaningful mechanism for enforcing the royalty obligations Congress

21

imposed. That result is not compelled by the text of Section 114 and is inconsistent with the statute's evolution and design.

As the history of Section 114 makes clear, Congress intentionally shifted licensing, administration, and enforcement away from individualized rights holders and toward a centralized collective. Reading the statute to deny that collective the ability to enforce compliance undermines the statutory bargain and leaves the performers Congress intended the statute to protect without any practical remedy.

### A. The District Court Treated the Absence of an Express Right of Action as Dispositive, Contrary to the Language and Operation of Section 114

The district court's analysis rests on the premise that because Section 114 does not expressly state that "SoundExchange may sue," Congress must have intended to withhold enforcement authority. That premise misconstrues how the Section 114 statutory license operates and elevates silence over structure, function, and context.

Statutory schemes frequently assign duties and responsibilities without enumerating every procedural mechanism necessary to carry them out. Here, Section 114 imposes mandatory payment obligations, requires centralized reporting and accounting, and authorizes the designated collective to incur—and recover— costs associated with licensing *and enforcement*. Reading the statute to deny

22

enforcement authority because Congress did not use a specific phrase ignores how the statutory license functions in practice.

1. Section 114 Creates Rights and Obligations That Cannot Function Without Enforcement

A statutory license is a legislative substitute for market negotiation, adopted where Congress determines that individual bargaining would be impracticable or inconsistent with the public interest. Under such a regime, copyright owners relinquish core market rights: they cannot refuse access, negotiate rates, or condition use on individualized agreements. In exchange, Congress guarantees compensation at rates set by law and provides mechanisms to ensure payment. *See, e.g.,* Kevin J. Hickey and Dana A. Scherer, *On the Radio: Public Performance Rights in Sound Recordings*, Cong. Rsch. Serv. at 4 (Mar. 31, 2025), https://www.congress.gov/crs-product/R47642 ("When Congress provides for a statutory license for some use of a copyrighted work, a third party need not seek individual permission from the copyright owner but can instead engage in the use and pay a royalty set by law.").

Section 114 embodies that exchange. It establishes a nonexclusive statutory license permitting digital audio services to publicly perform sound recordings without the copyright owner's consent, provided they comply with statutory conditions and pay royalties set by the Copyright Royalty Judges. *See* 17 U.S.C. § 114(d)(2),(f). To make the system administrable, the statute requires that payments

23

be made to a single designated collective rather than to individual performers or rights holders. *Id.* § 114(g)(2).

For copyright owners, the statutory license is a market constraint accepted in return for the certainty of compensation. Section 114 adds an additional constraint on copyright owners in its grant of royalties to performers. Specifically, Congress expressly reserved to performers a portion of the statutory royalty that would typically flow to the copyright owner. This royalty is due performers irrespective of the private contractual arrangements between the performer and the copyright owner that would otherwise govern the relationship.

That protection only has value if it is enforceable. If the designated collective lacks the authority to enforce compliance, the statutory license becomes fundamentally asymmetric: licensees receive certainty and immunity from infringement liability, while performers and copyright holders receive only a contingent expectation of payment dependent on voluntary compliance. Nothing in the text or history of Section 114 suggests Congress intended to create such a one-sided regime.

Indeed, Section 114(g) was not designed as a system that depends on good faith alone. It is a mandatory payment framework, supported by centralized administration. For decades, SoundExchange has served as the entity responsible for collecting royalties, conducting audits, resolving disputes, filing litigation, and

24

addressing underpayment. While past practice cannot itself confer authority, it is probative where Congress has repeatedly amended the statute without disturbing the collective's exercise of its enforcement function.

    2.   <u>The Court Mistook "No Express Right" for "No Enforceable Right"</u>

The district court conflated the absence of an express private right of action with the absence of *any* enforceable right. Section 114, however, creates an express, mandatory entitlement to royalties for performers and requires that those royalties be paid to a single designated collective. The statute does not leave enforcement to individual choice or voluntary compliance; it replaces individualized enforcement with a centralized statutory mechanism.

Once Congress required licensees to remit royalties to a collective agent rather than to individual performers and copyright owners, it necessarily displaced their practical ability to monitor compliance or pursue underpayment claims on their own. The statute thus presupposes that enforcement authority accompanies the obligation to collect, account for, and distribute royalties.

That understanding is confirmed by the text of Section 114(g)(3), which authorizes the designated collective to deduct its reasonable costs incurred in "the licensing and enforcement of rights." 17 U.S.C. § 114(g)(3)(C). This language is not merely administrative. The rights at issue are private property interests belonging to performers, and enforcement of such rights—particularly against

large commercial licensees—necessarily includes the ability to seek judicial relief when underpayment is identified.

Reading Section 114 to authorize identification of underpayment but to preclude any mechanism for adjudicating or remedying that underpayment would render the enforcement language superfluous and leave the statutory scheme unworkable. Congress designed a mandatory payment regime supported by centralized enforcement sufficient to operate at industry scale.

3.  The *Expressio Unius* Canon Does Not Foreclose Judicial Enforcement

Section 114(g)(3)(C) authorizes SoundExchange to deduct reasonable costs incurred in "the licensing and enforcement of rights…including those incurred in participating in negotiations or arbitration proceedings." 17 U.S.C. § 114(g)(3)(C). Relying on the canon of *expressio unius est exclusio alterius*, the district court reasoned that because Congress referenced negotiation and arbitration—but did not expressly reference litigation—it must have intended to exclude judicial enforcement.

That application of *expressio unius* is misplaced and misapplied. The Supreme Court has described the canon as "only a guide, whose fallibility can be shown by contrary indications." *U.S. v. Vonn*, 535 U.S. 55, 65 (2002).  Section 114(g)(3)(C) is administrative in form, governing cost allocation and permissible deductions, but it *presupposes* substantive enforcement activity rather than *limiting*

26

it. The provision was not drafted as a remedial catalog enumerating every mechanism by which compliance with Section 114 may be compelled.

The canon of *expressio unius* applies only where a statutory list is plausibly intended to be comprehensive. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (the canon applies only when context supports "a sensible inference that the term left out must have been meant to be excluded").Here, the references to negotiation and arbitration appear as illustrative examples within the broader category of "licensing and enforcement" costs, not as an exhaustive enumeration. More particularly, the inclusion of negotiation and arbitration reflects the regulatory architecture governing rate setting. Congress expressly required negotiation and arbitration as part of the rate-setting process under Sections 112 and 114. *See* 17 U.S.C. §§ 112(e), 114(f). Litigation, by contrast, is not a rate-setting mechanism; it is the ordinary means by which courts adjudicate post-hoc disputes over compliance with statutory obligations. Congress therefore had no reason to list litigation alongside negotiation and arbitration in a provision addressing deductible administrative costs.

More fundamentally, Congress does not prohibit judicial enforcement through its silence, particularly not through silence in a provision that addresses cost recovery rather than remedies. "The force of any negative implication ... depends on context," *N.L.R.B. v. S.W. Gen., Inc.*, 580 U.S. 288, 302 (2017), quoting

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). See, also, *Burns v. United States,* 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."). Section 114 establishes a statutory scheme that eliminates individual licensing, mandates payment, and centralizes collection. That structure necessarily presupposes a corresponding ability to enforce compliance when mandatory royalties are underpaid.

Reading Section 114 to allow SoundExchange to identify violations but to deny any adjudicative mechanism for resolving or remedying those violations would render the statutory scheme unworkable. Congress did not replace individual bargaining power with a system dependent on voluntary compliance alone.

4.  The District Court's Interpretation Renders Key Statutory Provisions Superfluous

The district court's reading of Section 114 cannot be reconciled with the statute's text as a whole. Courts "must give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Under the interpretation adopted below, multiple provisions of Section 114—including its express references to enforcement—are rendered meaningless. Section 114(g)(3)(C) authorizes the designated collective to deduct its reasonable enforcement costs. 17 U.S.C. § 114(g)(3)(C). If the collective lacks authority to

28

pursue remedies when statutory royalties are underpaid, the term "enforcement" has no operative function. Auditing and reporting alone do not enforce a right; they merely identify noncompliance.

Congress could have limited the collective's role to collection and distribution. It did not. Instead, it expressly included enforcement as a cost-bearing responsibility. The district court's interpretation reads that language out of the statute and violates the settled presumption against surplusage.

That flaw is compounded by the structure of the statutory license itself. Section 114 requires statutory licensees to make mandatory payments while simultaneously depriving rights holders of the ability to negotiate, refuse access, or condition use on individualized agreements. Absent collective enforcement, performers would be left with no meaningful mechanism to vindicate the very rights Congress guaranteed them—an outcome incompatible with the statute's design.

## B. The District Court's Holding Leaves Performers Without a Means of Enforcement

Under the district court's interpretation, the designated collective may audit licensees and identify underpayment, but no entity may compel payment. That result destabilizes a statutory licensing system Congress designed to operate in a predictable, efficient, and enforceable manner. Courts ordinarily construe statutes to preserve their practical operation, not to render them self-defeating. Section 114

29

should be interpreted in a manner that allows the system Congress created to function as intended.

1. Individual Performers Lack the Ability to Identify or Prove Violations of Section 114

In practice, individual enforcement is not a viable option. Performers entitled to statutory royalties under Section 114 lack access to the revenue and usage data necessary to identify underpayment, possess no audit rights, and would be required to litigate service-wide accounting disputes at prohibitive cost. These barriers are structural features of the statutory licensing regime, not incidental obstacles.

Royalty obligations under Section 114 are not based on discrete, observable acts. They are calculated using aggregate revenues, allocation formulas, and detailed usage data reported exclusively to the designated collective. *See* 17 U.S.C. § 114(f); 37 C.F.R. §§ 380.6, 382.6, 382.11–382.21. Individual artists and sound recording owners do not receive this underlying data, lack audit rights, and cannot independently determine whether statutory royalties have been correctly calculated or paid. Even if they could obtain partial information, the authority to audit and reconcile service-wide accounting resides solely with the collective. *See* 37 C.F.R. §§ 380.6, 382.7.

The statute accounts for these realities by requiring that statutory royalties be paid to a single designated collective responsible for collection, accounting, and

distribution. 17 U.S.C. § 114(g)(2). The statute thus substitutes centralized administration *and enforcement* for individual enforcement, precisely because individual enforcement is impracticable at industry scale.

Even if individual performers could somehow identify underpayment, individual litigation would be economically prohibitive.

### 2. Individual Litigation is Economically Prohibitive

Apart from the inability of individual performers to discover underpayment, individual litigation is unrealistic for nonpayment of Section 114 royalties. Section 114 does not provide for statutory damages, nor does it have fee-shifting provisions that could offset the cost of litigation. Recovery in most cases would be limited to the amount of unpaid royalties, which for most performers—particularly nonfeatured musicians and vocalists—is modest. [8]

To bring a claim, a performer would have to retain counsel, obtain expert accounting assistance, and litigate complex, service-wide questions regarding revenue reporting, usage allocation, and royalty calculation. Those costs would necessarily be incurred before any underpayment could be established and would

---

[8] While annual royalty payments provide an important source of income for thousands of musicians and vocalists, most performers receive relatively modest amounts, often totaling less than $1,000 per year.

31

far exceed the potential recovery available to an individual performer in most cases. For many, court filing fees alone could exceed their potential recovery.

These economic barriers are not incidental; they are inherent in the structure of the statutory license. Section 114 royalties are calculated on an aggregate basis using platform-level data that is reported exclusively to the designated collective. *See* 37 C.F.R. §§ 380.6, 382.6, 382.11–382.21. Individual performers lack access to that data and have no independent audit rights. As a result, it would require substantial expense simply to determine whether a violation occurred.

Consider a nonfeatured vocalist whose performances appear on multiple commercially released recordings regularly transmitted under the Section 114 statutory license. Over the course of a year, that performer may receive statutory royalties totaling a few hundred dollars, paid in small increments across multiple services. If a single service underpaid its statutory royalties, the performer would have no access to the underlying data, no audit rights, and no practical means of determining whether underpayment occurred without initiating litigation. Retaining counsel and engaging forensic accounting expertise would far exceed any potential recovery, rendering individual enforcement economically irrational.

This scenario is not exceptional. It reflects the ordinary operation of Section 114 for thousands of nonfeatured musicians and vocalists whose recordings remain

in active circulation but who lack any realistic means of enforcing statutory payment obligations on their own. [9]

Even if these hurdles could somehow be overcome, individual enforcement would remain economically irrational, particularly for nonfeatured performers. The practical effect of the district court's holding is to allow licensees to retain amounts they are statutorily required to pay. That result confers an unwarranted economic benefit untethered from the statutory scheme. Congress did not intend, let alone design, a mandatory licensing regime that depends on thousands of individual artists pursuing cost-prohibitive litigation to secure the compensation the statute guarantees.

Requiring individual performers to pursue such claims would also undermine the orderly administration of and impose unnecessary burdens on the

---

[9] Consider another example: a nonfeatured studio violinist who became a member of the American Federation of Musicians in the 1930s and who, over a career spanning more than half a century, worked as a session musician on sound recordings headlined by prolific artists like Frank Sinatra, Neil Diamond, Michael Jackson, Elvis Presley, and Barbra Streisand, all of which continue to be regularly transmitted by digital audio services. The statutory royalties arising from the digital transmission of those recordings now flow to his beneficiaries. Like the hypothetical vocalist, neither the musician during his lifetime nor his beneficiaries today can realistically enforce payment through individual litigation. Absent centralized enforcement as contemplated by the statute, the statutory right to compensation for the ongoing digital exploitation of such a performer's work would be effectively unenforceable.

courts. Fragmenting enforcement into innumerable individual actions would invite duplicative litigation, inconsistent rulings, and inefficient use of judicial resources, This is precisely the type of systemic inefficiency Congress sought to avoid by centralizing administration and enforcement in a single collective entity.

By denying enforcement authority to the collective while pointing to individual enforcement mechanisms that cannot function in practice, the district court's interpretation strips the statutory license of its core protection. For artists who depend on statutory royalties, the result is straightforward: a right without a remedy.

That is not the statutory bargain Congress enacted. Statutory licenses work only when the tradeoffs they impose are honored on both sides. Here, the decision below permits licensees to retain the benefits of compulsory access to sound recordings while eroding the centralized enforcement mechanisms that make mandatory compensation meaningful.

## IV. Conclusion

For musicians and sound recording artists, Section 114 is not a symbolic entitlement. It is the mechanism Congress adopted to ensure that performers are compensated when their work is digitally transmitted. That mechanism depends on centralized administration and meaningful, centralized enforcement.

For the foregoing reasons, and those set forth in the Plaintiff-Appellant's brief, *amici curiae* respectfully request that the court reverse the decision below.

Dated: December 17, 2025    Respectfully submitted,

<p style="margin-left:40%">
<u>/s/ Danielle S. Van Lier</u><br>
Danielle S. Van Lier<br>
5632 Van Nuys Blvd, #2155<br>
Sherman Oaks, CA 91401<br>
Tel: (424) 265-5564<br>
Danielle@VanLierLaw.com
</p>

<p style="margin-left:40%"><em>Counsel of Record for Amici</em></p>

35

## __CERTIFICATE OF COMPLIANCE__

I hereby certify that:

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) because this brief 6,933 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman font.

Dated: December 17, 2025

_/s/ Danielle S. Van Lier_
Danielle S. Van Lier

## CERTIFICATE OF SERVICE

I hereby certify that an electronic copy of the foregoing Brief of *Amici Curiae* Screen Actors Guild–American Federation of Television and Radio Artists, The American Federation of Musicians of the United States and Canada, The AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund, Music Artists Coalition, and Artist Rights Alliance in Support of Plaintiff-Appellant was filed with the Clerk of Court using the ACMS system on December 17, 2025, and thereby served upon all counsel appearing in this case.

*/s/ Danielle S. Van Lier*
Danielle S. Van Lier