# 25-2150-cv

## United States Court of Appeals
### *for the*
### Second Circuit

SOUNDEXCHANGE, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

SIRIUS XM RADIO, INC.,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

TODD LARSON
ROBERT NILES-WEED
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

ANDREW S. TULUMELLO
CRYSTAL L. WEEKS
MAX J. BLOOM
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000

*Attorneys for Defendant-Appellee*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for the Defendant-Appellee states:

1. Sirius XM Radio LLC is a wholly owned subsidiary of Sirius XM Inc., which in turn is a wholly owned subsidiary of Sirius XM Holdings Inc., a publicly held corporation.[*]

2. Berkshire Hathaway Inc. owns 10 percent or more of Sirius XM Holdings Inc.  No other publicly owned corporation owns 10 percent or more of Sirius XM Holdings Inc.

---

[*] While the caption refers to Sirius XM Radio, Inc., which was a Delaware corporation, Appellee converted into Sirius XM Radio LLC, a Delaware limited liability company, on September 6, 2024.

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

QUESTION PRESENTED ............................................................ 5

STATEMENT OF THE CASE ....................................................... 5

    A. Statutory and regulatory framework ..................................... 5

    B. Factual background and procedural history ........................ 13

SUMMARY OF ARGUMENT ...................................................... 18

ARGUMENT .............................................................................. 20

    I.  SoundExchange cannot sue under Section 114. ...................... 20

    A. Section 114 does not create a private right of action. .......... 20

    B. Section 114(g)(3)(C) does not provide a basis for inferring
       a right of action. .............................................................. 28

    C. Statutory context confirms there is no implied right of
       action. .............................................................................. 38

        1.  Congress explicitly provided private rights of action
           elsewhere in the Copyright Act. ..................................... 38

        2.  Section 114 does not use rights-creating language for
           SoundExchange. .......................................................... 42

        3.  There are alternative methods of enforcement. .............. 43

    D. Congress had compelling reasons not to alter the
       Copyright Act's remedial regime. ....................................... 46

    E. This Court should reject SoundExchange's policy
       arguments. ....................................................................... 50

    II.  SoundExchange's theory of third-party standing fails. ............. 53

CONCLUSION ........................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
944 F.2d 971 (2d Cir. 1991) .......................................................... 56

*Advocate Health Care Network v. Stapleton*,
581 U.S. 468 (2017) ...................................................................... 31

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .............................................................. *passim*

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007) ...................................... 21, 27, 38, 42

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......................................................................... 48

*California v. Sierra Club*,
451 U.S. 287 (1981) ...................................................................... 52

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979) ...................................................................... 42

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ...................................................................... 47

*Casas v. Am. Airlines, Inc.*,
304 F.3d 517 (5th Cir. 2002) ....................................................... 27

*Cervantes-Ascencio v. INS*,
326 F.3d 83 (2d Cir. 2003) ........................................................... 15

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018) ...................................................................... 35

*Deckert v. Indep. Shares Corp.*,
311 U.S. 282 (1940) ...................................................................... 35

iii

*Durgom v. Janowiak,*
87 Cal. Rptr. 2d 619 (Cal. Ct. App. 1999) ......................................... 45

*Edward J. DeBartolo Corp.*
*v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988) ............................................................................ 47

*Egbert v. Boule,*
596 U.S. 482 (2022) ............................................................................ 51

*FCC v. Consumers' Research,*
606 U.S. 656 (2025) .................................................................. 48, 49, 50

*Frazier v. Fairhaven School Comm.,*
276 F.3d 52 (1st Cir. 2002) ............................................................... 27

*Gazzola v. Hochul,*
88 F.4th 186 (2d Cir. 2023) ............................................................... 53

*Graham v. James,*
144 F.3d 229 (2d Cir. 1998) .............................................................. 44

*Holder v. Hall,*
512 U.S. 874 (1994) ............................................................................ 33

*In re Hokulani Square, Inc.,*
776 F.3d 1083 (9th Cir. 2015) ........................................................... 53

*Karahalios v. Nat'l Fed. of Fed. Emps., Loc. 1263,*
489 U.S. 527 (1989) ............................................................................ 27

*Keepers, Inc. v. City of Milford,*
807 F.3d 24 (2d Cir. 2015) ................................................................. 55

*Lexmark v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ............................................................................ 55

*Lopez v. Jet Blue Airways,*
662 F.3d 593 (2d Cir. 2011) .......................................................... 18, 53

*Mata v. Lynch,* 576 U.S. 143 (2015) ................................................. 26

iv

*Mississippi Band of Choctaw Indians*
  *v. Holyfield*, 490 U.S. 30 (1989)...........................................................31

*Moya v. U.S. Dep't of Homeland Security,*
  975 F.3d 120 (2d Cir. 2020)...............................................................44

*N.Y. Citizens' Coal. for Children v. Poole,*
  922 F.3d 69 (2d Cir. 2019)...........................................................53, 55

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
  107 F.4th 415 (5th Cir. 2024), *cert. granted, judgment vacated,*
  145 S. Ct. 2837 (Mem.) (2025)....................................................48, 49

*Oklahoma v. United States,*
  163 F.4th 294 (6th Cir. 2025)............................................................48

*Olmsted v. Pruco Life Ins. Co. of N.J.,*
  283 F.3d 429 (2d Cir. 2002).....................................................*passim*

*Oxford Univ. Bank v. Lansuppe Feeder, LLC,*
  933 F.3d 99 (2d Cir. 2019).......................................................*passim*

*Peer Int'l Corp. v. Pausa Recs., Inc.,*
  909 F.2d 1332 (9th Cir. 1990) ...........................................................44

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.,*
  351 F.3d 1229 (D.C. Cir. 2003)..........................................................17

*Silvers v. Sony Pictures Ent., Inc.,*
  402 F.3d 881 (9th Cir. 2005) ...............................................................5

*SoundExchange, Inc. v. Muzak LLC,*
  854 F.3d 713 (D.C. Cir. 2017)............................................................25

*Sunshine Anthracite Coal Co. v. Adkins,*
  310 U.S. 381 (1940).............................................................................48

*Thompson v. Thompson,*
  484 U.S. 174 (1988).............................................................................46

*Touche Ross & Co. v. Redington,*
  442 U.S. 560 (1979).................................................................*passim*

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
 444 U.S. 11 (1979)..................................................................52

*United States v. Gomez,*
 877 F.3d 76 (2d Cir. 2017) ......................................................53

*Universities Research Ass'n v. Coutu,*
 450 U.S. 754 (1981)..................................................................22

*W. Allis Memorial Hosp., Inc. v. Bowen,*
 852 F.2d 251 (7th Cir. 1988) ...................................................27

**Constitutional Provisions**

U.S. Const., art. II, § 2, cl. 2 .......................................................48

**Statutes**

15 U.S.C. § 77v(a) .......................................................................35

15 U.S.C. § 80a-46(b)(2)...............................................................22

17 U.S.C. § 1009(a) ........................................................................6

17 U.S.C. § 104A(d)......................................................................36

17 U.S.C. § 106...............................................................................5

17 U.S.C. § 114(d) ..........................................................................7

17 U.S.C. § 114(e)(1) ......................................................................8

17 U.S.C. § 114(f)(1)(A)............................................................7, 11

17 U.S.C. § 114(f)(1)(B)..................................................................7

17 U.S.C. § 114(g) ........................................................................28

17 U.S.C. § 114(g)(3) ...............................................................12, 29

17 U.S.C. § 114(g)(3)(B) ...............................................................37

17 U.S.C. § 114(g)(3)(C) ......................................................... *passim*

17 U.S.C. § 115(d)(3) ................................................................ 40

17 U.S.C. § 115(d)(6)(C)(i) ....................................................... 40

17 U.S.C. § 1201(a)(1)(E) ......................................................... 36

17 U.S.C. § 1203 ......................................................................... 6

17 U.S.C. § 501 ......................................................................... 21

17 U.S.C. § 501(b) ................................................................ 5, 39

17 U.S.C. § 501(f)(2) ......................................................... 5, 36, 39

17 U.S.C. § 512(f) ....................................................................... 5

17 U.S.C. § 603(b)(1) ............................................................... 36

17 U.S.C. § 801 ......................................................................... 11

17 U.S.C. § 910(b) ............................................................. 6, 36, 39

18 U.S.C. § 2318 ....................................................................... 39

Pub. L. No. 104-39, 109 Stat. 336 .............................................. 7

Pub. L. No. 107-321, 116 Stat. 2780 ................................... *passim*

Pub. L. No. 108-419, 118 Stat. 2362 ......................................... 11

Pub. L. No. 115-264, 132 Stat. 3676 ......................................... 40

Pub. L. No. 94-553, 90 Stat. 2549 ......................................... 6, 34

**Regulations**

37 C.F.R. § 380.3 ...................................................................... 12

37 C.F.R. § 380.4 ...................................................................... 12

37 C.F.R. § 380.4(d)(1) ............................................................. 12

37 C.F.R. § 380.6(a) .................................................................. 12

37 C.F.R. § 380.6(b) .............................................................. 12

37 C.F.R. § 382.7(a) .............................................................. 12

37 C.F.R. § 382.7(b) .............................................................. 12

37 C.F.R. § 382.7(d) .............................................................. 14

67 Fed. Reg. 45,239 (July 8, 2002) ............................... 8, 9, 10

84 Fed. Reg. 45,175 (Aug. 28, 2019)................................... 14

**Other Authorities**

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (rev. ed. 2025) ................................................................. 44, 45

Jacob Noti-Victor, *Copyright's Law of Dissemination*, 44 Cardozo L. Rev. 1769 (2023) ....................................... 7

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ................. 24

## INTRODUCTION

SoundExchange sued Sirius XM under Section 114 of the Copyright Act. But SoundExchange's cause of action does not exist. Section 114 does not expressly authorize suit. It does not mention causes of action, courts, venue, jurisdiction, or remedies, even though multiple provisions elsewhere in the Copyright Act authorize civil suits in express and unequivocal language. Congress knew how to authorize civil actions and carefully did so elsewhere in the Act. But not in Section 114.

SoundExchange conceded below, and admits here, that Section 114 does not provide an express cause of action. SoundExchange Br. 40; *see* JA119 n.6. That means this is an "implied-cause-of-action case." SoundExchange Br. 40. As the Supreme Court and this Court have emphasized for decades, SoundExchange faces a "heavy burden" to overcome the "strong presumption" against implied rights of action. *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002); *see Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979). SoundExchange cannot carry that burden and every relevant indication—text, context, history, precedent—cuts against implying a right of action.

1

SoundExchange purports to locate the source of its cause of action in the text of an expense-reimbursement provision buried in Section 114(g)(3)(C). That provision allows SoundExchange—which operates as a middleman to collect and distribute royalties paid by streaming music providers to copyright holders under a statutory license—to deduct the "reasonable costs" it incurs in, among other activities, "the licensing and enforcement of rights." According to SoundExchange, this provision "presupposes" a right for SoundExchange to sue statutory licensees, even though Congress said nothing about such a right, and even though the right to royalty payments belongs to the rightsholders and not SoundExchange. SoundExchange Br. 3.

Section 114(g)(3)(C) is miles away from language that so unmistakably "presupposes" a right to sue that it overcomes the strong presumption against implied rights. *See Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019). SoundExchange never once explains why a Congress intent on creating a new right of action would do so by amending an indirect and oblique provision on expenses to accomplish that objective. Nor does SoundExchange explain why Congress would not model a new cause of action on *any* of the existing

2

and unmistakable cause-of-action language elsewhere in the Act. No case from this Court or the Supreme Court has ever implied a private right of action on so thin a reed.

Section 114's context and history also repudiate SoundExchange's position. When Congress first established the statutory license regime in 1995, it saw no need to alter the Copyright Act's existing remedial provisions and did not do so. (SoundExchange does not argue otherwise.) Then, when Congress added Section 114(g)(3)(C) in 2002, it tweaked which expenses could be reimbursed, but left the Act's remedial provisions untouched. Findings enacted by Congress with that amendment state in no uncertain terms that Section 114(g)(3)(C) was enacted for the specific and limited purpose of allowing SoundExchange to reimburse particular costs that the Librarian of Congress had disallowed in 2001. This Court should take Congress at its word. It should not conclude—as it must for SoundExchange to prevail—that Congress unknowingly and unintentionally created a new implied cause of action using language that contemplates no such thing.

All SoundExchange is left with is a naked appeal to policy. SoundExchange (and its *amici*, too) says it would be "untenable" and

3

violate "common sense" if SoundExchange could not sue, citing "transaction costs," "feasibility problems," and "background principles." SoundExchange Br. 25, 32–38. But courts may not usurp Congress's role to create a cause of action, "no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). And Congress had good reason not to vest unbridled litigation authority in a private nonprofit that is not supervised or controlled by the government or by the rightsholders, in no small part because doing so would raise serious constitutional concerns.

Ultimately, SoundExchange asks this Court to recognize a sweeping power to sue third parties with no checks, guardrails, or rules of the road—and to do so based on an expense-reimbursement sub-sub-sub-section with no express, or even implied, reference to a cause of action. SoundExchange and its *amici* ask this Court to enact a remedy Congress did not provide. If Congress wants SoundExchange to have a right to sue, Congress can supply it. But the cause of action SoundExchange says *should* exist does *not* exist in the statute Congress enacted. This Court should affirm.

4

## QUESTION PRESENTED

Whether 17 U.S.C. § 114 contains an implied right of action that allows a private party to bring suit in federal court.

## STATEMENT OF THE CASE

### A. Statutory and regulatory framework

Section 106 of the Copyright Act establishes the rights that copyright owners possess. 17 U.S.C. § 106. These rights include the exclusive right to reproduce, distribute, and publicly perform a copyrighted work. *Id.*

But Congress "carefully circumscribed" the "right to sue" to vindicate those rights. *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005). Section 501 authorizes copyright owners to "institute an action for any infringement" in "court," and addresses issues like "serv[ice] … of the complaint," "joinder," and "intervention." § 501(b). A variety of other provisions in the Copyright Act define in detail the circumstances under which copyright owners and others may bring suit, and speak expressly of "civil action[s]," "district courts," "attorneys' fees," and the like. *See* § 501(f)(2) (a television broadcast station may file "a civil action against any satellite carrier that has refused to carry television broadcast signals"); § 512(f) (a person who misrepresents whether online material is infringing "shall be liable for … damages,

5

including costs and attorneys' fees"); § 910(b) (an owner of mask works may enforce their rights by bringing a "civil action for any infringement"); § 1009(a) (a person injured by the importation of certain digital audio recording devices "may bring a civil action in an appropriate United States district court"); § 1203 (a person injured by conduct that circumvents a technological measure that controls access to a protected work or by conduct that affects the integrity of copyright management information "may bring a civil action in an appropriate United States district court for such violation").

1. Copyright owners in sound recordings historically had only three rights: the right to reproduce the sound recording, the right to prepare derivative works, and the right to distribute copies. *See* Copyright Act of 1976, Pub. L. No. 94-553, § 114(a), 90 Stat. 2549, 2560 (codified as amended at 17 U.S.C. § 114(a)). Copyright owners did not originally have any exclusive right to perform (*i.e.*, broadcast) sound recordings. *Id.*

With the advent of the internet, Congress amended Section 106 to provide owners of sound recordings an exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission." Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No.

6

104-39, § 3, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)). At the same time, however, Congress imposed "[l]imitations" on this new performance right by establishing a statutory license to allow certain digital audio transmissions made via satellite radio and internet audio streaming. *See* 17 U.S.C. § 114(d). For the transmissions covered by this license, the licensee need not negotiate directly with the copyright owner. Instead, "services … may publicly perform any sound recording as long as they pay a government-set royalty." Jacob Noti-Victor, *Copyright's Law of Dissemination*, 44 Cardozo L. Rev. 1769, 1790–91 (2023).

2. Initially, the royalty rates for the statutory license were set through negotiation and, if needed, arbitration, under the auspices of the Librarian of Congress. Copyright owners first engaged in "voluntary negotiation proceedings" with statutory licensees. 17 U.S.C. § 114(f)(1)(A) (2000). If these negotiations proved unsuccessful, the Librarian of Congress would convene a "copyright arbitration royalty panel," or CARP, which would set rates after arbitration between the copyright owners and licensee services. § 114(f)(1)(B) (2000). At the time, the statute presumed that royalties would be paid directly by the services to the copyright owners, although it contemplated that copyright

7

owners or services might "designate common agents on a nonexclusive basis to negotiate, agree to, pay, or receive payments." § 114(e)(1) (2000).

As the Librarian of Congress would later observe, it was "impractical" for the radio and streaming services "to identify, locate and pay each individual Copyright Owner whose works [they] performed." 67 Fed. Reg. 45,240, 45,266 (July 8, 2002). Accordingly, in rate-setting proceedings before a CARP in 1998 to 2000, the parties (representing copyright owners and statutory licensees) proposed that a "Receiving Agent" would collect payments industry-wide and pass them on to "Designated Agents" to distribute to copyright owners and performers. *Id.* at 45,266–67.

At the request of the parties, the CARP designated SoundExchange, then a division of the Recording Industry Association of America, as both a Receiving Agent and a Designated Agent. *Id.* at 45,267. The parties agreed that SoundExchange would serve a limited role and operate as a clearinghouse to facilitate the distribution of royalties from licensees to rightsholders to avoid the administrative burdens of making payments on an individual basis. In reviewing the CARP's approval of this agreement, the Librarian of Congress explained that SoundExchange

had been designated to "receive statements of account and royalty payments from Licensees" and to "distribute royalty payments to each Copyright Owner and Performer entitled to receive royalties." *Id.* at 45,274. The parties to the CARP proceedings never agreed that an agent like SoundExchange could or should have a new and unprecedented cause of action to sue statutory licensees. No such agreement was considered, much less approved, by the CARP or the Librarian.

The parties did propose, and the CARP agreed, that Designated Agents could "deduct from the royalties paid to Copyright Owners and Performers 'reasonable costs incurred in the licensing, collection and distribution of the royalties paid by Licensees … and a reasonable charge for administration.'" *Id.* at 45,269. But the Librarian of Congress (who reviewed CARP rulings) adopted only part of this proposal.[1] While agents could deduct their costs for collecting and distributing royalties and for administration, the Librarian concluded that they *could not* deduct costs incurred in the process of rate-setting through negotiations and CARP arbitrations. *Id.* at 45,269, 45,275. As the Librarian reasoned,

---

[1] *See generally* 67 Fed. Reg. at 45,242–43 (explaining the Librarian's role in reviewing the CARP decision).

9

because the sole purpose of the Designated Agent was to "receive and distribute the statutory royalty fees," the Agent should not be compensated for the distinct activities of "participat[ing] in a CARP proceeding" or "engag[ing] in licensing activities." *Id.* at 45,269.

Congress, however, quickly overrode the Librarian on this narrow point. In the six-page-long Small Webcaster Settlement Act of 2002, enacted less than six months after the Librarian's decision, Congress added what is now Section 114(g)(3) to the Copyright Act. It provided that a "nonprofit agent designated to distribute receipts from the licensing of transmissions … may deduct … the reasonable costs of such agent" in specified categories. Pub. L. No. 107-321, § 5(b), 116 Stat. 2780, 2784 (codified as amended at § 114(g)(3)). These included costs incurred "in the administration of the collection, distribution, and calculation of the royalties," as the Librarian had allowed, but also costs incurred "in … the licensing and enforcement of rights … including those incurred in participating in negotiations or arbitration proceedings," which the Librarian had rejected. *Id.* Although Congress enacted this provision in 2002, it was made retroactive to 1995 to allow Designated Agents to recover costs incurred in prior negotiations and arbitrations. *Id.*

10

In legislative findings enacted as part of the Act, Congress made the amendment's narrow purpose crystal clear. "[R]egulations issued by the Librarian of Congress were inconsistent with the voluntarily negotiated arrangements by such parties concerning the deductibility of certain costs incurred for licensing and arbitration, and Congress is therefore restoring those terms as originally negotiated among the parties." *Id.* at 2783. And again: "[T]he voluntary negotiated arrangements agreed to among the parties are being codified." *Id.* Congress's enacted legislative findings nowhere mention creating a right of action.

3. Congress later amended the Copyright Act to abolish the CARP system for setting royalty rates. *See* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2362. Under the amended regime, which remains in effect today, Congress charged the Librarian of Congress with appointing three Copyright Royalty Judges. *See* 17 U.S.C. § 801. These individuals make up the Copyright Royalty Board, or CRB, which sets "reasonable rates and terms of royalty payments." *See* § 114(f)(1)(A).

Just as Congress had previously contemplated the role of a "nonprofit agent designated to distribute receipts" flowing from the

11

statutory licenses set by CARP rulings, Congress provided that the CRB would "designat[e]" a "nonprofit collective" to "distribute receipts from the licensing of transmissions." 17 U.S.C. § 114(g)(3). The CRB has designated SoundExchange as this nonprofit collective. *See* 37 C.F.R. § 380.4(d)(1). Just as it did under the old CARP system, SoundExchange today deducts its administrative costs from the royalties it passes on to rightsholders. 17 U.S.C. § 114(g)(3).

Under the CRB regime, SoundExchange continues to serve as a clearinghouse to streamline the payment and distribution of royalties. Regulations promulgated by the CRB specify the information that licensees must provide to SoundExchange, the efforts that SoundExchange must take to identify rightsholders, and the ways in which SoundExchange shall handle unclaimed funds. 37 C.F.R. §§ 380.3–380.4. SoundExchange may also "verify payments or distributions by auditing" licensees once per year. *Id.* §§ 380.6(a)–(b) (webcasting), 382.7(a)–(b) (satellite). Nothing in the Librarian's regulations—either under the CARP system or CRB system— contemplates or suggests that the collective has authority to sue under Section 114.

### B. Factual background and procedural history

1. Sirius XM is a satellite radio service provider that transmits more than 135 channels of music, sports, news, talk, comedy, entertainment, and weather to the vehicles of approximately 34 million subscribers nationwide. JA5–6. Sirius XM subscribers can also "webcast" Sirius XM programming over the internet via their computers, phones, and other connected devices. JA6. Sirius XM operates both its radio broadcasting and webcasting services pursuant to the statutory licenses set forth in Section 114 of the Copyright Act. *Id.* Royalty payments from Sirius XM and its subsidiary Pandora exceed $800 million of the more than $1 billion in royalties that SoundExchange distributes pursuant to Section 114 each year. *See* JA27.

Because Sirius XM sells subscription packages that combine satellite radio and webcasting, which are licensed under separate statutory licenses and subject to different royalty rates, Sirius XM must apportion the revenue from those subscriptions between its two service offerings to determine its royalty obligations under Section 114(f). Sirius XM has engaged in rigorous efforts to comply with this scheme. It retains outside professionals at substantial expense to determine which

13

revenue is attributable to which products. JA27. This involves surveying some 15,000 subscribers to determine what value they place on each service. JA16–17.

On July 29, 2019, SoundExchange filed with the CRB a notice of intent to audit Sirius XM's royalty payments for its various service offerings for 2018. *See* Notice of Intent to Audit, 84 Fed. Reg. 45,175, 45,176 (Aug. 28, 2019). In September 2022, an auditor repeatedly hired by SoundExchange issued findings alleging that Sirius XM had underpaid royalties in 2018 by $10.3 million. The auditor did not offset these findings by overpayments that Sirius XM had made in connection with several of its packages. *See* JA54. Sirius XM disagreed with these findings and objected that the audit was not conducted in accordance with professional auditing standards. *See* 37 C.F.R. § 382.7(d) (requiring that audits be conducted "according to generally accepted auditing standards"). Nonetheless, Sirius XM worked in good faith with SoundExchange to try to resolve these issues. *See* JA51.

On August 16, 2023, SoundExchange, with no notice, filed suit in the Eastern District of Virginia. JA51. Invoking Section 114, SoundExchange alleged that Sirius XM had underpaid royalties by using

14

an "[un]reasonable" "metho[d] for attributing revenues to webcasting in order to exclude them from [Sirius XM's] [satellite] Gross Revenues." JA21. The lawsuit also sought to recover the alleged $10.3 million underpayment identified by the audit. On Sirius XM's motion, the case was transferred to the Southern District of New York due to the absence of any connection to the Eastern District of Virginia.

2. Sirius XM moved for judgment on the pleadings on the basis that Section 114 does not create a right of action for SoundExchange to sue. JA110. The district court agreed and dismissed the case. The court observed that it was "undisputed that Section 114 lacks an explicit provision extending SoundExchange a right of action or the power to otherwise bring an action to litigate a royalty dispute." JA119. The district court then invoked the strong presumption that Congress does not impliedly create a cause of action "absent substantial evidence" to the contrary. *Id.* (quoting *Cervantes-Ascencio v. INS*, 326 F.3d 83, 86 (2d Cir. 2003)). The district court concluded that the three factors set forth by this Court in *Oxford University Bank* for finding an implied cause of action confirmed that there was no implied cause of action in Section 114. *See* JA123–132.

15

*First*, Congress "'expressly provided a cause of action' elsewhere in the Copyright Act," thereby making clear that Congress's omission of such explicit language in Section 114 was intentional. JA130 (quoting *Oxford Univ. Bank*, 933 F.3d at 104).

*Second*, Section 114 lacks any "rights creating language as to SoundExchange." JA124. The district court rejected SoundExchange's argument that such language existed in Section 114(g)(3)(C)'s reference to "enforcement of rights." "[E]nforcement" is not "synonymous with litigation" and "in an array of legal contexts, 'enforcement' can generally refer to the power to initiate audits and regulatory proceedings, issue violation notices or cease and desist orders, suspend regulatory licenses, and impose restrictions on activities," among other things. JA125.

*Third*, there are "means of enforcing" Section 114 other than litigation by SoundExchange. JA128 (quoting *Oxford Univ. Bank*, 933 F.3d at 104). The statute "contemplates SoundExchange engaging in a number of 'enforcement' activities other than initiating lawsuits in federal court," such as engaging in negotiation and arbitration, or initiating audits. JA128.

16

The district court rejected each of SoundExchange's remaining arguments. While SoundExchange had argued that private enforcement would make the statute more effective, the district court refused to rely on this policy rationale "to rewrite the statute," as only "'Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing [policy] interests.'" JA134 (alteration in original) (quoting *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1238 (D.C. Cir. 2003)). The court also found it unavailing that SoundExchange had brought suit in the past, as no previous courts had addressed the cause-of-action issue. JA134–35 (reviewing SoundExchange's prior cases). The court further explained that legislative history could not overcome the plain meaning of the statutory text and, in any event, SoundExchange "fail[ed] to offer persuasive evidence of Congress's intent to empower SoundExchange with … litigation authority." JA138–39. Finally, the court held that SoundExchange was not a membership-based organization that could take advantage of associational standing to assert rights on behalf of its members. JA139–42.

17

## SUMMARY OF ARGUMENT

I. It is undisputed that Section 114 does not expressly create a right of action. That absence triggers a strong presumption against implying a cause of action and imposes a heavy burden on SoundExchange to identify "a clear manifestation of congressional intent to create a private cause of action." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). Section 114 does not clear this high bar, as it does not mention courts, parties to litigation, remedies, venue, or jurisdiction, or have any other language undeniably presupposing a cause of action.

SoundExchange argues that an expense reimbursement provision in Section 114(g)(3)(C) provides a clear manifestation of Congress's intent to create a cause of action. It does not. Section 114(g)(3)(C) simply provides that, when SoundExchange incurs expenses in the "licensing or enforcement" of rights, it may deduct those expenses, while specifically referencing the "arbitration" and "negotiations" that occurred as a part of historical rate-setting proceedings. It is impossible that Congress intended this reference to the "enforcement of rights" in an expense-reimbursement provision enacted to overrule an expense-disallowance

18

decision by the Librarian of Congress to newly authorize SoundExchange to bring suit in federal court.

Other features of the statute confirm that Congress did not intend for SoundExchange to sue. Most obviously, several other provisions of the Copyright Act *do* contain express rights of action; Section 114 does not. Section 114 does not use rights-creating language with respect to SoundExchange itself. And, as SoundExchange explains, rightsholders may still be able to sue even if SoundExchange cannot. *See* SoundExchange Br. 25, 34, 47.

SoundExchange's theory also raises serious constitutional concerns. As SoundExchange sees it, Congress impliedly delegated to SoundExchange the power to enforce Section 114 through litigation without any governmental supervision or guardrails. This is exactly the sort of unchecked power the private nondelegation doctrine is designed to prevent.

Given the textual, structural, historical, and constitutional barriers to implying a right of action, SoundExchange resorts to policy. But, as courts have made clear time and again, broad notions of statutory purpose do not support inferring a cause of action that Congress did not

19

provide. In any event, as SoundExchange recognizes, there *are* other existing avenues for rightsholders to seek relief. It is hardly irrational for Congress to decide that these existing options strike the right balance between underenforcement and excessive litigation.

II. SoundExchange argues that it has third-party standing to sue on behalf of rightsholders. But SoundExchange forfeited any such argument by not raising it before the district court. This argument is also irrelevant: Because SoundExchange lacks a cause of action, it cannot sue even if it would have third-party standing.

## ARGUMENT

## I. SoundExchange cannot sue under Section 114.

### A. Section 114 does not create a private right of action.

"In determining whether Congress has created a private right of action, 'the interpretive inquiry begins with the text and structure of the statute.'" *Oxford Univ. Bank*, 933 F.3d at 104 (quoting *Sandoval*, 532 U.S. at 288 n.7). In this case, the inquiry should end there, too.

Section 114 sets forth, in exhaustive detail, a statutory licensing regime. But nowhere in its eight-thousand words does Section 114 create a right of action. Nowhere. The statute does not mention "civil actions," it does not mention "district courts," it does not mention "claims" or

20

"damages" or "attorneys' fees," or any other term contemplating proceedings in court. It certainly does not say that SoundExchange may sue to enforce interests that *other parties* (*i.e.*, rightsholders) may have to royalty payments, which is the cause of action SoundExchange asserts. Congress certainly knew how to create a cause of action. Other provisions throughout the Copyright Act explicitly authorize suit, like Section 501, which authorizes copyright owners to "*institute an action* for any infringement" in "*court*." 17 U.S.C. § 501 (emphasis added). Congress chose not to do so here.

This critical point is not in dispute. SoundExchange admits, as it must, that Section 114 lacks "express language" creating a cause of action and that this is thus an "implied-cause-of-action case." SoundExchange Br. 40. That concession all but resolves this case. A court "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided," *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007), and a plaintiff has a "heavy burden" to overcome this "strong presumption," *Olmsted*, 283 F.3d at 433. This presumption is even stronger where, as here, the question is whether "Congress wished to provide a private damages remedy" rather than, for

21

instance, injunctive relief. *Univs. Research Ass'n v. Coutu*, 450 U.S. 754, 773 (1981) (quoting *Touche Ross & Co.*, 442 U.S. at 572).[2]

In rare cases, a statute may overcome this presumption where the statutory text, read in context, necessarily contemplates a right to sue in court. These cases are few and far between, and they involve statutory provisions that presuppose a right to sue in unmistakable terms.

Consider this Court's decision in *Oxford University Bank*, one of exceedingly few instances where this Court found an implied right of action. *Oxford University Bank* interpreted Section 47(b) of the Investment Company Act, which states that "*a court* may not deny *rescission* at the instance of *any party*." 15 U.S.C. § 80a-46(b)(2) (emphasis added). This Court found such language "effectively

---

[2] SoundExchange caricatures this body of law by suggesting that the strong presumption against implied rights of action amounts to "some magic words test." SoundExchange Br. 40; *see also* SoundExchange Br. 17 (suggesting that the district court thought the question was whether Congress had "explicitly state[d] *in hac verba* that SoundExchange may bring lawsuits"). That is mischaracterization. Congress *must* say expressly that a private right of action exists. *Olmsted*, 283 F.3d at 433. But Congress is not prisoner to any single "magic words" formulation. As the many private rights of action throughout the Copyright Act (and the U.S. Code) demonstrate, *see supra*, at 5–6, Congress has a multitude of express ways to establish a new cause of action where it intends to do so.

22

equivalent to providing an express cause of action," because it "*necessarily presupposes* that a party may seek rescission in court by filing suit." *Oxford Univ. Bank*, 933 F.3d at 105 (emphasis added). By directing a "court" to enter a specific form of relief ("rescission") to a "party," the statute "comes close to expressly stating" that parties to contracts that violate the Investment Company Act "have a private right of action for rescission." *Id.*

SoundExchange never quotes the operative statutory language at issue in *Oxford University Bank*, which looks nothing like Section 114 of the Copyright Act. Unlike Section 47(b), Section 114 does not say anything about courts, it does not reference remedies, it does not reference parties to litigation, and Congress itself explained that the purpose of Section 114(g)(3)(C) has nothing to do with litigation. *Oxford University Bank* demonstrates the extremely limited category of statutory language that can give rise to an implied right of action—language that otherwise would be unexplainable had Congress not intended to provide a right to sue. Section 114 contains nothing comparable.

23

Indeed, SoundExchange does not point to any statutory language in any case where a private right of action was "inferred" based on language at all like Section 114's. SoundExchange instead relies on a hypothetical example from Justice Scalia and Bryan Garner's book, *Reading Law. See* SoundExchange Br. 3, 27–28. SoundExchange observes that "even Justice Scalia—no fan of implied rights of action" would have found a right of action in a statute providing that, "[i]n any private suit for violation of this statute, the victorious plaintiff will be entitled to attorney's fees." SoundExchange Br. 27–28 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 316 (2012)).

Putting aside whatever inferences can be drawn from the fact that SoundExchange's best precedent seems to be a hypothetical ruling on a hypothetical statute, even that double hypothetical undermines SoundExchange's real-world case. That hypothetical statute references private litigation in *four express* ways: (1) it references "private suit[s]" (2) "for violation of [the] statute," (3) with a "victorious plaintiff," and (4) a right to "attorney's fees." That is why Justice Scalia (and Bryan Garner) would find an implied right of action. And it is exactly why they

24

would not find one in Section 114, which has no express references to private litigation. It instead (1) discusses expense reimbursement, (2) mentions "licensing and enforcement of rights," not suits, courts, civil actions, or litigation, and (3) uses the generic term "costs" instead of the more specific "attorney's fees."

Finding no support in any real-world text enacted by Congress, SoundExchange egregiously and wrongly asserts (at 37) that the D.C. Circuit has adopted its view of Section 114 and that affirmance would "put this Circuit alone on an island" and "open up a split with the D.C. Circuit." The D.C. Circuit did not hold that SoundExchange has an implied right of action. The court held only that it had subject-matter jurisdiction over a suit by SoundExchange and that the suit did not need to proceed in the first instance before the CRB. *See SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713, 718 (D.C. Cir. 2017). If anything, the fact that the D.C. Circuit *sua sponte* requested supplemental briefing on the source of SoundExchange's cause of action underscores how obvious the absence of a cause of action is. *See* Order, *SoundExchange, Inc. v. Muzak LLC*, No. 16-7041 (D.C. Cir. Nov. 16, 2016). And it is notable too that, when asked *its* opinion on whether the private right SoundExchange

25

asserts exists, the United States "expresse[d] no view on the source of appellant SoundExchange's cause of action." *See* Brief for the United States as Amicus Curiae in Support of Neither Party, No. 16-7041, 2017 WL 34707, at *1 n.1 (Jan. 3, 2017). No party in the D.C. Circuit challenged SoundExchange's right to sue—before or in response to the court's supplemental briefing request—and it would therefore have violated rules of party presentation for the court to address this non-jurisdictional question. *See Mata v. Lynch*, 576 U.S. 143, 150 (2015) ("The absence of a valid … cause of action does not implicate subject matter jurisdiction" (alteration in original) (internal quotation marks omitted)). The D.C. Circuit has not remotely endorsed what SoundExchange is trying to do here, any more than has this Court or Justice Scalia.

The lack of an express cause of action dooms SoundExchange's case. SoundExchange does not argue it can satisfy the "strong presumption" required to imply a cause of action. *Olmsted*, 283 F.3d at 433. SoundExchange instead says there isn't one, and it urges this Court to adopt a first-of-its-kind *reverse* presumption *in favor* of implied rights. This position is meritless.

26

SoundExchange says (at 25) that the district court applied "a fundamentally misguided legal lens" by invoking the presumption against implied rights of action—the presumption this Court recognized in *Olmsted* and that the Supreme Court and the Courts of Appeals have applied for decades.[3] In fact, SoundExchange suggests, "the presumption should run in the opposite direction," *in favor* of implied rights of action and with the burden on Congress to expressly disclaim an implied right of action. SoundExchange Br. 26; *see* SoundExchange Br. 43 (Congress

---

[3] *See Karahalios v. Nat'l Fed. of Fed. Emps., Loc. 1263*, 489 U.S. 527, 533 (1989) ("[I]n the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." (internal quotation marks omitted)); *Touche Ross & Co.*, 442 U.S. at 571 ("[I]mplying a private right of action on the basis of congressional silence is a hazardous enterprise, at best."); *Bellikoff*, 481 F.3d at 116 (where no statutory provision "explicitly provides a private right of action," "we begin with the presumption that Congress did not intend one"); *Olmsted*, 283 F.3d at 433 ("A strong presumption that Congress did not intend a private right of action places a heavy burden on the plaintiffs to demonstrate otherwise."); *see also Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 522 (5th Cir. 2002) ("A plaintiff asserting an implied right of action under a federal statute … must overcome the familiar presumption that Congress did not intend to create a private right of action"); *Frazier v. Fairhaven School Comm.*, 276 F.3d 52, 68 (1st Cir. 2002) ("[W]e start with a presumption against reading an implied right of action into a statute—a presumption that can be overcome only by compelling evidence of a contrary congressional intent."); *W. Allis Memorial Hosp., Inc. v. Bowen*, 852 F.2d 251, 254 (7th Cir. 1988) ("A strong presumption exists against the creation of such implied rights of action.").

"could have simply said that the collective may not bring litigation."). SoundExchange does not cite any authority—let alone any controlling authority—adopting this upside-down view of implied rights doctrine. There is none.

## B. Section 114(g)(3)(C) does not provide a basis for inferring a right of action.

SoundExchange locates the source of its private right of action in Section 114(g)(3)(C), an expense-reimbursement sub-sub-sub provision that has nothing to do with litigation. As the district court properly concluded, this isolated provision cannot do the work SoundExchange requires of it. *See* JA126–27. Text, context, and statutory history, reflected in congressional findings enacted into law, make clear that Section 114(g)(3)(C) was designed to reimburse SoundExchange for costs incurred by participating in the rate-setting process, not to allow SoundExchange to bring suit against third parties. 116 Stat. 2783; *see* note to 17 U.S.C. § 114.

Section 114(g) of the Copyright Act is titled "Proceeds from Licensing of Transmissions." After explaining how the collection and distribution of royalty payments operates, Section 114(g)(3) provides that SoundExchange may deduct "the reasonable costs" incurred (A) in "the

28

administration of the collection, distribution, and calculation of the royalties"; (B) in "the settlement of disputes relating to the collection and calculation of the royalties"; and (C) in "the licensing and enforcement of rights …, including those incurred in participating in negotiations or arbitration proceedings." SoundExchange argues that, because Section 114(g)(3)(C) authorizes SoundExchange to deduct expenses incurred in the "enforcement of rights," it necessarily authorizes SoundExchange to bring suit in federal court asserting a cause of action for alleged royalty underpayment (from which it may then deduct its recoverable expenses).

This inference has no support in the text, context, or structure of the statute. To begin with the text, Section 114(g)(3)(C) does not authorize SoundExchange to sue *anyone*; rather, it allows SoundExchange to deduct certain costs. A right to deduct costs is not a right to sue.

Moreover, any inference from this provision would not support SoundExchange's right to sue. In implied rights-of-action cases, it is "critical" that the plaintiff identify statutory language that confers a right on the plaintiff. *Sandoval*, 532 U.S. at 288; *see infra*, at 42–43. The issue, then, is whether "the statute Congress passed … displays an intent

29

to create not just a private right but also a private remedy" for that right. *Id.* at 286. SoundExchange is not saying it has a private right of action to sue copyright holders for *its own* costs under Section 114. (That claim would fail, too, because the statute does not authorize suit on that ground either; but at least SoundExchange would be implying a remedy for the identified right.) Instead, SoundExchange is saying that because it has a right to set off certain expenses before it makes payments to copyright owners, it needs a remedy to enforce royalty underpayments on behalf of copyright holders. That is not drawing an inference from a right to a remedy. That is making up a new right, remedy, and cause of action out of whole cloth.

Moreover, Congress stated exactly what it was doing in Section 114(g)(3) in congressional findings enacted along with the provision—and it flatly refutes SoundExchange's view. Congress explained its purpose in no uncertain terms: "[R]egulations issued by the Librarian of Congress were inconsistent with the voluntarily negotiated arrangements … concerning the deductibility of certain costs incurred for licensing and arbitration, and Congress [was] therefore restoring those terms as originally negotiated among the parties." 116 Stat. 2783; *see*

note to 17 U.S.C. § 114. These findings, which were subject to bicameralism and presentment and are thus "a part of the statute," could not be clearer. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 45 (1989).[4] While SoundExchange says Congress created a new cause of action when it enacted Section 114(g)(3)(C), Congress itself thought otherwise, explaining *in the text of the enacted statute* that it was only tweaking the terms of an expense-reimbursement formula to "codif[y]" "voluntarily negotiated arrangements agreed to among the parties." *Id.* One could hardly imagine clearer evidence that Congress did not intend a new private right of action.

Moreover, the language Congress chose—addressing costs from "negotiations or arbitration proceedings"—is a direct reference to CARP proceedings, which had both an initial negotiation phase and an arbitration backstop. These findings, enacted shortly after the Web I proceeding, made explicit Congress's view that the Librarian had erred in not allowing SoundExchange to deduct its costs in relation to such

---

[4] By contrast, SoundExchange cites a single floor statement from then-Senator Jesse Helms. *See* SoundExchange Br. 10. But "scattered floor statements from individual lawmakers" are "among the least illuminating forms of legislative history." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017) (internal quotation marks omitted).

31

proceedings, as previously proposed by SoundExchange and accepted by the CARP. *See supra*, at 7–12.

The text Congress enacted thus fully explains why Section 114(g)(3)(C) references "enforcement" and "negotiation and arbitration," and the answer has nothing to do with SoundExchange's convoluted theory that Congress silently empowered SoundExchange to engage in litigation, contemplated that such suits might lead to arbitrations or negotiations, and then expressly referenced *those* dispute mechanisms while omitting any reference to litigation. *See* SoundExchange Br. 30 (arguing that Congress referenced negotiations and arbitration proceedings because "they presuppose the ability to litigate the claim the parties are trying to resolve"). The truth is much simpler. Congress wanted to ensure that SoundExchange could recover its costs for participating in the negotiation-and-arbitration rate-setting process that governed at that time. This explains, for instance, why Section 114(g)(3) is expressly backward-looking, allowing SoundExchange to recoup costs "incurred after November 1, 1995," thereby ensuring that SoundExchange would be able to recover the costs it had already incurred in any prior CARP proceeding.

32

This explanation is also confirmed by the limited role that SoundExchange played during the period leading up to the Small Webcaster Settlement Act of 2002, when SoundExchange was not a creature of statute, but simply an agent—not yet spun-off from the RIAA—designated by the parties to help collect and distribute funds. *See supra*, at 8–9. Indeed, while SoundExchange repeatedly emphasizes its own history of litigation, it does not cite to a single case filed earlier than 2013—well over a decade after Section 114(g)(3) was added in 2002, and 18 years after the statutory license was first created.[5] *See* SoundExchange Br. 12, 36.

It would have been particularly remarkable if Congress had silently overhauled the remedial scheme that had persisted since 1995 in the Small Webcaster Settlement Act of 2002. The only provision of that Act

---

[5] SoundExchange suggests (at 37–38) that the fact that it had engaged in litigation prior to 2018 establishes that there was a "longstanding … interpretation" of Section 114 that Congress respected when it amended the Copyright Act that year. *Holder v. Hall*, 512 U.S. 874, 961 (1994). SoundExchange does not cite a single case finding Congressional ratification based on the existence of litigation. The case SoundExchange cites refers to deference to "longstanding *administrative* interpretation[s]" of a statute, a word SoundExchange elides. *Id.* (emphasis added). Courts do not presume that Congress impliedly acquiesces to an interpretation of a statute that no court anywhere has rendered. *Contra* SoundExchange Br. 15–16.

33

to address SoundExchange consists of just a few paragraphs of operative language, some of which address expense-reimbursement, and the rest of which specify the formulas by which SoundExchange must distribute royalty payments. *See* 116 Stat. at 2784–85. As Congress explained in the Act, the sole purpose of this provision was to "codif[y]" "the voluntarily negotiated agreements agreed to among the parties," and thus *preserve the status quo*—not to radically upend the remedial scheme. *Id.* at 2783–84. Indeed, the Act as a whole is only six pages long. *See id.* at 2780–85. It is impossible to read this document and conclude that it has anything to do with creating a new private right of action, or that it was intended to do the work SoundExchange attributes to it.

Against this backdrop, SoundExchange's attempt to shoehorn a seismic reworking of the Copyright Act's remedial scheme into the word "enforcement" collapses. The reference to "enforcement of rights" is not contained in a standalone provision; rather, it is paired, in the very same clause, with costs associated with "licensing." This reference to rights enforcement in a provision primarily concerned with expense-reimbursement, itself contained in a provision that is mostly concerned with negotiation and arbitration in rate-setting, without any reference to

34

litigation, does not remotely provide the necessary unambiguous evidence that SoundExchange can sue. "Congress does not hide elephants in mouseholes." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018).

SoundExchange relies on a case stating that "[t]he power to enforce" a statutory "duty … implies the power to utilize any of the procedures or actions normally available." SoundExchange Br. 28 (quoting *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 287–88 (1940)). But SoundExchange omits the relevant statutory language from the case it cites, which addressed "*suits in equity and actions at law* brought to enforce any liability or duty created by this subchapter." *Deckert*, 311 U.S. at 287 (quoting 15 U.S.C. § 77v(a)) (emphasis added). Thus, SoundExchange's leading example of how the word "enforcement" presupposes a right to sue involves a statute in which Congress authorized litigation by using an *express* right of action and referring to "suits in equity and actions at law."

That is also true elsewhere in the Copyright Act. When Congress used the phrase "enforcement" in the Copyright Act to refer to civil litigation, it said so explicitly. This is true for every example of the use

of the word "enforcement" SoundExchange cites (at 28–29). *See* 17 U.S.C. § 501(f)(2) (a television broadcast station may file "a civil action against any satellite carrier that has refused to carry television broadcast signals"); § 603(b)(1) (regulations to enforce prohibitions on the importation of excluded articles may authorize parties to "obtain a court order enjoining importation of the articles"); § 910(b) (an owner of mask works may enforce their rights by bringing a "civil action for any infringement"); § 1201(a)(1)(E) (referencing "any action to enforce" provisions barring the circumvention of technological measures); § 104A(d) (copyright owners may enforce their rights in restored copyrights by securing the "remedies provided" by the statute for infringement suits). SoundExchange's own examples defeat its argument that Section 114(g)(3)(C)'s reference to "enforcement" alone presupposes litigation. When Congress intended enforcement to include litigation, it said so expressly.

If that were not enough, a neighboring provision reaffirms that the "enforcement of rights" referenced in Section 114(g)(3)(C) did not contemplate litigation to resolve royalty disputes: In a different part of Section 114(g)(3), Congress separately provided that SoundExchange

could deduct the costs incurred in "the settlement of disputes relating to the collection and calculation of the royalties." § 114(g)(3)(B). Thus, while Section 114(g)(3)(C) primarily concerned SoundExchange's role in enforcing the statutory provision by participating in licensing proceedings (and in the negotiations and arbitrations that previously accompanied such proceedings), Section 114(g)(3)(B) directly addressed "disputes" relating to royalty payment. And Section 114(g)(3)(B) contains *no* language that can be read to suggest litigation authority; instead, it contemplates only voluntary settlements.

Far from creating a newfound right for SoundExchange to sue, Section 114(g)(3)(C) only confirms the weaknesses of SoundExchange's position. The provision on its face has nothing to do with litigation, it is untethered from the right SoundExchange seeks to advance, and Congress stated that the provision was enacted to solve an entirely different problem than the one SoundExchange posits. Section 114(g)(3)(C) thus cannot come close to overcoming the strong presumption against implied rights of action.

37

### C. Statutory context confirms there is no implied right of action.

This Court has recognized several statutory features that "buttres[s]" the "presumption that Congress did not intend" a private right of action. *Bellikoff*, 481 F.3d at 116; *Oxford Univ. Bank*, 933 F.3d at 104. As the district court concluded, *see* JA122–32, each is present here: Congress used express language when it provided rights of action elsewhere in the Copyright Act, Section 114 does not endow SoundExchange with rights, and there are means of enforcing the provision other than private litigation by SoundExchange under Section 114.

### 1. Congress explicitly provided private rights of action elsewhere in the Copyright Act.

Start with the most obvious contextual indication: Congress knew how to create explicit rights of action in the Copyright Act but chose not to do so here. *See Bellikoff*, 481 F.3d at 116 ("Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of any explicit private right to enforce other sections was intentional." (quoting *Olmsted*, 283 F.3d at 433)).

Section 501, for example, establishes an action for copyright infringement: "The legal or beneficial owner of an exclusive right under

38

a copyright is entitled … to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). That provision goes on to describe the role of "the court" in such an action. *Id.*

But Section 501 is far from the only place in the Copyright Act where Congress expressly created a right of action. As noted above, *see supra*, at 5–6, there are a host of provisions that explicitly authorize private suit across a variety of contexts in unequivocal terms—from satellite carriers that refuse to carry television broadcast signals, § 501(f)(2), to owners of mask works whose rights are violated, § 910(b), to copyright owners who are victimized by trafficking in copyright labels, 18 U.S.C. § 2318.

Or take the provision that immediately follows Section 114. Section 115 sets forth a compulsory licensing regime for the distribution of "phonorecords"—*i.e.*, audio-only reproductions of a composition. Just as Section 114 contemplates a role for SoundExchange to distribute royalties, Section 115 contemplates an intermediary known as the Mechanical Licensing Collective that administers a blanket license for digital music providers that offer interactive streaming. *See* 17 U.S.C.

39

§ 115(d)(3). "[T]he legally-empowered MLC serves a functionally equivalent role to that of the collective under Section 114." JA130–31.

Unlike Section 114, Section 115 authorizes the collective to "commence an action in an appropriate district court of the United States for damages and injunctive relief" in the context of unpaid administrative assessments. § 115(d)(6)(C)(i).[6] Congress also specified the remedies that the federal courts may award: damages, reasonable attorney's fees, and costs. *Id.* That provision provides a limited right for the Collective to seek certain costs through litigation—a right Section 114, by contrast, nowhere provides.

SoundExchange suggests that, because "Congress largely patterned the mechanical licensing collective off of the SoundExchange model," it follows that Congress must have thought SoundExchange could bring

---

[6] SoundExchange suggests (at 20–21) that this language is not probative, because it was enacted in 2018, while Section 114(g)(3)(C) was enacted in 2002. The district court correctly found this argument unpersuasive. *See* JA131 n.10. As the court explained, "Sections 114 and 115 were both amended" at the same time. *Id.* (citing Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 102, 132 Stat. 3676, 3706–07). If anything, Congress's decision to amend Section 115 to expressly create a cause of action while not doing the same for Section 114, only confirms that the lack of express language creating a cause of action in Section 114 is intentional.

suit. SoundExchange Br. 38, 49. But SoundExchange has it backwards. Congress went out of its way in Section 115 to use language *not found* in Section 114 to establish a right to sue. It did so even as it made changes to Section 114. Congress did not view Section 114(g)(3) as sufficient to allow SoundExchange to bring suit, which is why it employed different (and unmistakably clear) language in Section 115.

SoundExchange confuses the issue when it suggests that none of the express rights of action in the Copyright Act is analogous to the implicit right of action it asks this Court to recognize in Section 114. *See* SoundExchange Br. 48 (arguing that, because "Section 114 does not have a parallel" to the right-of-action provision in Section 115, that provision "simply has nothing to say one way or the other"). The point is that Congress *knew* how to explicitly confer rights of action in the Copyright Act and did so repeatedly (including in Section 115), using language found nowhere in Section 114. "[W]hen Congress wished to provide a private damage remedy," whatever the precise nature of the remedy, "it knew how to do so and did so expressly." *Touche Ross & Co.*, 442 U.S. at 572.

41

### 2. Section 114 does not use rights-creating language for SoundExchange.

As the Supreme Court has emphasized, "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289. Consistent with that principle, this Court has explained that "the absence of 'rights-creating language' indicates a lack of congressional intent to create private rights of action." *Bellikoff*, 481 F.3d at 116. Importantly, the inquiry is not whether the statute contains *some* rights-creating language but whether the language "confer[s] a right directly on a class of persons that *include[s] the plaintiff*." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979) (emphasis added).

By SoundExchange's own account, Section 114 does not confer a right on SoundExchange to collect unpaid royalties. Instead, SoundExchange seeks to "bring lawsuits on behalf of §114 rightsholders." SoundExchange Br. 51 (capitalization altered). SoundExchange's core premise—that Congress paired "the private royalty rights it grants" with "private remedies" allowing SoundExchange to sue to collect those royalties—is dead wrong. SoundExchange Br. 42. SoundExchange itself has no such "private royalty rights." It thus has no "private remedies" to

42

invoke. Naturally, then, Section 114 does not use any language that gives SoundExchange the right to recover unpaid royalties. It does not, for instance, say that SoundExchange is "entitled" to licensing payments or that it has a "right" to such payments. SoundExchange does *not* have a right to these payments; it must disburse the payments to the ultimate copyright owners and other fund recipients, subject to a deduction for SoundExchange's costs. SoundExchange's statutory role is that of an administrator or a clearinghouse, not a rightsholder.

SoundExchange's core argument is that it *should* have a right to the payments and, in turn, a remedy to recover them, because it has a statutory mandate to perform the public-facing responsibility of enforcing the statutory scheme. *See* SoundExchange Br. 41–42. This would be an incredibly unusual way for a statute to operate, however, and as discussed below, it would raise serious constitutional concerns. *See infra*, at 46–50. The sounder interpretation is the one Congress intended: SoundExchange has neither the right nor the remedy it claims.

### 3. There are alternative methods of enforcement.

Finally, as the district court recognized, JA128–29, there are several "alternative means of enforcing" statutory royalty payments. *Oxford*

43

*Univ. Bank*, 933 F.3d at 104; *see also Moya v. U.S. Dep't of Homeland Security*, 975 F.3d 120, 128 (2d Cir. 2020) ("The availability of … alternative mechanisms to enforce" a statute "strongly suggests that Congress did not intend to imply a … private right of action."). SoundExchange recognizes as much. *See* SoundExchange Br. 33 (arguing that entities could "individually litigate" instead of relying on the collective). SoundExchange itself (with its *amici*), suggests that copyright owners could bring suit under Section 501 through infringement actions. *See* SoundExchange Br. 34, 47; RIAA Br. 18–23. These copyright owners include major record companies that could "individually litigate" the rights to hundreds of thousands or millions of songs. And even if an underpayment action is not cognizable as an infringement suit, any party—not just copyright owners—seeking to enforce the statutory license could invoke common-law breach-of-contract or unjust-enrichment theories. *See Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1339 n.9 (9th Cir. 1990) (recognizing common-law actions "to recover unpaid royalties"); 3 Nimmer on Copyright § 10.15[A] (same); *see, e.g.*, *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998) (breach-of-contract action for underpayment of royalties); *cf. Durgom v. Janowiak*,

87 Cal. Rptr. 2d 619, 622 (Cal. Ct. App. 1999) (state courts "have jurisdiction in contract actions for nonpayment of royalties arising out of the exploitation of copyrighted works" (quoting 3 Nimmer on Copyright § 12.01[A][2])); *contra* SoundExchange Br. 34–35. SoundExchange is simply wrong (and internally inconsistent) to suggest that there would be no means of enforcement unless SoundExchange could sue in federal court.

At the same time, there are other mechanisms under which SoundExchange itself may seek to bring licensees into compliance. For instance, SoundExchange may alert rightsholders to potential violations, or it may conduct audits and convey the results of those audits to rightsholders. SoundExchange can settle disputes over royalty payments and rates and may condition those settlements on repayment of prior alleged underpayments. All these tools refute SoundExchange's suggestion that Section 114 would be "useless" unless SoundExchange could bring suit in federal court. SoundExchange Br. 35–36.

Finally, SoundExchange is incorrect that a private right of action must be implied here because the federal government lacks enforcement authority. *See* SoundExchange Br. 41–42. That position is another

45

invitation to overturn decades of doctrine. Both this Court and the Supreme Court have squarely rejected the argument that the right-of-action inquiry turns on whether the government may effectively enforce the statute. *See Olmsted*, 283 F.3d at 435 ("[W]e reject the plaintiffs' argument that Congress must have intended [statutory provisions] to be enforceable through private rights of action because Congress did not allocate enough money to the SEC to do the job by itself."); *Thompson v. Thompson*, 484 U.S. 174, 187 (1988) (even if state courts failed to administer federal custody law, thus rendering federal law "nugatory," that would not support an implied right of action, and it would be up to Congress to "choose to revisit the issue").

## D. Congress had compelling reasons not to alter the Copyright Act's remedial regime.

Congress also had compelling reasons not to alter the Copyright Act's remedial regime. When Congress created the statutory license in 1995, it made no changes to the Copyright Act's remedies provision. The model of enforcement *by rightsholders* was not disturbed. Congress made the judgment that enforcement brought directly by rightsholders was sufficient to effectuate the Act's purposes. The 2002 amendments

46

reflected Congress's continuing view that this enforcement model continued to serve the Act's purposes better than any alternative.

This is plainly a judgment for Congress to make. And wholly apart from wanting to avoid the excessive litigation that a new right of action could entail, Congress surely would have been reluctant to vest an unaccountable private organization with the public role of enforcing third parties' rights through litigation without any government supervision. *See* SoundExchange Br. 41 ("Section 114 expressly delegates the 'enforcement of rights' to SoundExchange, not to any government agency."). That novel model would raise serious questions under the Constitution's non-delegation doctrine. And "where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

The delegation by Congress of unchecked public power to a private party is "delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Only where a private entity "function[s]

47

subordinately to" a government agency and is subject to its "authority and surveillance" is such a delegation permissible. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). A statute thus "violates the private nondelegation doctrine when it allows non-governmental entities to govern," unless a government "agency … retains decision-making power." *FCC v. Consumers' Research*, 606 U.S. 656, 692, 697 (2025).

SoundExchange's interpretation of the Copyright Act would blow through these constitutional limits. "[C]onducting civil litigation in the courts of the United States for vindicating public rights" is a paradigmatically executive function that cannot be delegated to private parties. *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (citing U.S. Const., art. II, § 2, cl. 2). As the Fifth Circuit recently explained, "[g]iving a private entity the sole power to sue in federal court to enforce a statute cuts to the core of executive power" and alone violates the Constitution. *National Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 431, 434 (5th Cir. 2024), *cert. granted, judgment vacated*, 145 S. Ct. 2837 (Mem.) (2025).[7]

---

[7] *See also Oklahoma v. United States*, 163 F.4th 294, 314 (6th Cir. 2025) (delegating the "power to enforce the law through civil lawsuits" raises "[d]ifficult and fundamental questions" and is constitutional only with

The staggering scope of SoundExchange's claimed authority confirms why Congress would not—and could not—enact the statute SoundExchange imagines. SoundExchange claims unfettered authority to initiate and direct litigation to enforce Section 114 on behalf of the public. Under its view of Section 114, SoundExchange and SoundExchange alone decides whether to sue, whom to sue, on what grounds, seeking what relief, when to settle, on what terms, and so on— with the regulated parties footing the bill. Not only can SoundExchange bring damages actions against entities like Sirius XM, it can do so not to recover its own private damages, but to sanction Sirius XM for what SoundExchange alone views as noncompliance with the statutory scheme.

SoundExchange's interpretation of the Copyright Act "allows non-governmental entities to govern" without standards or supervision,

---

"pervasive surveillance and authority" (internal quotation marks omitted)). The Supreme Court vacated the Fifth Circuit's decision and remanded for reconsideration following *Consumers' Research*. *See* 145 S. Ct. 2837 (Mem.) (2025). But nothing in *Consumers' Research* affects the logic here; if anything, *Consumers' Research* confirms that SoundExchange, which is not "broadly subordinate" to any government agency, cannot constitutionally exercise the unchecked power it claims. 606 U.S. at 692.

49

which the Constitution does not allow, and which Congress certainly did not intend when it surgically revised an expense-reimbursement sub-sub-sub-provision in Section 114. *Consumers' Research*, 606 U.S. at 697.

**E. This Court should reject SoundExchange's policy arguments.**

In the end, SoundExchange's argument—and that of its *amici*—boils down to pure policy. The statutory mechanisms for enforcing Section 114 are *inefficient* and *imperfect*, they say, so it would just be easier and more aligned with the Copyright Act's purposes if SoundExchange could just sue. *See* SoundExchange Br. 32–38 (invoking "transaction costs," "feasibility problems," and the "background principles against which §114 operates"); RIAA Br. 14 (citing "practical obstacles" to rightsholders enforcing their own rights); SAG-AFTRA Br. 8–9 (describing "the economic reality faced by most performers").

SoundExchange touts these arguments as "statutory context," *see* SoundExchange Br. 32, but they are not that. Nothing in SoundExchange's (or its *amici*'s) policy arguments turns on the statutory text or structure or history or the relationship between Section 114 and other provisions of the Copyright Act. Instead, this Court should recognize this for what it is: a naked appeal to policy over the text of the

law Congress enacted. But where Congress has not created a cause of action, one "does not exist and courts may not create one, *no matter how desirable that might be as a policy matter.*" *Sandoval*, 532 U.S. at 286–87 (emphasis added). If SoundExchange and its amici are unhappy with the statutory scheme, they should lobby Congress—as they have in the past—not the courts. *See* SoundExchange Br. 12–13 (discussing SoundExchange's lobbying efforts). Congress has revised this particular statutory scheme time and again, with input from various stakeholders (including SoundExchange and certain of its *amici*), to balance exactly the policy considerations SoundExchange raises. The audience for those concerns is Congress, not the Judiciary. *E.g., Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("[C]reating a cause of action is a legislative endeavor.").

SoundExchange's approach is not new. Plaintiffs routinely make similar arguments when advocating for a new implied right of action. And courts routinely reject them. In *Touche Ross & Co.*, the plaintiffs argued that "implication of a private remedy" was "essential to the goals" of the statute. 442 U.S. at 575. But arguments "concerning the 'necessity' of implying a private remedy" had "little relevance" because "[t]he ultimate question is one of congressional intent, not one of whether

51

this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Id.* at 575, 578. Indeed, *even if* rejecting an implied cause of action would "sanctio[n] injustice," "the argument is made in the wrong forum," for the Court was not "at liberty to legislate." *Id.* at 579.

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, the plaintiff argued that the Court "must consider the utility of a private remedy." 444 U.S. 11, 23 (1979). Again, the Court did not: "The dispositive question remains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end." *Id.* at 24. And again, only two years later, same argument, same result: "[T]he federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297 (1981).

Finally, one of SoundExchange's *amici* (though notably not SoundExchange itself) resorts to statutory interpretation's ultimate hail mary, the absurdity canon. RIAA Br. 26. But "[t]he absurdity canon isn't a license for [the Court] to disregard statutory text where it conflicts with [its] policy preferences; instead, it is confined to situations where it is

52

quite impossible that Congress would have intended the result … and where the alleged absurdity is so clear as to be obvious to most anyone." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015) (internal quotation marks omitted). As even SoundExchange seems to recognize, there is nothing absurd about concluding that Congress did not provide SoundExchange with a private right of action. And it is telling that SoundExchange's *amici* must resort to the absurdity canon to divine a "clear manifestation of intent" by Congress to enact a new cause of action. *Lopez*, 662 F.3d at 596.

## II. SoundExchange's theory of third-party standing fails.

SoundExchange concludes its brief (at 51–53) by arguing that it should have third-party standing to litigate on behalf of individual rightsholders.[8] This argument is forfeited and irrelevant.

SoundExchange did not raise this issue below and cannot do so for the first time on appeal. *See United States v. Gomez*, 877 F.3d 76, 94–95 (2d Cir. 2017). In the district court, SoundExchange made the distinct

---

[8] SoundExchange avoids labeling its argument as "third-party standing," but its authorities and its own formulation make clear that is the doctrine it is invoking. *See N.Y. Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019); *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023).

argument that it had "*associational standing* to bring suit on [the] behalf" of "artists and copyright owners" under Section 114. Dkt. No. 70, at 24 (emphasis added). The district court rightly rejected that argument because SoundExchange is not an association. Its leadership is not selected by constituent copyright owners, those copyright owners do not finance its activities, and SoundExchange is not an advocacy vehicle for copyright owners. *See* JA141–42.[9] Not once did SoundExchange argue, as it does now, that it had a "close relationship" with Section 114 rightsholders or that those rightsholders faced "barriers to their ability to assert their own interests"—classic third-party standing concepts. The district court had no opportunity to address this new issue, and this Court should not permit SoundExchange to raise it for the first time on appeal.

---

[9] This discussion makes very clear why the district court distinguished, in its summary of the facts, between private organizations that can "bring lawsuits to enforce the rights of their members," and SoundExchange, which has no members. JA114 n.3. SoundExchange misleadingly quotes this language by omitting the reference to "members" and instead referring generically to "ordinary agency-law principles"—perhaps in an attempt to obscure SoundExchange's rejected, and now abandoned, associational standing argument. *See* SoundExchange Br. 51.

In any event, whether or not SoundExchange has third-party standing, it still lacks a cause of action. It makes no sense for SoundExchange to claim that, in this action brought under Section 114, "it could sue statutory licensees on behalf of §114 rightsholders even if §114 did not supply a cause of action to do so." SoundExchange Br. 52 (capitalization altered). If anything, SoundExchange's failed standing argument only illustrates the extreme nature of its effort to imply a right of action to enforce rights that are not its own.

The third-party standing doctrine is a "rule of prudential standing" that generally "prevents 'litigants from asserting the rights or legal interests of others [simply] to obtain relief from injury to themselves.'" *N.Y. Citizens' Coal. for Children*, 922 F.3d at 75 (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)). The rule serves to "limit a cause of action that Congress has created"; it does not create an entitlement to sue in federal court. *Id.* (quoting *Lexmark v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). The fact that third-party standing principles might be satisfied is thus immaterial when Congress has *not* created a cause of action. And whether those principles could be satisfied here is doubtful in any event, as "the Copyright Act does not

55

permit copyright holders to choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991).

Ultimately, SoundExchange's lack of a cause of action is fatal to this lawsuit, as the district court concluded. Arguments about third-party standing cannot alter that conclusion.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Respectfully submitted,

*/s/Andrew S. Tulumello*

Todd Larson
Robert Niles-Weed
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

Andrew S. Tulumello
Crystal L. Weeks
Max J. Bloom
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7100
drew.tulumello@weil.com

February 20, 2026

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Second Circuit Local Rule 32.1(a)(4)(A) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 11,017 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Andrew S. Tulumello*
Andrew S. Tulumello
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7100
drew.tulumello@weil.com

February 20, 2026

57

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the ACMS system, which will send notification of such filing to all participants.

/s/ Andrew S. Tulumello

Andrew S. Tulumello
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7100
drew.tulumello@weil.com

February 20, 2026