# 25-2150-cv

## United States Court of Appeals
*for the*
## Second Circuit

———◆———

SOUNDEXCHANGE, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

SIRIUS XM RADIO, INC.,

*Defendant-Counter-Claimant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* JACOB NOTI-VICTOR AND SAURABH
VISHNUBHAKAT IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Russell F. Rennie
Susman Godfrey LLP
One Manhattan West, 50th Floor
New York, NY 10001
(212) 336-8330

*Counsel for* Amici Curiae

**TABLE OF CONTENTS**

INTERESTS OF *AMICI CURIAE* .......................................................................... 1

INTRODUCTION ................................................................................................... 2

ARGUMENT .......................................................................................................... 4

I.    The Separation of Powers Underpins Judicial Reluctance to Imply Rights of Action in Federal Statutes................................................................. 4

II.   § 114 Raises Strong and Copyright-Specific Separation of Powers Concerns that Counsel Against Implying a Right of Action.......................... 6

      A.    Congress's active and continuous regulation and development of the § 114 licensing regime should make courts reluctant to read into the statute what Congress has left out. ........................................................................................................ 6

      B.    Judicial implication of a right of action would undermine Congress's role as the interest-balancer in § 114 and upset the balance of interests that it deliberately struck. .................................. 12

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonneville Int'l Corp. v. Peters*,
347 F.3d 485 (3d Cir. 2003) ...............................................................15

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)...........................................................................17

*Egbert v. Boule*,
596 U.S. 482 (2022).............................................................................5

*Hernandez v. Mesa*,
589 U.S. 93 (2020)................................................................2, 3, 5, 19

*Jesner v. Arab Bank, PLC*,
584 U.S. 241 (2018).............................................................................5

*Nestle USA, Inc. v. Doe*,
593 U.S. 628 (2021)........................................................................4, 12

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)...........................................................................17

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975)...........................................................................13

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)..................................................................4, 5, 6, 11

**Statutes**

17 U.S.C. § 106....................................................................................6

17 U.S.C. § 114..............................................................................*passim*

17 U.S.C. § 115....................................................................................9

17 U.S.C. § 115(d)(6)(C) ..................................................................9, 21

Pub. L. No. 104-39, 109 Stat. 336 (1995)...........................................6

Pub. L. No. 105-80, 111 Stat. 1531 (1997)....................................................7

Pub. L. No. 105-304, 112 Stat. 2890-2897 (1998) ......................................7

Pub. L. No. 107-321, 116 Stat. 2781 (2002).................................................7

Pub. L. No. 108-419, 118 Stat. 2362 (2004).................................................7

Pub. L. No. 109-303, 120 Stat. 1481 (2006).................................................7

Pub. L. No. 110-435, 122 Stat. 4974 (2008).................................................7

Pub. L. No. 111-36, 123 Stat. 1926 (2009)...................................................7

Pub. L. No. 111-295, 124 Stat. 3180 (2010)............................................7, 10

Pub. L. No. 115-264, 132 Stat. 3723-3725, 3737 (2018) ............................7

## Other Authorities

Adam Gorgoni, *The Music Modernization Act: A Songwriter's
   Perspective* (July 1, 2021),
   https://ssrn.com/abstract=3898192 ......................................................16

H.R. 1506 ...............................................................................................13, 14

H.R. Rep. No. 104-274 (1995)................................................................13, 14

Jacob Victor, *Reconceptualizing Compulsory Copyright Licenses*, 72
   Stan. L. Rev. 915 (2020)......................................................................8, 9

Joseph P. Liu, *Regulatory Copyright*,
   83 N.C. L. Rev. 87, 103 (2004) ...............................................................18

Kimberly L. Craft, *The Webcasting Music Revolution Is Ready to
   Begin, As Soon As We Figure Out the Copyright Law: The Story of
   the Music Industry at War With Itself*,
    24 Hastings Comm. & Ent. L.J. 1 (2001)...........................................10, 15

Peter DiCola & Matthew Sag, *An Information-Gathering Approach to
   Copyright Policy*, 34 Cardozo L. Rev. 173, 223-25 (2012) .............10, 16

S. 326, American Music Fairness Act (119th Congress)................................7

S. Rep. No. 104-128 (1995) ...................................................................................14

S. Rep. No. 115-339 (2018) .........................................................................10, 16

William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. Legal Stud. 325, 326 (1989) ............................................13

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are professors of law who have studied, taught, and written about intellectual property law, administrative law, and the compulsory copyright licensing systems.[2] They submit this brief to share their views, based on that experience, on the proper interpretation of 17 U.S.C. § 114 and its compulsory licensing regime in light of the important copyright-specific equities and separation-of-powers concerns at stake.

**Jacob Noti-Victor** is Professor of Law at Cardozo Law School. His scholarship on copyright law and compulsory licenses includes *Reconceptualizing Compulsory Copyright Licenses*, 72 Stan. L. Rev. 915 (2020); *Antitrust Regulation of Copyright Markets*, 101 Wash. U. L. Rev. 851 (2024) (with Xiyin Tang); and *Copyright's Law of Dissemination*, 44 Cardozo L. Rev. 1769 (2023).

**Saurabh Vishnubhakat** is Professor of Law and Director of the IP and Information Law Program at Cardozo Law School. He is also a Research Fellow at the Duke Law Center for Innovation Policy. He writes on IP decision-making in federal courts and administrative agencies. His scholarship on the delegation and

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* confirm that no party or counsel for any party authored this brief in whole or in part, and that no person other than *amici* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] Institutional affiliations are included for identification purposes only; signatories to this brief provide their own views and do not represent the views of any institution.

allocation of IP powers includes *Copyright's Administrative Law*, 68 J. Copyright Soc'y 417 (2021) (with Dave Fagundes); *The Coming Copyright Judge Crisis*, 98 N.Y.U. L. Rev. Online 1 (2023) (with Dave Fagundes); and *Structural Bias in Patent Adjudication*, under submission (available at ssrn.com/abstract=3988952). He was formerly an advisor at the U.S. Patent and Trademark Office on the economic and legal policy of IP, and is a past chair of the AALS Section on Intellectual Property and the AALS Section on Remedies.

## INTRODUCTION

*Amici* agree with Sirius XM Radio that, as a matter of statutory interpretation, § 114 of the Copyright Act does not confer on SoundExchange a right to sue in federal court to enforce the payment of royalties under § 114's compulsory license. Any such right would therefore necessarily have to be an "implied" one.

This Court should not imply one. Federal courts are reluctant to imply rights of action in federal statutes where Congress has not expressly done so because of "the tension between this practice and the Constitution's separation of legislative and judicial power." *Hernandez v. Mesa*, 589 U.S. 93, 100 (2020). Supplying a damages remedy where Congress has not "risks arrogating legislative power" and "may upset the careful balance of interests struck by the lawmakers." *Id.*

Those risks are not merely abstractions in this case. To the contrary: the specific statutory history and context of § 114 gives these separation-of-powers

2

concerns particular weight and strongly counsels against implying SoundExchange's contended-for cause of action. Since creating the digital performance right (and corresponding compulsory license) in 1995, Congress has repeatedly and directly intervened in, overseen, and fine-tuned—through nine separate legislative amendments—all aspects of the § 114 licensing regime. And this assiduous exercise of Congress's policymaking prerogative has occurred in a domain of complex and cross-cutting technological, cultural, artistic, economic, and political interests. In the creation of the § 114 license and each subsequent amendment, Congress has weighed, calibrated, and re-calibrated the interests of numerous stakeholders—artists and musicians, record labels, music publishers, internet radio services, streaming services, satellite radio transmitters, AM/FM radio stations, and the radio-listening public—and struck a specific equilibrium, often heavily negotiated.

Against this backdrop, judicial creation of a cause of action in § 114 for SoundExchange to sue for royalties would both arrogate the "legislative power" Congress has continuously exercised in this licensing regime and "upset the careful balance of interests struck" by Congress—precisely the evils guarded against by the separation-of-powers principle. *Hernandez*, 589 U.S. at 100. If SoundExchange wants that balance of interests to be re-calibrated in favor of a right to enforce royalty payments, the proper recourse is the same legislative give-and-take through which

3

Congress and the interested parties (including SoundExchange) have been developing the § 114 licensing regime for the past thirty years—not through judicial revision.

The Court should affirm the judgment of the district court below.

## ARGUMENT

I. **The Separation of Powers Underpins Judicial Reluctance to Imply Rights of Action in Federal Statutes**

Judicial implication of a right of action in a federal statute is "an extraordinary act that places great stress on the separation of powers." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 636-37 (2021). The reticence of federal courts to create a cause of action where Congress has not done so explicitly is premised on separation-of-powers concerns and respect for the distinct, constitutionally appointed role of Congress. While federal courts once "often assumed authority to create causes of action" where Congress had not done so, they have since come "to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power." *Id.* Accordingly, "when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? The answer most often will be Congress." *Ziglar v. Abbasi*, 582 U.S. 120, 135-36 (2017) (citation omitted).

4

Underpinning the separation-of-powers principle are several distinct but complementary concerns. One concern is which branch the Constitution empowers to create and define substantive rights and duties through legislation. *See id.* at 135-36 ("When an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them.") (cleaned up); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 282 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) ("Deciding that, henceforth, persons like A who engage in certain conduct will be liable to persons like B is, in every meaningful sense, just like enacting a new law. And in our constitutional order the job of writing new laws belongs to Congress, not the courts.").

A second, related concern is which branch is better positioned to strike an appropriate and legitimate balance between a multiplicity of competing interests—public and private, consumer and corporate, social and economic and cultural. Implying a cause of action is, fundamentally, a "legislative endeavor" and "[c]ourts engaged in that unenviable task must evaluate a range of policy considerations at least as broad as the range a legislature would consider." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (cleaned up). In doing so, courts risk "upset[ting] the careful balance of interests struck by the lawmakers." *Hernandez*, 589 U.S. at 100.

5

**II.** **§ 114 Raises Strong and Copyright-Specific Separation of Powers Concerns that Counsel Against Implying a Right of Action**

The separation-of-powers concerns threaded throughout the Supreme Court's implied-rights cases have heightened and specific force in the context of the § 114 licensing regime because of features specific to copyright regulation and the history of § 114. *First,* since 1995, Congress has actively and assiduously regulated all aspects of the § 114 license, resolving the question of "'who should decide' whether to provide for a damages remedy, Congress or the courts" in its own favor. *Ziglar,* 582 U.S. at 135. *Second*, the § 114 license and its subsequent revisions have been the product of vigorous, multiparty negotiation and compromise. They represent Congress's determination as to how to strike the balance between competing interests. Judicially implying a right of action into § 114 would risk upsetting the balance that Congress has deliberately chosen.

**A.** **Congress's active and continuous regulation and development of the § 114 licensing regime should make courts reluctant to read into the statute what Congress has left out.**

Since Congress created a public performance right in sound recordings distributed via digital radio in the Digital Performance Right in Sound Recordings Act of 1995 (DPRA),[3] it has continually fine-tuned and amended the § 114 compulsory license in response to implementation issues, technological changes,

---

[3] Pub. L. No. 104-39, 109 Stat. 336, codified as amended throughout 17 U.S.C. §§ 106, 114-115.

market developments, and input from market participants, including webcasters, copyright owners, record labels and music publishers, the Recording Industry Association of America, the United States Copyright Office, and SoundExchange itself.

Congress's revision and fine-tuning of the § 114 licensing scheme has been continual and active. It has amended § 114 on nine separate occasions since enacting the DPRA in 1995:

- 1997: Public Law 105-80
- 1998: Digital Millennium Copyright Act (DMCA)
- 2002: Small Webcaster Settlement Act
- 2004: Copyright Royalty and Distribution Reform Act
- 2006: Copyright Royalty Judges Program Technical Corrections Act
- 2008: Webcaster Settlement Act of 2008
- 2009: Webcaster Settlement Act of 2009
- 2010: Copyright Cleanup, Clarification, and Corrections Act
- 2018: Music Modernization Act.[4]

Even now, Congress is considering proposed legislation (S.326) to further amend the § 114 licensing regime to create a public performance right—and corresponding compulsory license—for "terrestrial" broadcasting (*i.e.*, AM and FM radio stations).[5]

---

[4] Pub. L. No. 105-80, 111 Stat. 1531 (1997); Pub. L. No. 105-304, 112 Stat. 2890-2897 (1998); Pub. L. No. 107-321, 116 Stat. 2781 (2002); Pub. L. No. 108-419, 118 Stat. 2362 (2004); Pub. L. No. 109-303, 120 Stat. 1481 (2006); Pub. L. No. 110-435, 122 Stat. 4974 (2008); Pub. L. No. 111-36, 123 Stat. 1926 (2009); Pub. L. No. 111-295, 124 Stat. 3180 (2010); Pub. L. No. 115-264, 132 Stat. 3723-3725, 3737 (2018).
[5] *See* S. 326, American Music Fairness Act (119th Congress).

Congress's continual amendments and revisions have affected every aspect of the § 114 license, including the types of webcasters it covered, the standards for setting royalty rates, the structure of copyright royalty tribunals, oversight of specific royalty settlement negotiations, and the designation of a nonprofit collection agent—SoundExchange. Through the 1998 DMCA, Congress expanded the categories of webcasters who were subject to § 114's compulsory license and introduced a wholly new, market-mimicking standard for setting royalty rates for new digital radio services. In 2002, 2008, and 2009, Congress directly and repeatedly intervened in the royalty rate-setting process in order to facilitate negotiated settlements between webcasters and rightsholders and to provide relief to small webcasters.[6] In 2004, with the Copyright Royalty and Distribution Reform Act, Congress extensively revised the rate-setting process, replacing the existing system of ad hoc copyright arbitration royalty panels with the Copyright Royalty Board. And in 2018, Congress *re-re*-worked the rate-setting standard for § 114 licenses in the Music Modernization Act, as well as created new mechanisms for the distribution of licensing proceeds to copyright owners and other rightsholders.

Through the MMA, Congress also completely overhauled the neighboring licensing regime in § 115, which covers the "mechanical license" (*i.e.*, a license

---

[6] Jacob Victor, *Reconceptualizing Compulsory Copyright Licenses*, 72 Stan. L. Rev. 915, 983 & n.367 (2020) (discussing the Small Webcaster Settlement Act of 2002 and the Webcaster Settlement Acts of 2008 and 2009).

provided by those holding rights to the musical composition and lyrics, as opposed to the sound recording rights). Congress in the MMA created a new blanket mechanical license for digital music providers (streaming services), overseen by a new "mechanical licensing collective" (MLC) modeled on SoundExchange. Notably, Congress conferred an express right of action on the MLC to sue in federal district court for non-payment of administrative assessments, specifying the remedies and relief available, the partial defense of "excusable neglect," and the statute of limitations for such an action.[7] In its many and varied amendments to §§ 114 and 115 since 1995, this is the only instance of Congress incorporating an express right of action to sue for damages.

Throughout these amendments, Congress has adjusted, clarified, and re-balanced § 114 to address perceived problems, inconsistent standards, and even textual ambiguities in the § 114 licensing regime. For example, the 1995 DPRA exempted from § 114's coverage "nonsubscription" internet radio, while requiring "subscription" internet radio services to pay compulsory licensing fees to rightsholders. Congress swiftly moved to fix this "oversight" in the 1998 DMCA, amending § 114 to bring nonsubscription internet radio services within the compulsory licensing umbrella.[8] In the 2018 MMA, Congress replaced the

---

[7] *See* 17 U.S.C. § 115(d)(6)(C).

[8] Victor, *Reconceptualizing Compulsory Copyright Licenses*, 72 Stan. L. Rev. at 953 ("The DMCA's revisions were ostensibly designed to correct an 'oversight' in the

two-tiered rate setting standard for § 114 licenses with a "uniform willing buyer, willing seller" standard in order to "equalize the rate setting process for all licenses" and remove what the Committee report termed an "unnecessary discount" for certain services.[9] Some changes were smaller. In the 2010 Copyright Cleanup, Clarification, and Corrections Act, Congress amended a phrase in former § 114(f)(2) to clarify the scope of the license and elsewhere fixed a grammatical error.[10]

In short, Congress has pervasively and continuously regulated § 114 compulsory licensing since creating a digital performance right (and statutory license) in 1995. Congress's frequent interventions in the regulatory structure—from re-defining the scope of the license to fixing typos, suspending royalties for small

---

DPRA: the fact that *nonsubscription* digital services were grouped together with existing terrestrial radio and thus not required to pay sound recording copyright owners."); Peter DiCola & Matthew Sag, *An Information-Gathering Approach to Copyright Policy*, 34 Cardozo L. Rev. 173, 223-25 (2012) ("The recording industry soon realized its oversight and began lobbying for yet another revision to the Copyright Act to bring non-subscription webcasters within the scope of its newly acquired digital performance right."); Kimberly L. Craft, *The Webcasting Music Revolution Is Ready to Begin, As Soon As We Figure Out the Copyright Law: The Story of the Music Industry at War With Itself*, 24 Hastings Comm. & Ent. L.J. 1, 12-13 (2001).

[9] S. Rep. No. 115-339 at 15, 27 (2018) (accompanying S. 2328).

[10] Pub. L. No. 111-295, § 5(c) (clarifying edit to strike "preexisting subscription digital audio transmission services or preexisting satellite digital radio audio services" and insert "eligible nonsubscription services and new subscription services"), § 6(b) (fixing a pronoun-antecedent agreement error in § 114), 124 Stat. 3180 (2010).

webcasters to revising, then re-revising, royalty rate structures—demarcate § 114 as an area in which Congress has chosen to serve as an active, primary policymaker.

Given that choice by Congress, this Court should be especially reluctant to infringe on its prerogatives and primacy as the lawmaker and regulator in the § 114 licensing regime. Separation-of-powers principles are concerned with "'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Ziglar*, 582 U.S. at 135. While "[t]he answer most often will be Congress" in any domain, *id.*, the answer should especially be Congress in areas where Congress has decided to engage in continuous, iterative policymaking itself and to exercise close and ongoing oversight. In such an area, concern for Congress's legislative and policy prerogatives is maximally implicated and counsels strongly against judicial creation of rights and duties that Congress has not expressly provided for.

That is the case here. In the § 114 licensing scheme, Congress has continued to fine-tune the statutory licensing system and has intervened regularly and often to adjust it as the market has developed since 1995, technology has changed, and the equities have shifted between various stakeholders. In its frequent amendments and interventions, however, Congress has not expressly provided for the right of action SoundExchange asserts is implicit in § 114. The "great stress on the separation of powers" caused by implying a right of action would be all the greater here given

11

Congress's self-chosen role in overseeing and developing the § 114 licensing regime. *Nestle USA*, 593 U.S. at 636.

This Court should avoid such harm, respect Congress's established policymaking prerogative regarding § 114, and decline to read into the statute what an active Congress has not put there.

**B.** **Judicial implication of a right of action would undermine Congress's role as the interest-balancer in § 114 and upset the balance of interests that it deliberately struck.**

1. Copyright regulation inherently involves a complex balancing of different stakeholders' interests.

Copyright law is a tool for balancing the interests of creators, copyright holders, disseminators of creative works, and the public at large. Copyright aims to provide a limited property entitlement in creative works sufficient to incentivize the creation of new works, but not so restrictive as to deprive the public from reasonable access to those works. While lawmakers, courts, and commentators may disagree regarding how the various interests at stake should be weighed, and under what principles, they agree that copyright regulation requires negotiating and balancing the interests of creators, disseminators, and the public. For example, the Supreme Court has recognized the fundamental concern of copyright law as involving the "balanc[ing] of competing claims":

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be

12

encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).[11] One scholarly formulation of copyright by William Landes and Judge Richard Posner explains:

> Copyright protection—the right of the copyright's owner to prevent others from making copies—trades off the costs of limiting access to a work against the benefits of providing incentives to create the work in the first place. Striking the correct balance between access and incentives is the central problem in copyright law.

William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. Legal Stud. 325, 326 (1989).

In the same vein, Congress understood the DPRA as attempting to "strike a balance among all of the interests affected thereby."[12]

### 2. Congress decided to undertake itself the specific, complex interest-balancing relating to § 114 compulsory licenses.

In the copyright domain, Congress may decide to strike this balance of interests itself through continual statutory revision and ongoing consultation and oversight of industry negotiations. Alternatively, for other copyright issues,

---

[11] *See id.* at 164 (quoting the House of Representatives report accompanying the Copyright Act of 1909: "[I]t has been a serious and a difficult task to combine the protection of the composer with the protection of the public, and to so frame an act that it would accomplish the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monopolies, which might be founded upon the very rights granted to the composer for the purpose of protecting his interests.").

[12] H.R. Rep. No. 104-274 at 13 (1995) (accompanying H.R. 1506).

Congress may choose to delegate broad discretion to courts to assess and develop those issues on a case-by-case basis using common-law reasoning.

The choice Congress made with § 114 is clear: Congress itself will strike the balance of interests and equities, as is clear from the statutory history of § 114. The DPRA and the numerous legislative amendments that have followed were the product of multipartite negotiations and compromises between industry participants, all overseen and ratified by Congress. The resulting statutory scheme—complex, highly reticulated, and frequently fine-tuned and revised since 1995, as set out above—thus represents a careful and complex balancing of interests and equities *by Congress*.

In drafting the bill that became the DPRA, the House Judiciary Subcommittee on Courts and Intellectual Property "hosted 'roundtable' discussions in an effort to forge a consensus on appropriate legislation" with representatives of "the broadcast industry, cable and satellite digital audio service providers, restaurant owners, and copyright owners of both sound recordings and musical works."[13] The resulting bill was, in Congress's words, "carefully crafted" to "strike a balance among all of the interests affected thereby," which was "reflected in various limitations on the new performance rights."[14] That balance aimed to accommodate the needs of all

---

[13] S. Rep. No. 104-128 at 12 (1995) (accompanying S. 227).
[14] H.R. Rep. No. 104-274 at 12-14 (1995) (accompanying H.R. 1506).

14

stakeholders: to "provide copyright holders of sound  recordings with the ability to control the distribution of their product by digital transmissions, without hampering the  arrival of new technologies, and without imposing new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings."[15] The striking of this balance was only possible through an explicit "compromise" between record labels, songwriters, and publishers brokered by Congress.[16]

Congress's subsequent amendments to the DPRA likewise reflected this complex balancing of stakeholder interests. The 1998 DMCA extended the § 114 compulsory license to encompass so-called "nonsubscription" webcasters. This amendment reflected a negotiated give-and-take between record labels (who wanted nonsubscription webcasters to pay royalties), webcasters (who wanted a simple, usable compulsory license, if they were going to be required to pay), and publishers (who wanted clarification that the amendment would not impair their separate copyright in the musical compositions).[17] In the 2002 Small Webcaster Settlement Act, Congress implemented technical revisions to the cost-deduction provisions in

---

[15] *Id.* at 14.

[16] *Id.* at 11-12; *see also Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 497-99 (3d Cir. 2003) (noting that "Congress had in mind the symbiotic relationship between the recording industry and broadcasters" when enacting the DPRA).

[17] Craft, *The Webcasting Music Revolution Is Ready to Begin*, 24 Hastings Comm. & Ent. L.J. 1 at 13-14.

what is now § 114(g)(3),[18] and re-calibrated the § 114 license to accommodate the interests of small webcasters by temporarily suspending their obligation to pay just-established royalty fees—a change motivated by their "lack of representation" at royalty rate-setting hearings and "the assessment that such webcasters were unduly disadvantaged by the high per-performance royalty fees that resulted from the first round of" hearings.[19] (Nothing in the Small Webcaster Settlement Act evinced an intent by Congress to create a novel right of action for SoundExchange.) And the 2018 Music Modernization Act was explicitly a negotiated "collaborat[ion]" between artists, copyright holders, and other industry stakeholders overseen and enacted into law by Congress.[20]

Standing in useful and stark contrast to Congress's decision to be the interest-balancing entity in § 114, there are areas of copyright where Congress has chosen to delegate discretion to the federal courts to balance competing interests. The doctrine of fair use—as set out in § 107 and elaborated by the federal courts—exemplifies

---

[18] *See* Brief for Defendant-Appellee Sirius XM Radio, Inc. at 10-11.

[19] DiCola & Sag, *An Information-Gathering Approach to Copyright Policy*, 34 Cardozo L. Rev. at 229-30.

[20] S. Rep. No. 115-339 at 2 (2018) (accompanying S. 2823) ("Songwriters, artists, publishers, producers, distributors, and other stakeholders involved in the creation and distribution of music collaborated with legislators in both the Senate and the House to find a path forward on music reform."); Adam Gorgoni, *The Music Modernization Act: A Songwriter's Perspective* (July 1, 2021), https://ssrn.com/abstract=3898192, at 22-23, 28 (discussing the compromises made by artists to secure passage of the MMA).

that approach. Fair use was an "exclusively judge-made doctrine until the passage of the 1976 Copyright Act." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576, (1994). Even after statutory codification, however, Congress "meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication." *Id.* at 577 (citing H.R. Rep. No. 94-1476 at 66 (1976)). The task of "fair use adjudication" thus explicitly delegates to the federal courts the obligation to undertake "a sensitive balancing of interests." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984)." That balancing by judges is not susceptible to "bright-line rules" because Congress drafted § 107, "like the doctrine it recognizes," to "call[] for case-by-case analysis" with all four statutory factors "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78.

But Congress has made no such delegation to the courts in § 114. Instead, Congress itself has chosen to assert direct oversight and control over the balancing of competing interests through the legislative process. Unlike fair use, there is no history of common-law adjudication and development of the § 114 licensing regime. Rather, Congress has chosen to fine-tune and amend the statute directly—and frequently—when it wants to re-balance the interests. Unlike the broad set of factors and explicit grant of discretion in § 107, § 114 is a long, detailed, highly specific and

17

specified statutory provision. As one scholar has explained, provisions like § 114 "contain[] extremely detailed and complex statutory provisions allocating rights and responsibilities at a very fine-grained and particularized level. Rather than defining a broad property entitlement and leaving the courts to apply the entitlement in a case-by-case manner, the regulatory approach seeks to specify the precise results and lay them out in the statute itself."[21] And in a statute with no shortage of complex provisions, the DPRA (which created the § 114 compulsory license) is "quite possibly the most complex copyright provision yet enacted."[22]

3. <u>The Court should not upset the complex equity-balancing Congress has done in § 114 by implying a right of action.</u>

As set out above, Congress has overseen a complex, multipartite balancing of interests between various stakeholders in the music industry in creating the § 114 compulsory licensing regime and fine-tuning it through numerous amendments. In doing so, Congress decided to strike that balance of interests—and continue to re-weigh and re-calibrate it—rather than delegating that task to courts.

The § 114 licensing system thus paradigmatically embodies the concerns underlying the separation of powers. Because "lawmaking involves balancing interests and often demands compromise . . . finding that a damages remedy is

---

[21] Joseph P. Liu, *Regulatory Copyright*, 83 N.C. L. Rev. 87, 103 (2004).

[22] *Id.* at 119-21 (describing how the "exceptionally complex" DPRA "presents perhaps the most dramatic application" of what the author terms Congress's "regulatory approach" to copyright regulation).

implied by a provision that makes no reference to that remedy may upset the careful balance of interests struck *by the lawmakers*." *Hernandez*, 589 U.S. at 100 (emphasis added).

The "balance of interests struck by" Congress in § 114 has been detailed and careful indeed. It has entailed three decades overseeing the bargaining, negotiating, and re-calibration of the digital public performance right as the § 114 licensing regime has been implemented, technology and the market have evolved, and royalty rates have been considered, established, suspended, and revised. Congress is thus better positioned than a court to understand the complex interrelationships and balance of equities between artists, rightsholders like record labels and publishers, internet and satellite radio stations, and the public, as well as the various alternative enforcement mechanisms available to rightsholders under federal and state law. And Congress has deliberately chosen the particular balance to strike, and re-weigh, and then re-strike—in an ongoing and iterative process—as it has developed the § 114 license. Congress has chosen to do the weighing and balance-striking in § 114 itself and has not delegated to others—including courts—the task of developing the § 114 licensing scheme through common-law adjudication.

Judicial intervention in § 114 would upset that balance. Reading into the statute an implied right for SoundExchange to enforce royalty payments, where no express one exists, would upend the equilibrium Congress has struck and re-struck

19

over time and the multi-partite compromises embodied in the DPRA and its amendments. Respect for Congress's role, one it has chosen to exercise and not to delegate in this domain, requires that the Court not take it upon itself to re-balance the equities and interests that Congress has weighed and re-weighed since enacting the DPRA in 1995—and that Congress has reserved to itself the right to weigh and re-calibrate. Indeed, judicial intervention could jeopardize Congress's continued ability to rebalance the § 114 licensing regime as it sees fit by introducing risk that courts will adjust the equilibrium Congress chose and thereby invite industry players to re-litigate the legislative process through the federal courts. If SoundExchange (or the RIAA, or any other interested party) thinks the balance should be re-struck to permit direct enforcement of royalty payments by SoundExchange under § 114, it knows how to go about doing it—the legislative give-and-take that these parties and stakeholders have been engaged in together for several decades. Indeed, through such a process, industry participants proposed—and Congress adopted—an explicit cause of action for enforcement of administrative costs in the MMA, § 115(d)(6)(C).

Congress has not made any delegation to Article III courts to exercise discretion in developing the § 114 licensing regime. Instead, Congress has reserved that role to itself. Accordingly, judicial re-calibration of the sensitive, carefully-balanced § 114 licensing scheme is not appropriate and the Court should not imply a right of action for SoundExchange to enforce royalties under § 114.

20

## CONCLUSION

Respect for the separation of powers and Congress's role in regulating the § 114 licensing regime counsels strongly against implying a right of action for SoundExchange to enforce royalty payments under § 114 where Congress has not done so explicitly. Respectfully, the judgment of the District Court should be affirmed.

Dated:  February 27, 2026       Respectfully submitted,
        New York, New York

                                */s/ Russell Rennie*
                                Russell Rennie
                                SUSMAN GODFREY L.L.P.
                                One Manhattan West, 50th Floor
                                New York, New York 10001
                                Telephone: 212-336-8330
                                Facsimile: 212-336-8340
                                rrennie@susmangodfrey.com

                                *Attorney for* Amici Curiae
                                *Jacob Noti-Victor and*
                                *Saurabh Vishnubhakat*

21

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) and Local Rule 29.1(c). The brief contains 4905 words, excluding the portions exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Russell Rennie*
Russell Rennie

Dated: February 27, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February 2026, I caused true and accurate copies of the foregoing to be served on counsel of record via the ACMS system. I have also submitted six paper copies to the Court.

/s/ Russell Rennie
Russell Rennie

Dated: February 27, 2026

23