# No. 25-2150

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

SOUNDEXCHANGE, INC.,

*Plaintiff-Appellant*,

v.

SIRIUS XM RADIO, INC.,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court
for the Southern District of New York
No. 1:24-cv-5491 (Hon. Naomi Reice Buchwald)

_____

**REPLY BRIEF FOR PLAINTIFF-APPELLANT SOUNDEXCHANGE, INC.**

_____

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
KEVIN WYNOSKY
CAMILO GARCIA*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiff-Appellant
SoundExchange, Inc.*

March 27, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................. 4

I.     SoundExchange Can Enforce §114 By Bringing Lawsuits Against Parties Who Fail To Comply With The Obligations It Creates. ..................... 4

      A.    Section 114's Text, Structure, and History Confirm That SoundExchange's Power to "Enforce[] … Rights" Encompasses the Power to Bring Litigation ....................................... 4

      B.    Even if Legislative History Could Override Clear Text, §114's History Does Not .............................................................................. 8

      C.    Section 115 Reinforces the Conclusion That the Power to "Enforce[] … Rights" Includes the Power to Bring Litigation ..............................................................................11

      D.    Sirius XM's Nondelegation Argument Is Forfeited And Radically Off-Base .......................................................................... 14

II.    Section 114 Plainly Contemplates That The Royalty Rights It Creates May Be Enforced Via Lawsuits Brought Under §114 Itself ........... 18

CONCLUSION .............................................................................................. 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................................20

*Borochov v. Islamic Republic of Iran*,
    94 F.4th 1053 (D.C. Cir. 2024) .............................................26

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936)................................................................14

*Casas v. Am. Airlines, Inc.*,
    304 F.3d 517 (5th Cir. 2002)..................................................20

*Deckert v. Indep. Shares Corp.*,
    311 U.S. 282 (1940)..................................................................5

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025)................................................................16

*Frazier v. Fairhaven Sch. Comm.*,
    276 F.3d 52 (1st Cir. 2002) ....................................................20

*Garland v. Cargill*,
    602 U.S. 406 (2024)................................................................24

*Hall v. United States*,
    566 U.S. 506 (2012)................................................................11

*In re Hudson*,
    859 F.2d 1418 (9th Cir. 1988).................................................12

*Jonah R. v. Carmona*,
    446 F.3d 1000 (9th Cir. 2006).................................................12

*Karahalios v. Nat'l Fed'n of Fed. Emps.*,
    489 U.S. 527 (1989)................................................................22

*Leonard F. v. Israel Disc. Bank of N.Y.*,
    199 F.3d 99 (2d Cir. 1999)........................................................6

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................................14

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
283 F.3d 429 (2d Cir. 2002)..................................................................23

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
933 F.3d 99 (2d Cir. 2019)............................................................ *passim*

*Samantar v. Yousuf*,
560 U.S. 305 (2010)................................................................................6

*Santana v. Barr*,
975 F.3d 195 (2d Cir. 2020)...................................................................11

*SoundExchange, Inc. v. Muzak, LLC*,
854 F.3d 713 (D.C. Cir. 2017) ...............................................................25

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)................................................................................14

*Thompson v. Thompson*,
484 U.S. 174 (1988)......................................................................... 19, 23

*Transamerica Mort. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979)..................................................... 3, 19, 24, 25

*United States v. Gomez*,
877 F.3d 76 (2d Cir. 2017) ....................................................................14

*United States v. Rowland*,
826 F.3d 100 (2d Cir. 2016) ...................................................................6

*W. Allis Mem'l Hosp., Inc. v. Bowen*,
852 F.2d 251 (7th Cir. 1988).................................................................20

**Statutes**

17 U.S.C. §101 .......................................................................................6

17 U.S.C. §114(d)-(f)............................................................................21

17 U.S.C. §114(g)(2).............................................................................23

17 U.S.C. §114(g)(2)...............................................................................16

17 U.S.C. §114(g)(3)................................................................. 5, 6, 16, 18

17 U.S.C. §115(d)(3)...................................................................... 12, 14

17 U.S.C. §115(d)(6)...............................................................................13

17 U.S.C. §115(e)(6)...............................................................................12

17 U.S.C. §501 .......................................................................................23

Pub. L. No. 107-321, 116 Stat. 2780 (2002)........................................ 8, 10

Pub. L. No. 108-419, 118 Stat. 2341 (2004)............................................11

**Regulations**

63 Fed. Reg. 34,289 (June 24, 1998) ......................................................17

67 Fed. Reg. 45,240 (July 8, 2002)................................................ 9, 10, 17

**Other Authorities**

Amicus Br. for U.S., *SoundExchange, Inc. v. Muzak LLC*,
 2017 WL 34707 (D.C. Cir. Jan. 3, 2017)...........................................26

Compl., *SoundExchange, Inc. v. Muzak LLC*, No. 1:15-cv-476
 (D.D.C. April 1, 2015) ...................................................................... 26

S. Rep. No. 115-339 (2018) ...................................................................11

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ......................19

**INTRODUCTION**

Sirius XM's brief not only claims that §114 is the exceedingly rare statute that provides federal rights but no federal enforcement mechanism, but makes the equally strained suggestion that the entity Congress charged with "enforcement" of the royalty rights of rightsholders under §114 is powerless to bring litigation on their behalf. And not just litigation under §114. Sirius XM insists that SoundExchange could not bring lawsuits on rightsholders' behalf even under provisions that it concedes *do* create a cause of action to enforce their rights. Indeed, it even goes so far as to argue (for the first time) that it would be unconstitutional for SoundExchange to do so. Sirius XM seeks to ground both of those sweeping arguments in the "strong presumption against implying a cause of action." SXM.Br.18. But that presumption has nothing to do with the who-can-sue question; it is relevant only to whether §114 provides a cause of action. Sirius XM's dogged reliance on the presumption thus conflates two distinct questions: Can SoundExchange sue on behalf of rightsholders, and can it bring them under §114? Text, context, and common sense confirm that the answer to both questions is yes.

As to the first, the presumption Sirius XM repeatedly invokes is irrelevant, so it is just a straight-up matter of statutory interpretation. And the statutory text confirms that SoundExchange can bring lawsuits by expressly recognizing that it may engage in "enforcement" activities, which Congress made plain all throughout

the Copyright Act (including in the §115 collective regime it patterned off of §114) is a term that includes litigation. Sirius XM insists that legislative history shows that Congress intended "enforcement" in §114—and §114 alone—to refer exclusively to participating in proceedings before now-defunct Copyright Arbitration Royalty Panels, or CARPs. But that argument is squarely foreclosed by Congress' inclusion of the phrase "*including* negotiations and arbitration"; "including" is about the last word Congress would have used if "negotiations and arbitration" covered the waterfront. And Sirius XM's argument does not even comport with the legislative history, which confirms that Congress added §114(g)(3) to codify the *entirety* of the agreement rightsholders and the collective had reached about the powers the latter could exercise on the former's behalf, not just to address CARP proceedings.

As for the second question, even if the presumption against implied causes of action may be relevant, it is readily overcome here, as the express text of §114 references "enforcement" and presupposes that SoundExchange will be the one to enforce the private monetary rights that §114 bestows. Sirius XM does not dispute that §114 bestows royalty rights on identifiable parties; it just argues that SoundExchange is not one of them. But SoundExchange is not suing to collect royalties for itself; it is suing to collect them for the rightsholders whose rights it is statutorily designated to enforce. Sirius XM does not dispute that Congress did not task the federal government or anyone else with enforcing §114. Sirius XM instead

2

claims that Congress must have intended for rightsholders (but not SoundExchange) to enforce their federal royalty rights only by bringing common-law claims in state courts. As the Supreme Court has recognized in parallel circumstances, the notion that Congress "wished to remit the litigation of a federal right to state courts" would be quite "anomalous." *Transamerica Mort. Advisors, Inc. v. Lewis* (*TAMA*), 444 U.S. 11, 19 n.8 (1979).

At bottom, then, what Sirius XM is really arguing is that the presumption against implied causes of actions is so strong that this Court must conclude that Congress provided no federal remedy whatsoever for a violation of the federal royalty rights it created in §114. But the presumption is just a guide to sensible statutory construction, not a straitjacket that requires this Court to undermine the whole point of §114 simply because, in Sirius XM's view, Congress failed to use magic words. As Sirius XM emphasizes, Congress employed some 8,000 words in constructing an elaborate system for the efficient enforcement of statutory royalty rights via a collective. Sirius XM would undermine that entire effort—and, not coincidentally, skew the whole system in its favor, at the expense of rightsholders. Neither the statutory text nor common sense justifies that counterintuitive result. SoundExchange thus not only can sue, but can sue under §114, just as it has been doing with Congress' apparent approval and with no prior objection by Sirius XM for more than a decade. This Court should reverse.

3

## ARGUMENT

I.   **SoundExchange Can Enforce §114 By Bringing Lawsuits Against Parties Who Fail To Comply With The Obligations It Creates.**

A.   **Section 114's Text, Structure, and History Confirm That SoundExchange's Power to "Enforce[] … Rights" Encompasses the Power to Bring Litigation.**

No one disputes that the question here "should" "begin[]" and "end" with "the text and structure of the statute." SXM.Br.20. The problem for Sirius XM is that §114's text and structure "presuppos[e] the availability of" means by which SoundExchange can enforce §114's royalty obligations. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019). Indeed, for all Sirius XM's rhetoric about §114(g)(3) being a "sub-sub-sub provision," *e.g.*, SXM.Br.28, there is no dispute that, by allowing SoundExchange to "deduct … the reasonable costs of" "enforcement of rights," §114(g)(3)(C) gives SoundExchange the power to conduct enforcement. The only dispute is what form that "enforcement" may take.

Sirius XM does not and cannot deny that the plain meaning of "enforcement" readily encompasses using affirmative litigation to compel compliance with a law. *See* Opening.Br.28 (collecting dictionary definitions, which Sirius XM never addresses). In fact, Sirius XM goes out of its way to catalog instances in which Congress has used the term (or its variants) in exactly that way in the Copyright Act. SXM.Br.36; *see also* Opening.Br.29 (collecting examples). And while Sirius XM complains that Congress did not use words in §114 that explicitly contemplate

4

litigation, like "civil actions," "district courts," "claims," "damages," or "attorneys' fees," SXM.Br.20-21, 44-45, that argument confuses whether Congress provided a cause of action in §114 with whether Congress intended SoundExchange to be able to bring lawsuits *at all*. While the magic-words test Sirius XM envisions is not even the right standard for answering the former question, *see infra* pp.19-20, it makes no sense in the context of simply trying to interpret the term "enforcement."[1]

Unable to deny that "enforcement" typically encompasses litigation, Sirius XM insists that Congress signaled an intent to deviate from that natural meaning *here*, by adding the phrase "including … participating in negotiations or arbitration proceedings under … this section." 17 U.S.C. §114(g)(3)(C). According to Sirius XM, legislative history shows that "negotiations or arbitration proceedings" is a term of art that Congress used here—and here alone—to refer *only* to "the negotiation-and-arbitration rate-setting process" that used to take place before CARPs. *See* SXM.Br.30-32. But legislative history, even when codified as a statutory note,

---

[1] Sirius XM's effort to distinguish *Deckert v. Independent Shares Corp.*, 311 U.S. 282 (1940), fails for the same reason. SoundExchange invoked *Deckert* for the proposition that "[t]he power to enforce" a statutory "duty … implies the power to utilize any of the procedures or actions normally available" to do so. Opening.Br.28 (quoting *Deckert*, 311 U.S. at 287-88). Sirius XM responds by noting that the statute at issue in *Deckert* specifically contemplated "suits in equity and actions at law." *See* SXM.Br.35. But that speaks to the scope of "the procedures or actions … available" under that statute; it in no way detracts from the reality that "[t]he power to enforce" "implies the power to utilize" normally available tools of enforcement.

cannot "trump the plain meaning of a statute." *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 105 (2d Cir. 1999). And the text forecloses Sirius XM's argument several times over.

The first and fatal textual problem with Sirius XM's argument is that it ignores the word "including," which is about the last word Congress would use to refer exclusively to "negotiations or arbitration proceedings." Courts have a "duty to give effect, if possible, to every clause and word of a statute," *United States v. Rowland*, 826 F.3d 100, 109 (2d Cir. 2016), so courts cannot simply ignore words like including. And it is beyond debate that "includ[ing]" is "a term of enlargement, and not of limitation," *Samantar v. Yousuf*, 560 U.S. 305, 317 n.10 (2010), so courts likewise cannot substitute narrowing words that mean nearly the opposite, like "specifically," "exclusively," or "only." That goes double here, as the Copyright Act's definitional provision specifically instructs that the term "including" is meant to be "illustrative and not limitative" wherever it appears. 17 U.S.C. §101. Given the ordinary meaning of "including" as reinforced by that express statutory gloss, the notion that Congress limited the scope of "enforcement" to negotiations and arbitrations by referencing the "enforcement of rights … , *including* those incurred in participating in negotiations or arbitration proceedings," is a complete non-starter. *Id*. §114(g)(3)(C) (emphasis added).

6

And that is not the only problem Sirius XM's reading creates. If Congress really added §114(g)(3)(C) solely "to ensure that SoundExchange could recover its costs for participating in the negotiation-and-arbitration rate-setting process," SXM.Br.32, then Congress did not need to include the words "licensing and enforcement rights" at all; it could simply have said that the collective can recover costs "incurred in participating in negotiations or arbitration proceedings under section 112 and this section" and called it a day. Indeed, if that were all Congress wanted to accomplish, then it would have had no reason to include the term "enforcement," as CARP proceedings were used to set rates, not to enforce them. Sirius XM's argument thus requires reading "enforcement" to cover *only* something that term does not even naturally include (as evidenced by Congress' felt need to confirm that it was "includ[ed]"). On top of that, it requires reading negotiations or arbitration proceedings to refer *only* to CARP proceedings, even though §114(g)(3)(C) makes no mention of CARPs.

Instead of focusing on the text of §114(g)(3)(C), Sirius XM makes the head-scratching argument that Congress must not have intended the collective to engage in litigation because it did not specifically reference litigation in §114(g)(3)(B), the provision that covers costs incurred in "the settlement of disputes relating to the collection and calculation of the royalties." *See* SXM.Br.36-37. That gets matters backward. The fact that Congress separately covered "settlement" costs evinces its

7

understanding that the collective could engage in the litigation (or threaten the litigation) that typically produces a settlement. If §114(g)(3)(B) stood alone, then perhaps Sirius XM could argue that Congress had in mind only "voluntary settlements" accomplished with no prospect of litigation, SXM.Br.37—though that would still be a bad argument since it is the viable threat of litigation that typically induces parties to settle. (Indeed, only a counterparty could love an entity with settlement authority but no litigation authority.) But §114(g)(3)(B) does not stand alone, and the inclusion of §114(g)(3)(C) forecloses any such argument by confirming that Congress envisioned SoundExchange *enforcing* royalty rights, not just trying to settle them. The text thus does not begin to support Sirius XM's claim that the only "enforcement" Congress had in mind is participation in (non-enforcement) proceedings before CARPs. SXM.Br.28-29.

### B. Even if Legislative History Could Override Clear Text, §114's History Does Not.

At any rate, the legislative history does not support the conclusion Sirius XM tries to draw from it. Sirius XM's argument stems from a finding in the legislation adding §114(g)(3)(C) that "regulations issued by the Librarian of Congress were inconsistent with the voluntarily negotiated arrangements by such parties concerning the deductibility of certain costs incurred for licensing and arbitration." Pub. L. No. 107-321, §5(a)(3), 116 Stat. 2780, 2783 (2002). In the decision accompanying those regulations, the Librarian partially rejected a proposed regulation that would

8

have permitted the designated agent (i.e., the collective) to deduct its "reasonable costs incurred in the licensing, collection and distribution of the royalties paid by Licensees."  67 Fed. Reg. 45,240, 45,269 (July 8, 2002).  Reasoning that "licensing activities" are "not among the responsibilities of a Designated Agent," the Librarian decided to permit deduction only of "reasonable costs incurred in the collection and distribution of the royalties paid by Licensees," not costs associated with "licensing."  *Id*. at 45,269.  The Librarian then went on to opine that "costs incurred as a participant in a CARP proceeding" were "beyond the scope of collection and distribution of royalties."  *Id.*

Congress undoubtedly wanted to reverse that decision when it amended §114. But if *all* Congress had wanted to do was to "over[i]de the Librarian on this narrow point," SXM.Br.10, then it would have written a different amendment.  It would have simply specified that the collective may "deduct … reasonable costs incurred in the licensing, collection and distribution of the royalties paid by Licensees," which is the proposed language that the Librarian rejected, *see* 67 Fed. Reg. at 45,269, and added an express reference to CARP proceedings.  That is not remotely what Congress did.

For one thing, the 2002 legislation did not just add §114(g)(3)(C); it added the entirety of §114(g)(3), including the separate provisions permitting the offsetting of costs incurred in "the administration of the collection, distribution, and calculation

of the royalties" and "the settlement of disputes relating to the collection and calculation of the royalties." 116 Stat. at 2783-84. And in §114(g)(3)(C) itself, Congress did not confine itself to addressing "licensing activity" or "CARP proceedings"; it authorized the collective to offset costs for "the licensing *and enforcement* of rights …, *including* those incurred in participating in negotiations or arbitration proceedings." (Emphasis added). None of that comports with a "surgical[]" effort, SXM.Br.50, to ensure that only the collective "could recover its costs for participating in the negotiation-and-arbitration rate-setting process" under the CARP regime, which the statute does not even mention. SXM.Br.32. It instead reflects an effort, as Congress expressly said in the same findings, to "codif[y]" the *entirety* of "the voluntarily negotiated arrangements agreed to among the parties" about the activities in which their designated agent could engage, which swept far beyond participating in CARP proceedings. 116 Stat. at 2783-84.

That history not only defeats Sirius XM's atextual argument, but refutes its repeated claims that §114(g)(3)(C) has nothing to say about what powers Congress intended the collective to be able to exercise. *See, e.g.*, SXM.Br.34-35. The reason the Librarian thought the collective could not recoup costs for "licensing activities" is because the Librarian took a narrow view of "the responsibilities of a Designated Agent." 67 Fed. Reg. at 45,269. Congress corrected that misconception by broadly reaffirming that the collective could recover its costs for the full range of licensing

10

and enforcement efforts, confirming that the cost-recovery provision is very much indeed the place to look to understand what powers Congress wanted the collective to be able to exercise.

Sirius XM's contrary argument not only finds no support in the 2002 amendments, but is at considerable odds with the 2004 amendments. As Sirius XM notes, Congress "amended the Copyright Act to abolish the CARP System" in 2004. SXM.Br.11. When it did so, it made amendments elsewhere in the statute to account for their elimination. *See, e.g.*, Pub. L. No. 108-419, 118 Stat. 2341, 2362-64 (2004) (amending §114(f)). Yet it did not amend §114(g)(3)(C) at all—let alone delete it as obsolete. Sirius XM's argument thus would require believing that Congress did not "mean[] … what it sa[id]" in §114(g)(3)(C) in 2002, *contra Santana v. Barr*, 975 F.3d 195, 198 n.1 (2d Cir. 2020), and then simply forgot about the provision in its 2004 efforts, *contra Hall v. United States*, 566 U.S. 506, 516 (2012). The much more straightforward conclusion is the one the text compels: Congress never intended to confine the term "enforcement" to (non-enforcement) proceedings before CARPs.

**C. Section 115 Reinforces the Conclusion That the Power to "Enforce[] … Rights" Includes the Power to Bring Litigation.**

Sirius XM's argument defies not only the text of §114, but the text and context of §115. When Congress added §115, it patterned it off of §114. *See* S. Rep. No. 115-339, at 19-20 (2018). In so doing, it included a provision laying out the "[a]uthorities and functions" of the new mechanical collective. *See* 17 U.S.C.

11

§115(d)(3)(C). Among those is authority to "[e]ngage in legal and other efforts to enforce rights and obligations under this subsection." *Id.* §115(d)(3)(C)(i)(VIII). And when laying out what costs the mechanical collective may charge to licensees, the statute refers back to that authority with the same shorthand Congress used in §114, providing that the collective may include "costs of licensing, royalty administration, and enforcement of rights." *Id.* §115(e)(6)(A)(v).

Congress thus made plain in §115 its understanding that "enforcement of rights" in the collective context is not limited to participating in CARP rate-setting proceedings (which were abolished long before Congress enacted §115) but rather includes "legal" action. Sirius XM's argument accordingly would compel the conclusion that Congress intended "enforcement" to have an entirely different meaning in §115 than it has in §114—even though the §115 collective was modeled on the §114 collective. In reality, the fact that Congress gave the mechanical collective the same litigation power that SoundExchange had by then been exercising for years underscores that Congress both understands and approves of the fact that SoundExchange enforces rightsholders' royalty rights by bringing lawsuits on their behalf.[2] Indeed, Sirius XM itself seemingly was fine with that too for years;

---

[2] *Contra* SXM.Br.33 n.5, "legislative silence in the face of a generally-accepted practice is evidence that Congress wanted to leave the existing understanding in place." *Jonah R. v. Carmona*, 446 F.3d 1000, 1009 (9th Cir. 2006); *accord In re Hudson*, 859 F.2d 1418, 1423 (9th Cir. 1988) ("[T]he very persistence … among

12

when it petitioned the Copyright Royalty Board to promulgate a two-year statute of limitations for SoundExchange to sue, it never even suggested that SoundExchange lacked authority to sue in the first place. *See* Opening.Br.15-16.

Sirius XM has nothing to say about either of the provisions of §115 that address the mechanical collective's enforcement powers. It instead points to §115(d)(6)(C)(i), which it claims is the *true* source of the collective's purportedly "limited right" to bring lawsuits. SXM.Br.40. But as SoundExchange explained in its opening brief (at 48), that provision has nothing to do with the mechanical collective's power to litigate *on behalf of rightsholders*. It instead authorizes the collective to sue licensees *on its own behalf* in one narrow circumstance—namely, if a licensee fails to pay the administrative assessments that fund the collective's activities. *See* 17 U.S.C. §115(d)(6)(C)(i) (authorizing suit for "fail[ure] to comply with subparagraph (A)," which requires payment of an "administrative assessment"). That provision thus bestows a substantive right on the collective itself—a right that Congress did not need to give SoundExchange in §114 because SoundExchange is funded by offsets to royalty payments, not fees collected from licensees. The §115 collective's power to litigate *on behalf of rightsholders* comes

judges and executive officials, as well as among litigants and their counsel … of [an] assumption … and the absence of legislative action to change that assumption provide further evidence that Congress at least acquiesces in, and apparently affirms, that assumption." (alterations original)).

13

from §115(d)(3)(C)(i)(VIII), which makes plain Congress' understanding that the power to "enforce rights and obligations" includes the power to take "legal" action. *Id.* §115(d)(3)(C)(i)(VIII).

> **D.    Sirius XM's Nondelegation Argument Is Forfeited And Radically Off-Base.**

With nothing else left to offer (save misplaced reliance on the presumption against implied causes of action), Sirius XM argues that reading §114 to permit SoundExchange to bring lawsuits on behalf of rightsholders "would raise serious questions under the Constitution's non-delegation doctrine." SXM.Br.47. At the outset, Sirius XM forfeited this argument by failing to raise it below. *See United States v. Gomez*, 877 F.3d 76, 94-95 (2d Cir. 2017). Neither the Constitution's Vesting Clauses nor any variant of the word "delegation" appears anywhere in Sirius XM's motion for judgment on the pleadings. Nor does *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), or *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). Indeed, the only thing even remotely gesturing in the direction of delegation was an argument that SoundExchange's views on the meaning of "enforcement" are not entitled to deference under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), *see* D.Ct.Dkt.62 at 24—which, of course, SoundExchange never claimed they were.

At any rate, Sirius XM's nondelegation argument is fundamentally misplaced. SoundExchange did not initiate this lawsuit to "vindicat[e] public rights," and it is

14

not trying "to sanction Sirius XM" "on behalf of the public" for "noncompliance with" §114. *Contra* SXM.Br.48-49. SoundExchange brought suit to secure relief on behalf of the parties who have royalty rights under §114, in its capacity as their statutorily designated agent. If SoundExchange secures monetary relief, it will hand that money over to rightsholders, deducting only its costs, as §114(g)(3)(C) envisions and authorizes. If rightsholders brought such suits themselves—which Sirius XM agrees that at least some could do, *see* SXM.Br.43-44—no one could seriously contend that they were trying to "vindicat[e] public rights." Indeed, Sirius XM itself says that it would be perfectly fine for rightsholders to bring their own lawsuits seeking "damages" and the other relief SoundExchange seeks for "noncompliance with the statutory scheme." SXM.Br.49. A suit seeking the exact same relief on behalf of the exact same parties does not somehow transform into an effort to usurp the Executive's power to "vindicat[e] public rights" just because it is brought by a third party. SXM.Br.48. If it did, then nondelegation concerns would arise anytime Congress allowed someone to sue as agent, guardian, or any of the many other capacities in which one party has long been permitted to sue on behalf of another.[3]

---

[3] Even if the nondelegation doctrine had any role to play here, Congress did not empower SoundExchange to "enforc[e] third parties' rights through litigation without any government supervision." *Contra* SXM.Br.47. While §114 codifies *the role* of the collective, it leaves it to the Copyright Royalty Board to decide whom to

15

Far from embracing that extreme position, Sirius XM agrees with the district court that *other* private organizations can "bring lawsuits to enforce the rights of" rightsholders under the Copyright Act. JA114 n.3; *see* SXM.Br.54 n.9. Sirius XM even begrudgingly admits that SoundExchange may be able to sue on behalf of rightsholders under third-party standing principles; it just insists that it cannot do so under §114 because Congress did not supply a cause of action. *See* SXM.Br.55-56.[4] That is wrong, *see infra* Part II, but it does not begin to explain why Sirius XM insists that SoundExchange cannot bring lawsuits on behalf of rightsholders *at all*. Sirius XM is thus left with the nonsensical argument that, though SoundExchange may well be able to bring suits on behalf of rightsholders even without §114(g)(3)(C), it would be anomalous in the extreme to read §114(g)(3)(C) as permitting it to do so.

---

designate as the collective. *See* 17 U.S.C. §114(g)(2)-(3). If SoundExchange were to exercise poor judgment about "whether to sue, whom to sue, on what grounds" to sue, or "what relief" to seek, SXM.Br.49, then presumably the CRB would expeditiously designate a different statutory collective. *Cf. FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025) (no nondelegation concerns where private entity "function[s] subordinately," and remains "subject to," government "authority and surveillance").

[4] Sirius XM notably does not embrace the district court's befuddling claim that the reason SoundExchange may not do so is because it is a "statutory creation[]." JA114 n.3. Why that would make a difference, the court never explained. But as Sirius XM admits, SoundExchange is *not* a statutory creation; it came into existence independent of its designation as the §114 collective and would continue to exist if Congress eliminated that role tomorrow, rendering any such distinction irrelevant. *See* SXM.Br.33, Opening.Br.51-52.

In reality, what would be anomalous in the extreme is to read a statutory regime that was created to codify rightsholders' agreement to permit a collective to assert, administer, and enforce their royalty rights as giving that collective no power to engage in the single most important form of "enforcement"—i.e., bringing lawsuits against licensees who violate those royalty rights. After all, the whole point of designating a collective to act on rightsholders' behalf was to obviate the need for rightsholders to assert, administer, and enforce their rights themselves. The industry voluntarily developed that approach, and Congress ultimately codified it, because a regime in which rightsholders were left to fend for themselves would impose "crippl[ing]" transaction "costs and administrative burdens" on licensees and rightsholders alike. 63 Fed. Reg. 34,289, 34,292 (June 24, 1998). Digital entities would be forced to "identify, locate and pay" the correct amount to thousands of copyright owners individually. 67 Fed. Reg. at 45,266, 45,271. And the royalties due many rightsholders could easily be dwarfed by the costs of suing to enforce them. *See* RIAA.Br.17-23; SAG-AFTRA.Br.31-34. None of that has anything to recommend it.

That is not a "policy" judgment SoundExchange is asking this Court to make. *Contra* SXM.Br.50. It is a policy judgment Congress already made when it chose to codify the role of the collective and the powers that rightsholders had agreed to let it exercise on their behalf (and made once again when it imbued the §115

17

mechanical collective with the same powers that had worked so well under §114). And against that critical backdrop, the only sensible conclusion is that Congress intended SoundExchange to be able to enforce §114 royalty rights the same way §114 rightsholders could enforce those rights themselves if it were not so impractical to do so, which even Sirius XM admits must include *some* type of litigation. That conclusion best accords with what Congress was trying to accomplish. And, more importantly, it is the only way to give meaning to Congress' decision to permit SoundExchange to recover not just "its costs of participating in the negotiation-and-arbitration rate-setting process" under the CARP regime, SXM.Br.32, but *all* of its costs incurred in "the licensing *and enforcement* of rights … , *including* those incurred in participating in negotiations or arbitration proceedings," 17 U.S.C. §114(g)(3)(C) (emphasis added).

## II. Section 114 Plainly Contemplates That The Royalty Rights It Creates May Be Enforced Via Lawsuits Brought Under §114 Itself.

The only remaining question, then, is whether SoundExchange may bring lawsuits on behalf of rightsholders under §114, or must do so under some other cause of action. While the presumption against implied causes of action is at least implicated by that question, the "statutory text, even though not explicit in declaring the right to a cause of action, unambiguously communicates Congress's intention" to provide one. *Oxford Univ. Bank*, 933 F.3d at 108. The text includes explicit language that logically presupposes a federal cause of action, which makes the cause

18

of action more express than implied. And the statute creates private royalty rights that may not be enforceable in federal court *at all*—not by SoundExchange, not by the federal government, not even by all relevant rightsholders themselves—if §114 does not supply a cause of action to secure those royalties when licensees refuse to pay them. That is precisely the context in which this Court and others have concluded that statutes can and should be read to supply a cause of action to enforce the rights it creates, as doing so avoids the "anomalous construction" that Congress "wished to remit the litigation of a federal right to state courts." *TAMA*, 444 U.S. at 19 n.8.

At the outset, Sirius XM "exaggerates the difficulty of establishing an implied right" to an extent that neither this Court nor the Supreme Court has endorsed. *Thompson v. Thompson*, 484 U.S. 174, 190-91 (1988) (Scalia, J., concurring in the judgment); Antonin Scalia & Bryan A. Garner, *Reading Law* 316-17 (2012) (framing the inquiry as whether there is "discernible basis in" "the text of the statute" to conclude that Congress envisioned private enforcement). Sirius XM fixates on Congress' failure to include magic words, SXM.Br.20-21, 34-35, and points to a variety of other provisions of the Copyright Act in which Congress expressly provided a cause of action. *See* SXM.Br.38-41. But implied-right-of-action cases will *always* involve statutes that "lack[] 'express language' creating a cause of action" in so many words, SXM.Br.21; otherwise, they would not be "implied"-

19

right-of-action cases. If that alone sufficed to "all but resolve[ a] case," SXM.Br.21, then there would be not just a presumption against inferring causes of action, but a rule flatly forbidding courts from doing so.

That has never been the law, and rightly so, as there are some statutes that so "unambiguously communicate[] Congress'[] intention" to provide a cause of action that it would do violence to Congress' evident intent to foreclose them. *Oxford Univ. Bank*, 933 F.3d at 108. "The judicial task" thus is not to demand clear statements or magic words, but "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). And under the factors this Court uses to answer that question, *see Oxford Univ. Bank*, 933 F.3d at 104, §114 plainly does.[5]

First, §114 unquestionably "contain[s] rights-creating language" "focus[ed] on the" parties SoundExchange has been designated to represent. *Id.* at 104. Indeed,

---

[5] The out-of-circuit cases on which Sirius XM relies (at 27 n.3) focus on the same factors, each of which cuts in favor of reading §114 to provide both private rights and a cause of action to enforce them. *See, e.g.*, *W. Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 254-55 (7th Cir. 1988) (asking whether "a statute is framed as a general prohibition or command to a federal agency"); *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521-23 (5th Cir. 2002) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 68 (1st Cir. 2002) ("the explicit provision of remedies within a statute cuts sharply against the implication of a private right of action").

it is hard to imagine a statute that more plainly conveys rights on identifiable private parties than §114, which essentially creates a compulsory contract between two sets of specifically identified private parties:  Digital service providers are given a statutory license to perform sound recordings, but in return must pay the royalties to which copyright owners, recording artists, and nonfeatured musicians and vocalists are entitled under §114—and must pay those royalties to the collective designated to act on their behalf.  *See* 17 U.S.C. §114(d)-(f).  Section 114 thus not only creates private rights, but creates private *monetary* rights, which would make it particularly anomalous to conclude that Congress left no means to collect those royalty payments in federal court if a recalcitrant service provider refused to pay them.

Sirius XM does not and cannot dispute that §114 creates private monetary rights.  It instead argues only that "Section 114 does not use rights-creating language with respect to SoundExchange itself."  SXM.Br.19.  That is another non sequitur.  SoundExchange has never claimed to have any royalty rights under §114, and it did not bring this lawsuit to collect any royalties for itself.  As explained, it brought this lawsuit in its capacity as the collective statutorily designated to represent *rightsholders*, seeking relief only on their behalf.  The question that matters thus is whether §114 conveys rights on rightsholders, and not even Sirius XM disputes that it does.  To the contrary, Sirius XM goes out of its way to argue that rightsholders can and should be able to bring their *own* lawsuits vindicating their §114 royalty

21

rights (just not, in its view, under §114), *see, e.g.*, SXM.Br.43-45, which suffices to render its professed concerns about permitting "a private damages remedy" in this context irrelevant, *see, e.g.*, SXM.Br.21.

Second, Congress did not "provide[] an alternate means of enforcing" §114 *other than* private rights of action. *Oxford Univ. Bank*, 933 F.3d at 104. Congress did not task the Executive with enforcing the rights and obligations §114 creates—and sensibly so, as §114 creates rights and obligations vis-à-vis private parties, not vis-à-vis the public. Congress gave the Executive no role whatsoever to play in enforcing §114. The question here thus is not whether Congress intended to authorize private parties (or their statutorily designated agent) to seek monetary and injunctive relief on top of some other remedy Congress authorized the government to secure against licensees who violate §114. *Cf. Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) ("where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies"). It is whether Congress intended *anyone* to be able to seek *any* remedy when a recalcitrant licensee refuses to pay the royalties it owes under §114.

Sirius XM does not identify any case that refused to recognize a right of action under a statute that creates private monetary rights with no government enforcement mechanism at all. It instead just cites cases in which courts rejected arguments that they should infer a private right of action because the government enforcement

22

mechanism Congress supplied was insufficiently "effective[]." SXM.Br.46 (citing *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 435 (2d Cir. 2002) ("[W]e reject the plaintiffs' argument that Congress must have intended [statutory provisions] to be enforceable through private rights of action because Congress did not allocate enough money to the SEC to do the job by itself."), and *Thompson*, 484 U.S. at 187 (rejecting argument that Congress must have intended to permit private enforcement because "the States are either unable or unwilling to enforce the provisions" that Congress tasked them with enforcing)). But the relevant question is what kind of enforcement Congress intended to permit. A statute that supplies a government enforcement mechanism that may not work as well as Congress envisioned still evinces Congress' intent to have government enforcement. A statute that provides no enforcement mechanism at all does not.

Finally, Congress did not "expressly provide[] a cause of action" elsewhere in the statute for all private rightsholders under §114 to secure a remedy for unpaid royalties. *Oxford Univ. Bank*, 933 F.3d at 104. Sirius XM points to §501, but as SoundExchange explained in its opening brief (at 47), §501 provides an infringement action only for a "copyright owner," which not everyone with royalty rights under §114 is. *See* 17 U.S.C. §501; *id.* §114(g)(2)(B)-(D); RIAA.Br.15-17. And Sirius XM is not willing to concede that "an underpayment action is … cognizable as an infringement suit" anyway. SXM.Br.44. It just says that it does

23

not matter if there is no federal cause of action whatsoever to enforce royalty rights under §114 because rightsholders "could invoke common-law breach-of-contract or unjust-enrichment theories" in state court. SXM.Br.44.

But there is a reason why courts ask whether "*Congress* expressly provided a cause of action" elsewhere, *Oxford Univ. Bank*, 933 F.3d at 104 (emphasis added): because courts will not lightly assume that Congress created a federal right with no federal remedy. *See, e.g.*, *TAMA*, 444 U.S. at 19 n.8. After all, "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024). And a federal statutory right to payment of royalties would be pretty toothless if there was nothing a federal court could do when a recalcitrant licensee refuses to pay them. So Sirius XM's unwillingness to admit that there is *any* other way to enforce §114 in federal court just underscores why the only sensible conclusion is that Congress intended SoundExchange to be able to enforce those rights by suing under §114 itself, which it has been doing with Congress' acquiescence for years.

That conclusion would follow even if §501 infringement suits were available (and Sirius XM offers no explanation for its seeming view that they are not). As explained, many rightsholders under §114 do not own the copyrights in the sound recordings to which they contributed, so they cannot bring an infringement action. *See* RIAA.Br.17-23; SAG-AFTRA.Br.31-34. And a regime in which some

24

rightsholders have a federal remedy but others do not would raise all sorts of complex questions. For instance, can the copyright holders recover the full amount of royalties due, or only the 50% to which they are entitled under §114(g)(2)(A)? If the former, would the featured artist and nonfeatured vocalists and musicians who are entitled to the other 50% then have a claim against the recalcitrant licensee? The copyright holder? Both? What would happen if the copyright holder sued in federal court but the other rightsholders sued in state courts, and the courts reached different conclusions about what royalties were due under federal law? All of that would create an even more "anomalous construction" than a regime in which Congress "remit[ted] the litigation of a federal right to state courts" alone. *TAMA*, 444 U.S. at 19 n.8. That is all the more reason to recognize that Congress intended SoundExchange to be able to enforce royalty rights through a single suit on behalf of all affected rightsholders under §114 itself, just as it has been doing for years.

That conclusion accords not only with the statute, but with the view of the only other court that has addressed the issue. *See SoundExchange, Inc. v. Muzak, LLC*, 854 F.3d 713 (D.C. Cir. 2017). Sirius XM insists that the D.C. Circuit did not actually answer the cause-of-action question that it expressly asked the parties to address. SXM.Br.25. But by holding that it had jurisdiction over SoundExchange's appeal from a district court judgment, and rejecting the alternate view that SoundExchange had to first litigate before the agency and then bring suit directly in

25

the court of appeals under the Hobbs Act, *see* 854 F.3d at 718, the D.C. Circuit necessarily concluded that SoundExchange could bring suit to enforce §114, which was the only cause of action its lawsuit invoked.  *See* Compl.12, *SoundExchange, Inc. v. Muzak LLC*, No. 1:15-cv-476 (D.D.C. April 1, 2015), Dkt.1; *see generally Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060 (D.C. Cir. 2024) ("[W]e have an 'independent obligation' to assure ourselves both that we have, and the district court had, subject-matter jurisdiction.").

Moreover, the D.C. Circuit never even suggested that SoundExchange cannot sue *at all*.  Neither did the United States in its amicus brief.  *See* Amicus Br. for U.S., *Muzak*, 2017 WL 34707, at *1 & n.1, *12-13 (D.C. Cir. Jan. 3, 2017).  The only question the D.C. Circuit ever raised was whether SoundExchange had to sue in the court of appeals or in district court.  Indeed, until this litigation no court or party had ever suggested that SoundExchange cannot bring lawsuits *at all*—and understandably so, as that argument is foreclosed by text, context, and common sense.  *See supra* Part I.  So even if §114 did not supply a cause of action, that would simply mean that SoundExchange must proceed under §501 or the various common-law causes of action that Sirius XM agrees can be used to vindicate rightsholders' rights.  It would not mean that SoundExchange cannot enforce §114 rightsholders' royalty rights at all.  But the far better reading of the statute is that Congress not only intended SoundExchange to be able to sue to enforce the rights it created, but

26

intended to supply a federal remedy for the violation of those rights in the form of a lawsuit under §114 seeking to enforce them.

## CONCLUSION

The Court should reverse and remand for further proceedings.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
KEVIN WYNOSKY
CAMILO GARCIA[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant SoundExchange, Inc.*

March 27, 2026

27

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(B) because it contains 6559 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

March 27, 2026

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that an electronic copy of the foregoing Reply Brief for Plaintiff-Appellant SoundExchange, Inc. was filed with the Clerk of Court using the ACMS system on March 27, 2026, and thereby served upon all counsel appearing in this case.

<u>s/Paul D. Clement</u>
Paul D. Clement